IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

THE UNITED STATES OF AMERICA,  )
                         Complainant,)
                                 )
vs.                          ) Case No.:  CR-08-310 (FAB)
                                 )
4 WILFREDO ROSARIO-CAMACHO,    )
                                 )
                    Defendant.  )

---

TRANSCRIPT OF PROCEEDINGS
**HEARING ON MOTION**
HELD BEFORE JUDGE FRANCISCO A. BESOSA
ON JULY 19, 2010

---

## A P P E A R A N C E S

For the United States:

        **MARQUEST MEEKS**
        Assistant U.S. District Attorney
        Torre Chardon, Suite 1201
        350 Carlos Chardon Street
        Hato Rey, Puerto Rico  00918

For the Defendant:

        **FRANCISCO DOLZ-SANCHEZ**
        P.O. Box 361451
        San Juan, Puerto Rico  00936

---

**ROLAYNE M. VOLPE, CCR, RPR**
**Court Reporter for the U.S. District Court of Puerto Rico**
**Federal Building, Room 150**
**San Juan, Puerto Rico  00918**
**(787) 772-3482**

1                              **I N D E X**

2

   **DESCRIPTION**                                              **PAGE**

3

4    PROCEEDINGS                                                    3

5

   REPORTER'S CERTIFICATE                                        41

6

7

8

9                            **E X H I B I T S**

10   **DESCRIPTION**                                              **PAGE**

11

12              (No exhibits marked during this session.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          The above-styled cause came on for hearing on the

2   19th day of July, 2010, at 10:05 a.m., before Judge Francisco

3   A. Besosa, Judge in the United States District Court for the

4   District of Puerto Rico, when the following proceedings were

5   had and entered of record, to wit:

6                          **PROCEEDINGS**

7                       **HEARING ON MOTION**

8          THE COURT:  Mr. Dolz, are you ready?

9          MR. DOLZ-SANCHEZ:  Yes.

10          THE COURTROOM DEPUTY CLERK:  Criminal 08-310,

11   Defendant Number 4, Wilfredo Rosario-Camacho, for Hearing on

12   Motion.  On behalf of the Government, Assistant U.S. Attorney

13   Mr. Marquest Meeks; on behalf of Defendant, Attorney Francisco

14   Dolz-Sanchez.  Defendant is present and assisted by the Court

15   Interpreter.

16          MR. MEEKS:  Good morning, your Honor.  Assistant

17   United States Attorney Marquest Meeks on behalf of the

18   Government.  The United States is ready to proceed.

19          THE COURT:  All right.  I called this hearing because

20   Mr. Rosario filed a motion on his own in which he indicates

21   that he wants to -- he no longer wants to have Mr. Dolz as his

22   attorney.  And he indicates --

23          I'm trying to translate here from the Spanish.

24          -- that Mr. Dolz has never had the interest or the

25   legal obligation [sic] to represent me, he's not giving -- he

1   has -- he has not given me any type of information or documents

2   in relation to this case, he understands it's a bit late, but

3   there are still some legal matters that are -- that are pending

4   before the Court, and that he would like the Court to assign

5   him another attorney to be able to have for the first time a

6   competent legal representative and to be able to file certain

7   documents and motions as should be done in this case.  He also

8   indicates that he wants to inform that the date that the

9   probation officer interviewed him, Ms. Katherine Valentin, he

10  did not -- he waived the right that Mr. Dolz would be present

11  at the interview, because I was not in agreement with his

12  attitude or legal representation in my case.

13          All right.  Mr. Rosario, please come forward.

14          I would like to know, Mr. Rosario, with detail what

15  are the -- what is the information and documents in relation to

16  this case that Mr. Dolz has not given to you?

17          THE DEFENDANT:  From the beginning since before the

18  trial?  Or.  .  .

19          THE COURT:  Well, I --

20          THE DEFENDANT:  Throughout the trial?

21          THE COURT:  Well, I'm not sure what you mean here.

22  That's why I'm asking.

23          THE DEFENDANT:  Okay.  From the beginning, I attempted

24  to have the attorney, Mr. Dolz, discuss the case with me, I

25  explained to him what had happened, why -- the reason for the

```
 1    accusations.  I explained to him the persecution there had
 2    been, the events that occurred, the policemen that had
 3    intervened with me before, and that the majority of those
 4    agents, before the investigation began, they, themselves, had
 5    criminal cases, such as murders, murder of a minor, murder of a
 6    policeman, aggression towards policemen, negligence, disregard
 7    of their duties and other -- many cases.  I explained to him
 8    that I had met with an attorney before the charges were
 9    brought, and I had even entered a complaint before the -- the
10    Department of Justice of Puerto Rico against the police,
11    because they were persecuting me.  And when we came to the
12    bond hearing, Ms. Castellon, the U.S. Attorney, she used
13    Agent Cruz, and it was said that I had been fired from the
14    police, that I -- that I had been arrested with three weapons
15    from a disco tech when I was a policeman still.  That in other
16    arrests, the cases didn't move forward because witnesses did
17    not show up.  And my family brought the letter of resignation
18    in that bond hearing, so it was proven by us; so, therefore, it
19    was proved that I resigned; that I was never fired from the
20    police.  And that I also let it be known that it was a lie that
21    I had never been arrested with three illegal weapons as a
22    policemen, that the agent was lying, and that in the other
23    weapons' case, the agent did show up in the preliminary
24    hearing.  The judge had the hearing, and he understood that
25    there was no probable cause.  But witnesses did appear, and I
```

1    let him know of that, the bond hearing; but he told me that it

2    wasn't important right then and there, to leave that aside.

3    Then, the sworn statements of those agents were given to him,

4    the documents were given to him, the Complaint, everything, to

5    prove that there -- they lied in the bond hearing, totally.

6    In order to -- for me to have bond denied.

7              Excuse me.

8              THE COURT:  Why was bond denied?

9              THE DEFENDANT:  From what I could read on the docket,

10   the judge -- the judge denied it because I was supposedly

11   arrested before because of weapons.  Weapons in plurals, just

12   like the agent of the Strike Force wanted to indicate.  And the

13   weapon that was seized from that day was my own -- my own

14   weapon -- duty weapon.

15             THE COURT:  Was the weapon seized from you when you

16   were arrested --

17             Was a weapon seized from you when you were arrested in

18   this case?

19             THE DEFENDANT:  No.  No, that was in the year 2003,

20   2004, the first weapons arrest.  When I was a policeman.

21             I explained to the attorney that one of the agents

22   that had testified was Agent Colon, and he had been fired for a

23   case.  I think he's currently still a policeman.  I think that

24   in Monte Parena Housing Project (phonetic) he killed a minor,

25   and he has a case.  And the other one, Agent Felix was also

1    accused of killing another policeman in La Perla Ward.  The

2    supervisor was Mickey Flores.  At that time, he was a sergeant.

3    And he's currently serving a federal sentence because of drug

4    trafficking.

5         THE COURT:  Well, let me ask you this, did Mr. Dolz

6    show you the evidence that the Government was going to use in

7    this case against you?

8         THE DEFENDANT:  He told me that the only evidence that

9    the U.S. Attorney had was the witness testimony -- witnesses'

10   testimony.  That there -- there was no other evidence, and

11   nothing had to be -- that we didn't have to present anything.

12   I let him know of some audiotapes at one point; and in the

13   beginning, the U.S. Attorney, she said that they were not

14   important because they were just mere conversations between

15   policemen.

16        THE COURT:  But did you get to hear those?

17        THE DEFENDANT:  Yes.  And I let the attorney know so

18   that he could present a motion to ask for the transcript of

19   those.  Because it was more or less proof of everything I was

20   telling the attorney.  In the majority of those audios, the

21   person is speaking about me, and they -- they identify me at

22   all times as an owner -- as an owner of a drug point on October

23   17th.  According to witness -- According to the trial record,

24   they only had one witness, who could say nothing.  She couldn't

25   even tell if the person she was talking about had anything to

1  do with the conspiracy or not.

2          THE COURT:  Well, if I recall -- If I recall, during

3  the trial, several of the witnesses mentioned you:  Jesus

4  Robles, Freddy, Jessica -- I forget if Xiomara Rosado mentioned

5  you.

6          THE DEFENDANT:  They all mentioned my name.  Well,

7  for -- By October 17th, apparently there was only one witness,

8  Frances Alvarez.

9          THE COURT:  That you knew of?

10          THE DEFENDANT:  From what I investigated, yes.

11          THE COURT:  The thing is -- The thing is that the

12  other -- the other witnesses were cooperating witnesses and

13  were Defendants in the case, and the Government may want -- may

14  have wanted to not to indicate who those witnesses are for

15  their safety.  And I think -- I don't know if Mr. Dolz

16  explained this to you, but I think that's a matter that the

17  Government can -- can do, and I believe I ordered the

18  Government to provide the names of the witnesses even from

19  before they had to do it.

20          THE DEFENDANT:  No, the U.S. Attorney, she retained

21  all the names until three days before the trial was to begin.

22          THE COURT:  That was my Order.

23          THE DEFENDANT:  I have no problem with the amount of

24  witnesses, eight or ten.  I had told Mr. Dolz that this was

25  something that was personal, that I had already interviewed

1   with a federal attorney before.  I gave him the list of persons

2   he could interview, because what they would do each time, they

3   would approach a business -- each time they wanted to speak to

4   someone, and they -- they would first begin by telling the

5   person that the owner of the drug point in Altos de Cuba was

6   Tito.

7          THE COURT:  Who would say that first?

8          THE DEFENDANT:  The police.

9          That's why I went over and had an interview with an

10  Attorney.  And it was proven during trial, during Jesus Robles'

11  testimony, the first time he mentioned it, I kind of moved

12  forward and told the attorney; I was trying to let him know

13  that what I was saying was the truth.  And I believe that

14  Attorney Garay or one of the lady attorneys presented an

15  objection, because it was something that didn't -- didn't

16  -- (Spanish) --

17          THE INTERPRETER:  Can I clarify, your Honor?

18          (The Defendant begins again in Spanish.)

19          THE DEFENDANT:  That it was something that -- that

20  wasn't of the witness' knowledge, and that it was taken off the

21  record; but, then, when Attorney Garay Crosses the witness, the

22  first and only witness that they got said that the police had

23  arrested him, and that he was telling them the name of the

24  owner -- of the point owner.  So this was very clear in that

25  testimony, and I'm trying to explain the whole time to

1    Attorney Dolz why they are accusing me.  And I told him -- I
2    told him that there were some audiotapes of the agents and in
3    it they say that their idea is to have Tito go up the hill, up
4    the slope towards the point, and that's their idea.
5           THE COURT:  Well, they may have had information -- You
6    know, the police may have had information of your role in the
7    drug trafficking organization, and what they were trying to do
8    was get you on the video.
9           THE DEFENDANT:  Well, they say it, that they want
10   me to go up, because their idea is to have me talk to these
11   people, going by, me being by them, so that I look as an
12   -- that I look like an accomplice.  Those are their words.
13          THE COURT:  Well, precisely.  They may have had
14   information that you were involved in this organization, and
15   they're saying, Well, let's -- we have to get Tito on this
16   video.  I mean, it seems to me that's, you know, the police
17   wanting to get you on the video to get, maybe, perhaps, better
18   evidence of your participation in the organization, if that's
19   -- if that's what they wanted.  But what does that have to do
20   with Mr. Dolz?
21          THE DEFENDANT:  I was asking him the whole time to get
22   transcripts, because part by part, I can prove what they wanted
23   to do with me.
24          THE COURT:  Well, what do you say that they wanted to
25   do?

```
 1            THE DEFENDANT:  They were trying to get me in jail for
 2   over six years.  I had three arrests in pubs.  I was inside
 3   these places.  It's not that I was outside, and they went by.
 4            THE COURT:  Well, isn't that true for all the
 5   Defendants here, Mr. Rosario?  That -- I mean, this
 6   investigation took a long time, seems to me.
 7            THE DEFENDANT:  How long, 17 months around --
 8            THE COURT:  The conspiracy was --
 9            THE DEFENDANT:  That long?
10            THE COURT:  The conspiracy was charged from 1999.  I
11   believe that the investigation began sometime in 2004, 2005,
12   2006, and -- and --
13            THE DEFENDANT:  Well, in the bond hearing, the Strike
14   Force Agent said it had been March, 2007.
15            THE COURT:  When the investigation started?
16            THE DEFENDANT:  Yes.  There's another point that I
17   discussed with Attorney Dolz, and he didn't want to ask anyone
18   about it.  And even more so, when the first witness came over
19   to testify, Frances Alvarez, I become aware that she's
20   confusing me with someone else, and I tried to send him a note
21   to let him know that if his turn came up, not to start the
22   questioning so I could explain to him who this lady is
23   confusing me with and because there was a 2002 police report
24   that could specify and explain the person that she was
25   testifying about.  But notwithstanding that, he didn't want to
```

1    do anything.  He didn't want to investigate.

2              I started trial, and he had not been to see me --

3              THE COURT:  From the --

4              THE DEFENDANT:  -- when the trial had started.

5              THE COURT:  From the day you were arrested until the

6    date that the trial started, he never went to see you?

7              THE DEFENDANT:  Yes.  He went in September for the

8    bond hearing, and in December for the second -- of the bond

9    hearing, and either in February or March, one of those, to let

10   me know -- of 2008 to let me know that bond had been denied to

11   me -- I'm sorry, 2009.  And I believe -- I believe there was a

12   status conference in December, or in April, he stood in a

13   corner and never even came up to me.  And last minute, I asked

14   him a question, and he didn't know anything -- I didn't know

15   anything.

16             THE COURT:  So what you are saying is that he never

17   visited you in the prison to discuss the evidence?

18             THE DEFENDANT:  Yes.  On those dates that I stated.

19   And he returned on November, 2009, to see if I wanted to accept

20   an agreement, a cooperation agreement or -- an agreement

21   presented to us by the U.S. Attorney.  And then when the

22   witnesses were presented, it was one of my family members that

23   gave me the news and -- gave me news of who was going to sit

24   and testify.  Trial started on the 19th, the jury was selected

25   and everything, and he had not been over.  Nothing.  And there

1   was so much to be looked at, because, honestly, only two types

2   come to trial here, the mad men and the truly innocent.  And I

3   am not crazy.

4            THE COURT:  Well, I get the drift of what you are

5   saying.  I would like to hear from Mr. Dolz.

6            THE DEFENDANT:  Just one last thing that's important.

7            THE COURT:  Go ahead.

8            THE DEFENDANT:  The U.S. Attorney, Olga Castellon, she

9   brought in Alfredo Sierra to testify, and Alfredo Sierra did

10  testify that he was present on February 15th -- The day the

11  alleged meeting occurred.  -- in that area there, when I

12  arrived at Susana's house.  When the U.S. Attorney was asking

13  questions, he said that he heard me speak.  And that I

14  supposedly said, That I was ready; that I was armed.  And that

15  the attorney asked him, What did he mean by that?  And he said

16  that I was just referring to the fact that I was armed.  And it

17  was asked, What happened there?  And he said that Tito -- I

18  don't know if you remember.  -- that he said that we were

19  waiting for Pepon to come -- to come up in a gray car.  And

20  then Tito -- Correction.  -- then Alfredo Sierra says that

21  Tito, Omar, Carlitos, and Alfonso went up to have that meeting

22  with Pepon.  And that fires were -- fire shots were heard, and

23  that Omar, Nuni, came down.  And then when Omar is about to go

24  into the house again, the Prosecutor, she pauses the tape, and

25  she asks, Where was -- Where's Tito?  And Tito -- and he says

1    that Tito is up there arguing with Pepon, and he can see that.

2              And if something is clear from the video, it is that

3    when I got to that house, Alfredo Sierra was nowhere around

4    that house.  And when Omar -- and when the people, he says, go

5    by his side, when they go up there, when Omar, Carlitos, and

6    Alfonso go up there to talk to Pepon, I had never left the

7    house.  And she allowed the witness to continue on lying.  And

8    it's very clear in the video.

9              And if something was clear --

10             And the Prosecutor, she knew that I did not go up

11   there and I did not participate with those people.

12             -- one, the video is very clear and you can see that;

13   and, secondly, Prosecutors, Massucco and Castellon, before the

14   Grand Jury, they asked a witness, they asked, Why didn't Tito

15   participate in that meeting?  But then in -- during the trial,

16   they presented it as if I was in the meeting and I had

17   participated in the meeting with all those people there.  And

18   the Prosecutor knew the whole time that I did not participate

19   in that.  And all the persons came -- aside from me, and she

20   stopped video -- And you can see it.  Policemen arrived in

21   civilian clothing.  And they were there in front of Susana's

22   house more than the three minutes that I was in -- in front of

23   Susana's house talking to the same people.  And all that I

24   explained to him, I say, Look, they're lying.  You have the

25   evidence.  And he would just say, the whole time, I'm not going

1   to ask about that; I'm not going to ask.

2           And that -- that was -- that which was related to

3   Frances and the business, all that, I told him, Bring the

4   evidence.  And he said he was not going to ask about that.  And

5   as far as Jessica's testimony, I also told him that there was

6   evidence that she was lying, and he also said that he was not

7   going to ask about that.  He didn't want to ask questions of

8   any of the witnesses.

9           I wanted to sit and testify, and he didn't allow me

10  to do so.  Well, what could I do if I wasn't going to be asked

11  questions?

12          There was a policeman that said that he could identify

13  me, and a video was shown, and only three seconds were shown --

14  five or ten seconds for him to -- for him to identify me, and

15  the policeman said he didn't know about me, but that he could

16  identify me because of my physical description.  But,

17  notwithstanding that, the audiotapes -- in the audiotapes, you

18  can hear that they're talking about me the whole time.  And you

19  can hear him say, Is that him, the one you were telling me was

20  the owner?  Is that him?  I tell him to ask about that, and he

21  didn't want to ask.

22          Agent Mera sat here to testify.  He said he arrested

23  Jannette Hernandez, a girl that died in MDC.  He said that he

24  was with Agent Slesar and they -- they saw her with drugs and

25  they arrested her and they took her -- they took her away, but

1     they didn't file any documents, and he was the witness that you

2     -- that you asked the documents from.  Some documents that he

3     was using in his testimony; you asked for them.  You became

4     upset, and you took them from him; and if they had not been

5     important, you wouldn't have asked for them -- you wouldn't

6     have taken the documents from him.

7              And when they brought the drugs, they identified it in

8     the exhibits -- I think it was marijuana and crack.  -- and

9     Agent Carlos Rosario later testified that he was the one who

10    had stopped in the alley -- that had stopped Jannette.  He

11    -- he was on foot in the alley, and he saw that Jannette -- He

12    saw the girl hiding the drugs.  But -- and then he also

13    identifies the same exhibit.  And I tell him all that, but he

14    didn't want to Cross either Mera or Rosario.

15             And Frances Alvarez testifies, Alfredo Sierra

16    testifies, everyone identifies me as Tito.  Julio Gonzalez,

17    Strike Force Agent, comes in, and then he calls me Tito Kilo.

18    And then after that agent testified, then every other witness

19    started calling me Tito Kilo once they -- when they were

20    identifying me.

21             THE COURT:  Well, let me hear from Mr. Dolz.  Thank

22    you, Mr. Rosario.

23             MR. DOLZ-SANCHEZ:  Let me start with the -- with the

24    reservation that should be mentioned before this Court.

25             At the outset, when I was appointed to represent this

1    Defendant, when I went to see him in MDC, the first thing that

2    he asked of me was that he wanted to see -- speak with Attorney

3    Gil Guillermo.  It took me two weeks to put that meeting

4    together.  Because I thought that he was in the process of

5    maybe trying to reach some kind of agreement with the

6    Government.  He was brought over, Ms. Castellon was there,

7    Mario Torres was there, and Mr. Gil was there, and I allowed

8    them to speak for half an hour, 45 minutes, and I was just

9    outside the room.  I didn't want to get involved in those

10   conversations.  At the end of the 45 minutes, Mr. Gil comes

11   back to me and tells me there's nothing we can do.  We have not

12   reached an agreement.  We don't have an agreement.  From there

13   on, the instructions were not -- not to pros- -- not to seek

14   any agreement with the Government.  Which I tried to do.

15          Bail matter comes --

16          THE COURT:  You mean instructions from the --

17          MR. DOLZ-SANCHEZ:  From the Defendant himself.

18          THE COURT:  Okay.

19          MR. DOLZ-SANCHEZ:  He didn't want to allow me -- he

20   wouldn't allow me to even meet with Ms. Castellon or Mr. Torres

21   or Mr. Gil, so that's how we started.

22          The issue on the bail, the initial hearing was heard,

23   he was held -- temporarily held, I filed for a reopening, and

24   that was a full-blown hearing.  So by that time I have already

25   memorized the videos and the contents of the videos that were

1    -- that relate to him.  So during that hearing, those videos

2    were -- we knew the contents, we knew there were comments in

3    Spanish.  As your Honor recalls, there were issues with those

4    comments because the Government elected to present the videos

5    without the audio, with reason, because, in my estimation, I

6    told him, Those videos might contain -- Those audios might

7    contain some information -- some information that could be

8    helpful to you.  But most of it is damaging.  And he knew that

9    because he had access to the videos at MDC, and each and every

10   time I went to see him, I made sure that he was reviewing those

11   tapes at the same time that I was reviewing the tapes.

12          We did get an investigator.  I decided that I would

13   not tax the Court's resources, so I asked the family to pay for

14   the investigator.  Who was Mr. Luis Ortiz, who used to be a

15   police officer with him.  And Mr. Ortiz did his job, he brought

16   all the information that was requested, including the records

17   of arrests of this particular Defendant.  Three or four

18   arrests.  Your Honor heard that evidence.  Not one of those

19   arrests -- either because I negotiated the situation with

20   Ms. Castellon or there were motions filed with the Court, which

21   the Court eventually granted, that's the reason why neither of

22   those arrests were mentioned during the case.

23          There was also the issue that he wanted me to allow

24   the jury to know that he was a police officer.  Your Honor is

25   knows -- knows that there were motions filed, there were

1    agreements reached with the prosecution, and that was not

2    mentioned at all through all the trial.  When I went to

3    interview him the number of times that I met him --

4              I don't recall exactly how many it was.

5              -- the conversations were around, "This is a

6    fabrication," "I didn't do any of this," "It's something that

7    the police made up," and we kept on doing our -- our own

8    investigation, our own research; eventually, we came to trial.

9              Again, the issue of the audios; it was before the

10   Court.  The defense wanted to play the audios; the Government

11   didn't want to play the audios.  That's their prerogative.  But

12   it was up to us, within our case, to then present the audios.

13   Again, it was my estimation -- my professional estimation that

14   those statements would hurt him more if they came in.  So it

15   was a matter of strategy.

16             He mentions something about Frances Alvarez.  Frances

17   Alvarez was the widow of Rolando Sostre.  On that examination

18   of what she said was that this Defendant was the one who was

19   supplying cocaine to Rolando for him to make crack, and they

20   would meet three, four, five times a week.  At least three

21   times a week, I recall.  My only Cross was directed at

22   narrowing down the times when they would meet.  Because, as the

23   Court recalls, it was something like car-to-car, and nobody

24   would get down, but -- but Frances was able to -- was able to

25   recognize him because of the number of times that this

1  happened.

2       Now, these witnesses were impeached to the most -- Of

3  course, we had to wait until the Government provided the list

4  of the names; and myself, Ms. Ramos, Ms. Tirado, spent weeks

5  and at least two weekends gathering that information in order

6  for the proper impeachment to be made.  All throughout he was

7  -- the Defendant kept on telling me:  "I have nothing to do

8  with this witness"; "I don't know this witness."  First thing I

9  asked, they recognize him, and they even make specific

10  reference to dates, to situations wherein he pointed a gun at

11  one of the sellers, different situations that were just coming

12  out, and that's the way it went.  Not one police officer -- not

13  one police officer.  And he was claiming that it was

14  fabrication.  Only one or two police officers came to identify

15  him in the video.  But none of the police officers who

16  testified provided an incriminated or damaging information

17  about his participation.  It was the Co-Defendants.  It was the

18  Co-Defendants; the persons he was doing business with that

19  explained to the jury what was his role.  So we had to handle

20  it the way it came, because the Government was not obliged to

21  provide us with that information before trial.

22       In general terms, your Honor -- there's a matter

23  of -- it has been a -- a like a seesaw, bad communication,

24  instances when I -- In my estimation, was trying to bully me.

25  I had -- he did provide a number of questions that I had to

1    sort out with the rest of the lawyers, because most answers

2    were damaging to everyone.  And I think we -- we controlled

3    that to the best that we could.

4            Your Honor, as things stand now; that is, that the

5    Presentence Report has been prepared, and I agree with him in

6    the sense that I do not feel comfortable; plus, an issue that

7    transpired on the day of the verdict where this Defendant at

8    the cellblock posed a number of threats against me.  And five

9    or six of the deputies came to me to warn because -- because of

10   several comments he made.  I kept quiet until today.  So, in my

11   estimation, he's correct; I shouldn't represent him anymore.

12           THE COURT:  Well, the only thing -- the only thing

13   that we have left is the sentencing.

14           MR. DOLZ-SANCHEZ:  Correct, your Honor.  But since the

15   Presentence Report is a 50-page document, I brought him a copy.

16   I want the CSO to tender it to him.  This is a copy of the

17   Presentence Investigation Report.

18           THE COURT:  That looks like the Indictment.

19           MR. DOLZ-SANCHEZ:  Wait.  It is the Indictment.

20           THE COURT:  Is that the Presentence Report?

21           MR. DOLZ-SANCHEZ:  That's correct, your Honor.  That's

22   the full Presentence Report.

23           (Document is handed to the Defendant.)

24           MR. DOLZ-SANCHEZ:  We have been calling each other and

25   at least discussing over the phone, motions that he wants to

1   file or motions that he thinks should be filed at this stage.

2   I told him this is not the proper time.  We have the sentence

3   pending, we have to work --

4           THE COURT:  Well, there's a Motion for Acquittal

5   pending.  Or for New Trial.

6           MR. DOLZ-SANCHEZ:  Thanks, your Honor.  All the

7   motions that had to be filed in this case, were filed.  Were

8   timely filed:  Motion for Acquittal, Motion for New Trial, so

9   everything is --

10          THE COURT:  There were several evidentiary matters

11  that were briefed also.

12          MR. DOLZ-SANCHEZ:  That is correct, your Honor.  So

13  I think we did the best that we could with the circumstances.

14  I -- I heard the Defendant; I never heard him once say -- say

15  that he was innocent.  There's no protestation of innocence.

16  He says that only mad people and -- and innocent people come to

17  trial before this Court.  That is not correct, and your Honor

18  knows that.  He elected to go to trial, he dragged the other

19  Defendants into trial, there was a consequence for not

20  cooperating with his lawyer --

21          THE COURT:  What do you mean -- What do you mean he

22  dragged all the others in?

23          MR. DOLZ-SANCHEZ:  Well, people had pleas in this

24  case, and he had offers.  And at the very end, at least three

25  Defendants that had pleas for 12, 14 years, just elected to

1  follow into what we knew was going to be a guilty verdict, and
2  a life sentence because of the amounts of drugs involved.  We
3  knew that, and we told him that.  I told him that a number of
4  times.  And now he comes with this thing about that:  I didn't
5  do what -- I did what I had to do.  And most of what he says is
6  trial strategy discussed with him, discussed with the other
7  lawyers, discussed with the other persons, he was not alone in
8  the case, and things were discussed at length in the afternoons
9  and in the evenings, and we came up with motions, and the Court
10 is aware of those, so we -- I think, in my estimation, that I
11 did the best that I could with the circumstances.
12         And, obviously, the Court -- I mean, the jury
13 could have elected not to believe the Co-Defendants, the
14 Co-Conspirators, but the jury elected to believe them, because
15 all the Defendants were found guilty.
16         Thank you, your Honor.
17         THE COURT:  Mr. Meeks, do you have a dog in this
18 fight?
19         MR. MEEKS:  Not towards one side or the other in
20 particular, your Honor.  However, the Government would like to
21 note for its position that of course under the Sixth Amendment
22 the Defendant is guaranteed the right to counsel to represent
23 him throughout all of the judicial proceedings, including
24 sentencing.  What the Sixth Amendment does not guarantee the
25 Defendant is the right to counsel of his choosing or choice if

1    he can't afford it or counsel that he gets along with at all

2    times.  From what -- what Mr. Rosario had to say, it seems that

3    his issues are centered around two important topics.  First,

4    Mr. Dolz' alleged failure to approach the strategy of the trial

5    in a way that he thought would have been best; and, then, also,

6    if I understood correctly, Mr. Dolz' refusal to let the

7    Defendant testify.

8            The first issue concerning the strategy of a trial, as

9    your Honor well knows, is typically left to the province of the

10   attorney.  And as myself and Mr. Dolz and your Honor are aware,

11   because we are lawyers, oftentimes what it seems to laymen's to

12   be the best path to follow in a trial or hearing is not

13   necessarily the best path to follow in light of trying to

14   follow the law and present the evidence or rebut the

15   Government's evidence, in Mr. Dolz' case, before the jury.

16           With regard to the audiotapes that Defendant mentioned

17   repeatedly, as Mr. Rosario highlighted, and as the Court well

18   knows, there was a ferocious battle concerning the playing of

19   the audio portion of the videotapes.  Mr. Dolz, as well as the

20   other defense counsel filed motions before the Court,

21   approached the Court at side-bars, had several oral arguments

22   trying to get that audio portion played.  Ultimately, your

23   Honor decided not to require the Government to play that audio

24   portion, but it was after Mr. Dolz tried to get that portion

25   played.

1          THE COURT:  What I think I -- If I recall what I
2    ordered, was that if the Defendants -- if they wanted to bring
3    those -- that audio in their case in chief, could do that.
4          MR. MEEKS:  Yes, your Honor.  Yes.  And then that
5    buttresses kind of the Defendant's complaints that at several
6    points he passed notes to Mr. Dolz and things of that nature;
7    again, that falls into that category of it's Mr. Dolz' job for
8    the Defendant to present his case or rebut the Government's
9    case against the Defendant in the best way -- in the best --
10   zealously on behalf of the Defendant.
11         Now, Mr. Rosario's disagreement with Mr. Dolz'
12   strategy decisions and things of that nature are fine, but they
13   don't really equate to the necessity to replace Mr. Dolz at
14   this point.  Those issues -- everything that Mr. Rosario
15   highlighted that happened at trial -- witnesses he believed
16   that lied, evidence that should have been addressed or rebutted
17   in a particular matter, this is not the time or forum for those
18   issues to be addressed.  If Mr. Rosario's request at this point
19   is to have replacement or substitute counsel appointed for him
20   at the sentencing stage, he has to put forth to the Court
21   reasons for that.  And the one question your Honor asked the
22   Defendant clearly was:  Of the documents you say Mr. Dolz has
23   never given you and things of that nature, please list them for
24   me.  I have yet to hear the Defendant list a single document.
25   As a matter of fact, he contends that he was never shown the

1    evidence, but then he goes in quite detail to reference things

2    that he heard before trial started, the audio and things of

3    that nature.  So the Government doesn't --

4              THE COURT:  Well, which -- which demonstrates to me

5    that he had the -- he had the Rule 16 evidence before the

6    trial.

7              MR. MEEKS:  Yes, your Honor.

8              THE COURT:  Except for the names of the cooperating

9    witnesses, which, like I told Mr. Rosario, the Government

10   doesn't have to announce them until really close to the trial

11   for safety reasons.  As a matter of fact, I think the

12   Government provided those names when the Court said the names

13   had to be provided.

14             MR. MEEKS:  Yes, your Honor, that's correct.  So, your

15   Honor, in an abbreviated response to the Court's inquiry, the

16   Government doesn't necessarily have a dog in the fight; however

17   -- what we leave to the sound discretion of the Court whether

18   it provides substitute counsel at this time -- I have not heard

19   anything from the Defendant that would put forth a reason that

20   the Court should do so.

21             THE COURT:  Well, it seems to me from what I've heard,

22   especially from Mr. Rosario, that the issues that he has

23   brought up are issues that have, number one, been presented in

24   the Motion for Acquittal or the Motion for New Trial; those

25   issues as to sufficiency of the evidence have been -- have

1    already been presented in those motions by all the -- by all

2    the Defendants.  And assuming -- assuming -- because we're

3    working on those motions now.  Assuming that I deny them, they

4    are issues that are properly presented before the appellate

5    court.  So what I'm going to do is I'm going to ask Mr. Dolz to

6    remain as Mr. Rosario's counsel through sentencing; at which

7    time, Mr. Rosario may request substitute counsel for his

8    appeal, and I will name counsel for his appeal under the

9    -- Well, I will -- I will ask the Circuit to name counsel for

10   his appeal, under the civil -- Criminal Justice Act.  I think

11   -- I think that -- from what I've heard from Mr. Rosario, the

12   issues that he brought up are more -- are issues that have been

13   presented in the motions that are pending before the Court now,

14   the Rule 29 Motion and the Rule 33 Motion, and they may be

15   addressed once again, if the motions are denied, before the

16   Court of Appeals.

17          Mr. Dolz, you want to say something?

18          MR. DOLZ-SANCHEZ:  Yes, your Honor.  Of course, I will

19   not quarrel with the Court's Order.

20          Since we have -- The sentence is scheduled for

21   August 16, I believe, so that leaves me little time.  What I

22   will do is I want -- I want to ask the Court to allow

23   Mr. Rosario to file whatever motion --

24          THE COURT:  Of course.

25          MR. DOLZ-SANCHEZ:  -- he deems that he needs to file.

1   Even if I don't agree with it.  If I see it -- if I see some
2   reason to that, I'll adopt them.  But please allow him to file
3   whatever document he needs to file.  If he wants to challenge
4   the Presentence Investigation Report, he can file his
5   objections.  I'll be filing my objections.  I just want to
6   -- your Honor to allow him to file whatever he deems that he
7   needs to file.
8           THE COURT:  All right.  I will allow that.
9           Yes, Mr. Rosario, please.
10          THE DEFENDANT:  I have two questions.  I believe I
11  heard Mr. Dolz mention that I didn't want -- that I didn't want
12  them to know that I was a policeman.
13          THE COURT:  No, I don't think he said that.  I don't
14  think he said that.
15          MR. DOLZ-SANCHEZ:  The other way around.
16          THE COURT:  It's the other way around.
17          As a matter of fact, Mr. Rosario, when the jury got
18  the Indictment, that part of the Indictment that mentioned that
19  you were a policeman was redacted, was taken out, because
20  everybody thought that that would be to your benefit that the
21  jury not know that you had been a policeman before.
22          THE DEFENDANT:  But was that decision made to protect
23  my rights?
24          THE COURT:  Everybody thought that if the jury heard
25  that you had been a policeman, it would have been worse for

1   you.

2          THE DEFENDANT:  That it would be inflammatory, and it

3   would be worse?

4          THE COURT:  I don't know if it would be inflammatory,

5   but it would -- it would tend to -- The jury would tend to say,

6   "Here's another corrupt policeman," and that may not have been

7   to your benefit.  You know what I mean?

8          THE DEFENDANT:  Yes.  But I ask --

9          And this is one of the things I want to put in the

10  motions.  Even the attorney may not want.

11          -- who protected my rights before the Grand Jury?

12          THE COURT:  Well, you got to remember, Mr. Rosario,

13  the Grand Jury is -- only the Government presents evidence.

14  And the other -- the defense attorneys cannot go -- be in there

15  and ask questions.  The only thing that the Government -- that

16  an attorney may do is sit outside -- an attorney for a witness,

17  sit outside and counsel that witness, but the attorney cannot

18  go into the Grand Jury.

19          THE DEFENDANT:  I know that, but -- but with what

20  intention did the Government bring that information to the

21  Grand Jury in an Indictment?

22          THE COURT:  The purpose of an Indictment is to

23  show that there's probable cause that a person committed a

24  crime -- that a crime was committed and that a particular

25  person committed it.  And the way the Grand Jury works, they

1    only hear the Government's side of the story.  That's why I

2    don't -- I don't know if you recall when I was instructing the

3    jury, I said precisely that:  The Indictment doesn't prove

4    anything.  The Indictment only is the way to bring charges

5    against a person.  You cannot use the Indictment -- the

6    Indictment to find someone guilty or not.  It proves nothing.

7              And then in that Indictment, what we decided --

8              THE DEFENDANT:  Here's my insistence.  What was

9    the intent -- their intention if they included that in the

10   Indictment that I was a police officer if it didn't have a

11   relationship with the Indictment itself?

12             THE COURT:  Well -- I don't know what the Government

13   was thinking, but perhaps just -- they just wanted to identify

14   you as much as possible.  But the important thing is -- the

15   important thing is not that the -- not that the Indictment

16   found probable cause, because, from reading the Indictment,

17   whether or not it had indicated that you had been a policeman,

18   the -- the Grand Jury would probably have found probable cause

19   against you.  The important thing is that the jury that decided

20   the case did not know that you were a policeman.  And that was

21   something that was brought up by Mr. Dolz and that the other

22   -- the other attorneys and Defendants agreed to.  It could have

23   affected them also.  I don't know.

24             THE DEFENDANT:  Well, halfway through the trial, we

25   heard that Joe Slesar, the DEA agent, had testified before the

1   Grand Jury and the U.S. Attorney had not informed the defense
2   of that, that the -- the agent had testified.
3           THE COURT:  Well, you have to remember, the defense
4   had the Grand Jury transcripts.
5           Did they, Mr. Meeks?
6           THE DEFENDANT:  But not -- not that of Agent Slesar.
7           MR. DOLZ-SANCHEZ:  Mr. Slesar was never a witness in
8   this trial.  He had gone to the Grand Jury and taken the stand,
9   but the Government elected not to present him.  We tried to
10  bring him in and --
11          THE COURT:  I remember that.
12          MR. DOLZ-SANCHEZ:  -- telling he wouldn't testify, so
13  we were not entitled to that transcript.  And as of now, we are
14  not entitled to that transcript.  That's the legal position.
15          THE COURT:  So -- but what Mr. Dolz has indicated,
16  Mr. Rosario, is that -- Well, you heard me say that I will not
17  allow Mr. Dolz to withdraw from your representation for the
18  sentencing, however, I think Mr. Dolz is correct in his request
19  to the Court to allow you to file whatever motions you need to
20  file before sentencing to include whatever comments or
21  objections you may have to the Presentence Report prepared by
22  Ms. Valentin.  Mr. Dolz will do his own objections to the
23  Presentence Report, but -- and this usually -- usually this
24  doesn't happen, but in the situation of this case, I'm going to
25  allow you personally to file whatever motions you need to file

1   before the date of sentencing, which I believe is August --

2            What?  16?

3            MR. DOLZ-SANCHEZ:  I think it's the 16th?

4            THE DEFENDANT:  (Spanish.)

5            THE COURT:  Well, now you have it.  It wasn't filed

6   that long ago.

7            THE DEFENDANT:  Okay.

8            THE COURT:  What's the date of the filing?  Up top.

9            MR. DOLZ-SANCHEZ:  July 1st.

10           THE DEFENDANT:  I think that the most, it's 35 days

11   before, it should be discussed with me.

12           THE COURT:  Thirty-five days from the date it was

13   provided, not the date it was filed.  Because it -- what the

14   probation officer does is provide the report, gets comments,

15   and then files it.  But we have -- we have -- we have about 30

16   days before --

17           MR. DOLZ-SANCHEZ:  It will be a matter of postponing

18   the sentence for five or ten days.  That's the motion.

19           THE COURT:  I don't think that would be necessary.  I

20   think you will have enough time to take a look at it and file

21   whatever motions you need, not only as to the Presentence

22   Report, but whatever motions you may want to file concerning

23   your case.

24           Remember, I'm making an exception here.

25           THE DEFENDANT:  And I really appreciate that.

 And the main problem that I have is that I haven't been given the trial transcripts. And we've insisted on asking for those transcripts. Attorney Dolz hasn't given me those transcripts. There's some important Grand Jury testimony that I need, like Jesus Robles' testimony, and also the bond hearing in which Agent Cruz Marrero testified. I've asked for the information all the time, and I am not given the information ever. I want to ask for you to please have that information be given to me.

MR. DOLZ-SANCHEZ: Your Honor, I will provide whatever information I deem -- I deem -- necessary, because as far as I know, the chemists are -- the testimony of the chemists, which basically determined the amount of drugs, the testimonies of the Defendants that are alluded to in the report, I will provide it. I will not provide the full transcript of the trial, because I don't think -- I don't see the necessity at this time. I will provide whatever -- whatever is needed for him to make the objections to the PSI. But this is a 44-day trial and there are thousands of pages and I don't think we could -- going to get anywhere with that.

THE COURT: Well, let's do this, we will start with that. If --

Mr. Rosario, if you really -- once you see these parts of the transcript that go towards any objections that you may have to the Presentence Report, if you need anymore --

1          You know, you can file whatever motion you -- you deem

2     necessary, and I will consider it.

3          THE DEFENDANT:  In reality, I don't know much about

4     the Presentence Report.  Right now I don't know what it says.

5     But I'm not going to emphasize that report so much.  There are

6     some important things in the transcripts that are important to

7     me because the motion is practically completed.  All I need to

8     do is add the page, the line number, and the date, so that it's

9     easier to follow, but the -- it's practically prepared, more or

10    less.

11         THE COURT:  Well, let me ask you this, are you -- are

12    you making reference to the testimony of any particular person?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Well, then, you know, I have a copy of the

15    transcript also, and I'll be able to find --

16         THE DEFENDANT:  But as the attorney said, there were

17    40-something days of trial, and I know --

18         THE COURT:  No, I understand --

19         THE DEFENDANT:  I know what happened, but if I don't

20    have the transcript, I can't tell your Honor on what page and

21    what line this is -- this is at.

22         THE COURT:  But you can say that it was the testimony

23    of --

24         Say, for example, Jesus Robles, and I will look

25    through the -- through the testimony of Jesus Robles to find

1  whatever it is.

2          MR. DOLZ-SANCHEZ:  Your Honor, even -- when I get my

3  copy, of whatever is it that he files, I'll go through the

4  transcript, if I have to supplement it, I'll do it.  I just

5  want the Defendant to bear in mind that what is important now

6  is the Presentence Report.  That's what's before the Court now.

7          THE COURT:  The only thing --

8          You know, Mr. Rosario, Mr. Dolz is correct in that.

9  The thing that is now before the Court is the --

10          MR. DOLZ-SANCHEZ:  Presentence Report.

11          THE COURT:  -- the Presentence Report.  There are

12  motions pending for acquittal already by all the Defendants

13  that we have to decide before the sentencing.  But this -- this

14  exercise that you're going through will probably assist you and

15  whatever counsel is appointed to you for appeal purposes.

16  Because right now at sentencing I'm not going to get involved

17  in -- as to who -- who told the truth and who didn't tell the

18  truth.  The jury already decided that.  And that's an issue

19  that I'm going to decide based on the motions for acquittal

20  that were filed and that may be an issue that will be presented

21  before the Circuit by whatever attorney will represent you.

22          MR. DOLZ-SANCHEZ:  I'll supplement whatever I can.  As

23  soon as I have the -- his document, I'll supplement it as best

24  as I can.

25          THE DEFENDANT:  Without being disrespectful, I've been

1    waiting for him for three months to discuss the case.

2          THE COURT:  Yeah, but the only thing that is -- the

3    only thing that is proper to discuss now is the Presentence

4    Report.  You didn't even allow him to be there with you.

5          MR. DOLZ-SANCHEZ:  And I was there, your Honor.  I was

6    there at nine o'clock in the morning.

7          THE COURT:  That would -- I don't think if you

8    remember when I said -- You know, when I set a sentencing date,

9    I always say it's very important that you go to this interview

10   and that your attorney be there to assist you.  Because things

11   that may not be -- may not seem important to you at the time,

12   the attorney may -- may -- may say that, you know, it's

13   something that has to be brought to the attention of the

14   probation officer.  But you didn't allow Mr. Dolz to be there,

15   and I think that -- that was a bad decision on your part,

16   really.

17         THE DEFENDANT:  Can I tell you why I didn't allow him

18   to be there?

19         THE COURT:  Yes, please.

20         (Respite.)

21         (No response by the Defendant.)

22         THE COURT:  All right.  Okay.  Well, I will expect a

23   motion from you objecting to the -- or stating whatever you

24   want to state about the -- about the -- about the Presentence

25   Report.  All right?

1          THE DEFENDANT:  With all due respect to this Court and

2    everyone, I'm going to accept whatever sentence you deem I

3    should have.  I have no problem with all the life terms you

4    want to give me.

5          THE COURT:  I don't know what sentence I'm going to

6    impose on you.

7          THE DEFENDANT:  What I want to do is to appeal at my

8    time --

9          THE COURT:  That's your right.

10         THE DEFENDANT:  -- because what I want is to present

11   the motions so that everything is on the record, things that

12   didn't come up in trial, with all the witnesses, with all the

13   things that the witnesses said and all the evidence presented,

14   even -- I would have even deemed myself guilty if I had been a

15   juror.  But my defense did not present the things --

16         What I want to do is present my motion with all the

17   pages and everything numbered.  And if there's a cost to it to

18   get those transcripts, my mother is here, we will try to do

19   everything that we can do to find the money.

20         THE COURT:  That won't be necessary.  But right now

21   you should concentrate on the Presentence Report.  That's the

22   important thing right now; your sentence.

23         THE DEFENDANT:  Well, if I don't present the motion

24   before you, hammer me, then the truth will never come out.

25         THE COURT:  Well, you know, I'm -- I'm working right

1    now on the motions for acquittal that were filed and the

2    motions for a new trial.  And, you know, it was a long trial,

3    and we've been working on this for a while.

4            MR. DOLZ-SANCHEZ:  We will present whatever he needs

5    to present in a sort of Defendant's version --

6            THE COURT:  Of course.

7            MR. DOLZ-SANCHEZ:  -- attached to the Presentence

8    Report.

9            THE COURT:  Of course.

10           There's -- You know, Mr. Rosario, I just want to

11   make sure you understand that the important thing now is the

12   Presentence Report.  Whatever -- whatever other type of motion

13   concerning the evidence is more of an issue now for the -- for

14   the Court of Appeals, really.

15           THE DEFENDANT:  The thing is, I wouldn't appeal the

16   sentence.  What I would appeal -- I need a document.  I've been

17   waiting for the transcripts for three months.  I'm just asking

18   for you to allow me to prepare myself as -- so that you can

19   receive something well prepared as you deserve -- as this Court

20   deserves.  I ask you to please have that forwarded to me, not

21   one week before the sentence.

22           THE COURT:  Well, Mr. Dolz has already said that he

23   will provide you those parts of the transcript that have to do

24   with the Presentence Report.  And I -- You know, I have to tell

25   you, Mr. Rosario, again and again, you should concentrate on

1    the Presentence Report.  The other issues as to the evidentiary

2    matters that happened in court, who told the truth, who didn't

3    tell the truth, that's more of an issue for the Court of

4    Appeals.  All right?

5                THE DEFENDANT:  What if I show you the document?

6                THE COURT:  What document?

7                THE DEFENDANT:  The motion that I was working on.  I'm

8    just missing.  .  .

9                THE COURT:  Once -- You know, finish what you can, and

10   file it.  I will consider it.

11               THE DEFENDANT:  I don't want to cite words that seem

12   favorable to me, because I don't want to do what the Government

13   did with me.  I don't want to -- it to be biased in my favor.

14   I want to cite things just as they happened in reality.  That's

15   my only concern.

16               THE COURT:  Like I told you, I will take a look at

17   the transcript myself and make sure that what is said in the

18   transcript is what is used to be -- to -- for my decision.  All

19   right?

20               THE DEFENDANT:  It might be a little longer, so that

21   you can find it easier.

22               THE COURT:  However you want to prepare it.

23               THE DEFENDANT:  Thank you, Honorable Judge, and I

24   apologize for the time I've taken.

25               THE COURT:  No.  No apologies necessary.  Thank you

1    very much.

2              COURT SECURITY OFFICER:  All rise.

3

4

5

6              (The hearing of this cause concluded at 11:24 a.m., on

7    July 19, 2010.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **R E P O R T E R ' S     C E R T I F I C A T E**

2
   **UNITED STATES DISTRICT COURT )**
3                                  **) ss.**
   **OF PUERTO RICO              )**

4

5          I, **ROLAYNE M. VOLPE**, Certified Court Reporter, CCR, and

6    Registered Professional Reporter, RPR, do hereby certify that

7    the transcript of the foregoing proceedings accurately reflects

8    the events that occurred before me to the best of my ability at

9    the time and place set out on the caption hereto, the witnesses

10   having been duly cautioned and sworn, or affirmed, to tell the

11   truth, the whole truth, and nothing but the truth.

12         I FURTHER CERTIFY that I am neither counsel for, related

13   to, nor employed by any of the parties to the action in which

14   these proceedings were taken or to any attorney or counsel

15   employed by the parties hereto, nor financially interested,

16   directly or indirectly, in the outcome of this action.

17         CERTIFIED AND SIGNED on this 23rd day of January, 2011.

18

19
                            S/:  *Rolayne M. Volpe*
20                          ROLAYNE M. VOLPE, CCR, RPR
                            Certified Court Reporter and
21                          Registered Professional Reporter

22

23

24

25


                    ROLAYNE M. VOLPE, CCR, RPR
        COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
                            787-772-3482