**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**THE UNITED STATES OF AMERICA**,  )
                    Complainant,)
                                 )
vs.                              ) Case No.:  CR-08-310 (FAB)
                                 )
**4 WILFREDO ROSARIO-CAMACHO**,  )
                                 )
                    Defendant.   )

_____

TRANSCRIPT OF PROCEEDINGS
**SENTENCING HEARING**
HELD BEFORE JUDGE FRANCISCO A. BESOSA
ON AUGUST 18, 2010

_____

**A P P E A R A N C E S**

For the United States:

        **MARQUEST MEEKS**
        Assistant U.S. District Attorney
        Torre Chardon, Suite 1201
        350 Carlos Chardon Street
        Hato Rey, Puerto Rico  00918

For the Defendant:

        **FRANCISCO DOLZ-SANCHEZ**
        P.O. Box 361451
        San Juan, Puerto Rico  00936

_____

**ROLAYNE M. VOLPE, CCR, RPR**
**Court Reporter for the U.S. District Court of Puerto Rico**
**Federal Building, Room 150**
**San Juan, Puerto Rico  00918**
**(787) 772-3482**

1                          **I N D E X**

2    **DESCRIPTION**                                          **PAGE**

3

4    PROCEEDINGS                                                  3

5
     REPORTER'S CERTIFICATE                                      29
6

7

8

9                        **E X H I B I T S**

10   **DESCRIPTION**                                          **PAGE**

11

12              (No exhibits marked during this session.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1         The above-styled cause came on for hearing on the

2    18th day of August, 2010, at 11:34 a.m., before Judge Francisco

3    A. Besosa, Judge in the United States District Court for the

4    District of Puerto Rico, when the following proceedings were

5    had and entered of record, to wit:

6                              **PROCEEDINGS**

7                          **SENTENCING HEARING**

8         THE COURT:  Please be seated.

9         THE COURTROOM DEPUTY CLERK:  Criminal 08-310,

10   United States of America versus Wilfredo Rosario-Camacho for

11   sentence.  On behalf of the Government, Assistant U.S.

12   Attorney Marquest Meeks; on behalf of the Defendant, Francisco

13   Dolz-Sanchez.  Defendant is present and assisted by the Court

14   Interpreter.

15        MR. MEEKS:  Good morning, your Honor.  Assistant

16   United States Attorney Marquest Meeks on behalf of the United

17   States.  The Government is prepared to proceed.

18        MR. DOLZ-SANCHEZ:  Good morning, your Honor.

19   Francisco Dolz-Sanchez for the Defendant, Wilfredo

20   Rosario-Camacho.  I'm court-appointed CJA counsel.

21        THE COURT:  All right.  Mr. Dolz, would you like to

22   say something on behalf of your client before I pronounce

23   sentence?

24        MR. DOLZ-SANCHEZ:  Your Honor, before we get into

25   that I just want to make sure that there's a -- There's two

```
 1    objections that I filed in writing, and there's one that I
 2    missed.  We objected to the -- to the drug calculation, of
 3    course, and for the reasons stated therein, and then we also
 4    objected to the leadership in the offense because --
 5              THE COURT:  I'm sorry?  To the what?
 6              MR. DOLZ-SANCHEZ:  To the four level increase for --
 7              THE COURT:  Leadership role.
 8              MR. DOLZ-SANCHEZ:  -- the adjustment for role in the
 9    offense because it's our estimation, your Honor, throughout the
10    testimony there was ample evidence that Manny, meaning Luis
11    Sostre-Miranda, was always -- was always the leader and the
12    owner of these points.  And there's also ample testimony that
13    this Defendant was leasing from him, so at -- all throughout,
14    in my estimation, the one that was making the decisions and
15    acting as a true drug point leader was Manny; Luis
16    Sostre-Miranda.  Which brings us briefly -- very briefly -- to
17    the argument that was listed this morning, that in terms of the
18    sentence that Luis Sostre received of, I think, 180 months
19    compared to whatever sentence this Defendant will receive, in
20    our estimation, Luis Sostre never ceased to be the owner -- or
21    the real owner of this group, your Honor.  In that sense, we
22    want to make sure that those objections are noted.
23              And then there's one that I missed on Page 20 of the
24    Presentence Investigation Report, Paragraph 19.  There's a
25    paraphrase from the Indictment that states:  He also -- meaning
```

1    the Defendant -- received an incentive, monthly payment, for

2    the cocaine sold at the drug points from Co-Defendant Ramon

3    Maysonet-Soler.  That's charged -- That's wording of the

4    Indictment.  There was never evidence -- no evidence presented

5    throughout the trial that that was so.  In that sense, your

6    Honor, we move to strike that -- that sentence, because there

7    was no evidence as to that effect.

8            Your Honor, the Defendant will address the Court, and

9    then I will ask -- I will beg the Court to give me one last --

10   a few minutes for mitigation purposes.

11           THE COURT:  All right.  But before I ask Mr. Rosario

12   to address the Court, I would like to hear from Mr. Meeks.

13           MR. MEEKS:  Yes, your Honor.  For the most part, the

14   United States relies on its Sentencing Memorandum, which was

15   filed last night, to address specifically the concern about the

16   drug quantity calculation.  There's a quantity calculation in

17   the United States Sentencing Memorandum that is being

18   recommended to the Court by the U.S. Attorney's Office.

19   Similar to the last Defendant that was sentenced this morning,

20   the United States' recommendation is an extremely conservative

21   recommendation in light of the fact it comes down two levels

22   from what could be held attributable to this particular

23   Defendant.  With regard to the plus-four points for leadership

24   role, which has been recommended by the probation office and

25   is also being recommended by the United States, it is not

1    simply the fact that either in the Indictment, by other
2    co-conspirators, by the Court, or by anyone else the Defendant
3    is entitled as a leader or given any such title that suggests
4    that.  The plus-four for leadership role comes from
5    Section 3B1.1(a), where it says:  If the defendant was an
6    organizer or leader of a criminal activity that involved five
7    or more participants, or was otherwise extensive, increase by
8    four levels.
9         And where similar to other Defendants who received
10   this plus-four enhancement, this Defendant had sellers who
11   would work for him and runners who would also work for him and
12   of course this criminal enterprise involves at least 74
13   individuals who were indicted.  And although Mr. Dolz has
14   proffered to the Court that the true and accurate owner of the
15   crack cocaine drug points for the time frame that's recommended
16   in the United States Sentencing Memorandum was actually a
17   different Defendant, the testimony at trial was contrary to
18   that, and so the United States would request that the Court
19   rely on the trial testimony as highlighted and cited to in the
20   Sentencing Memorandum.
21        MR. DOLZ-SANCHEZ:  Your Honor, I just want to mention
22   that the memo was filed last night after midnight and we were
23   able to open it this morning, so we not have had time.  But I
24   believe that my objection to the calculation go to specific
25   issues, and I -- I think that the calculations are addressed

1    properly in my objection to the Presentence Report, your Honor.

2          (Respite.)

3          THE COURT:  Now, Mr. Rosario, would you like to

4    address the Court?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Please.

7          THE DEFENDANT:  Before I get into the sentence,

8    there's a motion that I filed that has not been replied to as

9    of yet.  I received the one about not changing the date of the

10   sentence.  As to the motion about the transcript of the DEA

11   agent before the Grand Jury, I still not have received a reply

12   from the Court.

13         THE COURT:  That motion was denied.

14         THE DEFENDANT:  Okay.  Well, by way of

15   reconsideration, can I ask your Honor to please tell the AUSA

16   that -- You see, on another occasion when there was a -- a

17   search conducted by the DEA, the Court ordered that the

18   affidavit be turned in and that it remain sealed in the file.

19   I asked by way of reconsideration if I can ask that transcript

20   of the DEA because if it's not in the file.  I can't make -- I

21   can't appeal and make reference to that at all because it's not

22   there.

23         THE COURT:  Well, that -- that request by you would be

24   considered at the time of your appeal if you file an appeal.

25         THE DEFENDANT:  Honorable Judge, and very

1   respectfully, when you are going to appeal, that takes a long

2   time.

3            THE COURT:  Well, you know, if you file a Notice of

4   Appeal, whoever represents you in the appeal will have plenty

5   of time to take a look at the entire record, including Grand

6   Jury transcripts, for purposes of filing his brief on appeal.

7   So there -- the -- and you can -- you can imagine, that the

8   transcript of this case is 44 days long, and it will take a

9   while for the -- your attorney, whoever that is who will handle

10  your appeal, to go through that appeal to be able to -- to go

11  through all that transcript to be able to -- to file his brief

12  on appeal.

13           Now, I don't know what the situation is as to the

14  Grand Jury transcripts, but it may be something that you're

15  entitled to, it may be something that you're not entitled to, I

16  don't know.

17           Mr. Meeks.

18           MR. MEEKS:  I just wanted to clarify something briefly

19  for the record because the Defendant mentioned an affidavit

20  that I think he was referring to that the Court ordered that

21  the Government turn over during trial and it was sealed as part

22  of the record.  Just so it's clear for the record and for the

23  Defendant, and maybe this will address the concern --

24           THE COURT:  Well, it's sealed, but the parties have

25  access to it.

1          MR. MEEKS:  Right.  That is part of the record, so if

2     an appeal is filed, that's there.

3          THE COURT:  That will part of the record.

4          MR. DOLZ-SANCHEZ:  Let me clarify.  I think the

5     Defendant wants to have the transcript of Agent Slesar; and

6     since he did not testify, the transcript is in the possession

7     of the Government.  I think that's -- what he wants is that it

8     be made part of the record and remain sealed.  I think that is

9     what he wants.  But I told him that I will take care of that

10    after the sentencing.

11         THE COURT:  Okay.  All right.

12         All right.  Anything else, Mr. Rosario?

13         THE DEFENDANT:  Well, in the Indictment, it was

14    introduced -- the Indictment that was introduced, it was

15    mentioned that I was a police officer.

16         THE COURT:  But that did not come out during the

17    trial, if you will recall.  So I -- if I recall your motion,

18    you're saying that the fact that the Government's -- the

19    testimony presented during the Grand Jury -- before the Grand

20    Jury indicated that you were a police officer, perhaps was

21    something that the Grand Jurors considered in order to -- to

22    issue the Indictment.

23         That -- I don't know whether -- whether that's true or

24    not.  But that's -- that may be something that you may want to

25    bring up on appeal, but not at sentencing.

1          THE DEFENDANT:  Okay.

2          THE COURT:  But if you recall, when -- when the jury

3    received the Indictment, when they went to deliberate, at the

4    request of your counsel, the fact that it appeared in the

5    Indictment that you were a former police officer, was redacted

6    from the Indictment.  Was eliminated from the Indictment.  So

7    the jury never knew that you were a former police officer.

8          MR. DOLZ-SANCHEZ:  It was a fact, your Honor, that we

9    asked from the Government, and the Court allowed us to talk

10   with the Government, and the Government's witnesses were

11   instructed not to mention that fact.

12         THE COURT:  That's correct.

13         MR. DOLZ-SANCHEZ:  Just to have the record clear.

14         THE COURT:  Nothing came out at the trial that -- that

15   you were a former police officer.  That may have come out in

16   the Grand Jury, I don't know.  I haven't read the transcripts,

17   but if it did and if it's an issue that you want to raise on

18   appeal, you may.

19         THE DEFENDANT:  Okay.

20         THE COURT:  Okay.  Anything else, Mr. Rosario?

21         THE DEFENDANT:  Well, yes, in relation to the

22   sentence.  Okay.  In relation to Ms. Katherine Valentin's

23   report, I do not agree with several of the things that she

24   alleged in the report, and I find that they are erroneous

25   because nothing was ever testified about that.

1          Okay.  On Page 20, it was mentioned --

2          And I think counsel already talked about this.

3          -- that Ms. Katherine Valentin is attributing to

4   me a certain amount of cocaine since the Indictment read that

5   Defendant Wilfredo Rosario received a monthly amount of money

6   from the cocaine that he received from Maysonet.  You see,

7   during the trial, there was no witness -- there was no

8   testimony about this -- I don't know where this information

9   came from.  And in terms of any drugs that they want to tie

10  me -- associate with me in terms of what was sold at the drug

11  point, there is no evidence about that according to what the

12  witnesses testified in this case said.

13          THE COURT:  Well, let me -- let me stop you right

14  there.

15          Mr. Meeks, do you recall any testimony at the trial

16  that said that Mr. Rosario received an incentive or monthly

17  payment for the cocaine sold at the drug points from

18  Co-Defendant Ramon Maysonet-Soler?

19          MR. MEEKS:  I do not recall it off the top of my head,

20  your Honor, but it doesn't mean that it's not there.

21          THE COURT:  Go ahead, Mr. Rosario.

22          THE DEFENDANT:  I just observed AUSA Castellon shaking

23  her head as if saying "yes."  If -- if she could step up and

24  testify about that.

25          THE COURT:  Mr. Meeks is the -- is the AUSA in charge

1   of the case now.

2           MR. MEEKS:  Your Honor, I know that the Defendant has

3   a right to an allocution, but that right is not unlimited.  I

4   would just respectfully request that the Court kind of guide

5   the Defendant that we focus on the sentencing.  Many of the

6   issues he's bringing --

7           THE COURT:  Well, part of the sentencing is -- is

8   -- is to be able to object to the Presentence Report.

9           MR. MEEKS:  Yes, your Honor.  And with regard to that,

10  I'd ask that -- maybe Mr. Dolz can help us out.  If Mr. Dolz

11  has already made the same objections in writing or orally

12  concerning the Presentence Report, I don't know that it's

13  efficient to have the Defendant repeat the same.

14          THE COURT:  That may be true.  And Mr. Dolz did

15  mention it orally here in court, and -- I don't recall if he

16  mentioned it in his writing, but he did mention it orally here

17  in court.

18          Mr. Rosario, is there anything else that you would

19  like to draw the Court's attention in the Presentence Report

20  that Mr. Dolz has not already done so?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Go ahead.

23          THE DEFENDANT:  Okay.  Well, in relation to the amount

24  of crack that is being -- that I am being charged with, this

25  Defendant is being charged with having participated 15 months

1    in this conspiracy.  And Ms. Katherine Valentin filed a report

2    concerning the amounts, amounts of drugs, but letting herself

3    be guided by the testimony of Jesus Robles-Santana.

4            THE COURT:  Well, she can do that.  That's the

5    evidence that came out at trial.  Whether or not you personally

6    believe that he told the truth or not, the jury apparently

7    believed what he said.

8            THE DEFENDANT:  Apparently.  They believed the part

9    about whether or not there was a conspiracy.

10           THE COURT:  Well, but Mr. Robles testified extensively

11   about the amounts of drugs, not only involving you but

12   involving other Defendants, so that's -- you know, that's

13   -- that's an issue that Ms. Valentin can take into

14   consideration when preparing the Presentence Report.

15           THE DEFENDANT:  But I was not able to discuss that

16   with Ms. Valentin.

17           Right now the amounts in terms of all the drugs,

18   according to the report, is a total of 5,240 bags of drugs.

19   And if you divide that into the 24 hours a day that the drug

20   point is operating, that -- about 218 persons per hour have to

21   go up and down that street.

22           THE COURT:  All right.  But.  .  .

23           THE DEFENDANT:  Without considering the brands known

24   Guacamayo, Volcan, Saltamonte, Zorro of the evening shift --

25           THE COURT:  Yeah, but --

1          THE DEFENDANT:  I'm sorry, the morning shift.  The
2     a.m. shift.
3          THE COURT:  Ms. Valentin, I believe, mentioned
4     generally what happened, but --
5          THE DEFENDANT:  I'll give you an example as to the
6     amounts.
7          THE COURT:  Excuse me.  Excuse me.
8          She mentions that -- She limits -- On Page 36,
9     Paragraph 69 of the Presentence Report, she limits that
10    testimony to the crack sold, according to Mr. Robles.
11         THE DEFENDANT:  Okay.
12         THE COURT:  So her calculation is -- apparently
13    is -- is based on the amount of crack sold, not on the amount
14    of all the other drugs sold, as I understand the -- the
15    Presentence Report.
16         THE DEFENDANT:  Okay.  What I want to give you is an
17    example of the exaggeration that you can see so clearly that
18    exists in that testimony.  And by that, I'm referring to my
19    experience as a drug agent.  In those videos, which is the best
20    evidence that the Government can have, you don't even see 50
21    persons an hour go up there.  How is it possible that two -- a
22    little over 200 people per hour go up there?  That's just to
23    give you an example.  If it were only the crack, it would be
24    1,200 divided into 24 hours, would be 15 persons.
25         THE COURT:  I just did that.  In one day.

1          THE DEFENDANT:  In one day.  And if that was clear,

2     then where are the other 4,000 persons who bought drugs in that

3     conspiracy?

4          THE COURT:  All right.  But, Mr. Rosario, you have to

5     remember that the calculation done for your case is based on

6     those 50 persons, not the other 4,500.

7          THE DEFENDANT:  According to the evidence of the

8     videos, where are -- Because it's easy for me to come here and

9     say I sold a thousand -- correction -- 2,000 bottles of crack

10    in one shift, I sold 3,000 bags of heroin in one shift,

11    exaggerate the amounts, you know, that based on the experience

12    that I have, it was completely exaggerated, because the videos

13    are very clear.

14         THE COURT:  But that -- Mr. Rosario, that's water

15    under the bridge.  The jury has already decided that.

16         THE DEFENDANT:  The jury was not able to determine the

17    amount that I was responsible for.

18         THE COURT:  But -- but the testimony at trial

19    allows me to make a calculation.  And to tell you the truth,

20    both -- my calculation is a conservative calculation.

21         THE DEFENDANT:  Okay.  Ms. Frances Alvarez also

22    testified about amounts sold there.  She testified that in 2003

23    when they introduced crack at that drug point, she sold about a

24    thousand bottles --

25         THE COURT:  That --

1              THE DEFENDANT:  Every two or three days.

2              THE COURT:  All right.  That may be true, but the

3    calculation that was done by Ms. Valentin is solely for the

4    period that Mr. Robles sold, if you add what was -- what

5    Ms. Alvarez says, then that's going to be even more crack.  So

6    that's what I'm saying, this calculation is pretty

7    conservative.

8              THE DEFENDANT:  In relation to that --

9              THE COURT:  Mr. Robles sold crack during 2007 and

10   2008, and that is -- that is the calculation that is being

11   done.  We're not even considering the crack that was sold

12   before 2007.  So if you -- you know, if we were to consider

13   that, we would have to add that to whatever amounts Mr. Robles

14   said that he sold, which would be even more crack.

15             THE DEFENDANT:  I'm not following that line of

16   thought, though.

17             THE COURT:  That's what I understood you to say.

18             THE DEFENDANT:  Let me explain.  I'll explain it.

19             This has a sequence, just like in the trial.  In 2004,

20   she testified that another drug point in Trocha in Vega Baja

21   introduced crack at their drug point, and that the drug sales

22   at the drug point diminished.

23             THE COURT:  But that's 2004.  We're not even

24   considering 2004, Mr. Rosario.

25             THE DEFENDANT:  Okay.  Now I'm going to talk about

1   2007.  When she arrived in 2006, 2007, she testified that

2   things had changed.  That her husband had another drug point.

3          THE COURT:  Mr. Rosario -- Mr. Rosario, we're not even

4   considering Ms. Alvarez' testimony, because if we did, we would

5   just have to add more crack.  We're taking a conservative look

6   at the amount of crack sold during a period -- a period of just

7   one year.

8          THE DEFENDANT:  One final detail about that, please.

9          When she testified that she bought the amount with her

10  husband in 2000- -- still talking about 2007, her husband was

11  alive.

12         THE COURT:  Until May of 2007.

13         THE DEFENDANT:  And she testified that two-eighths

14  would be bought for two drug points, one in the La Playa area,

15  beach area, and the other in Altos de Cuba.  However, she said

16  that one drug point bought material to divide it between crack

17  and cocaine, and the other would be for the -- for El Altos.

18  What had to be divided would be less than 60 grams, which is

19  what her husband sold at El Altos, a week.  And the difference

20  that the lady testified about that her husband sold, there's a

21  big difference between then and what the other man testified.

22         The other point would be about the points as a leader.

23  Discuss that issue?  They want to attribute four points as a

24  leader to me, and according to what the witnesses testified,

25  the one who had the control of the crack and marijuana drug

1   point was Defendant Luis Sostre-Miranda, who received a monthly

2   sum for the drug points in that ward.  And according to his

3   agreement with the Government, he -- the eight, nine, ten years

4   of the conspiracy, no witness ever said that that man got out.

5   But then he received a monthly amount based on the earnings

6   made in that drug point -- in those drug points.  The witnesses

7   even say that when the drug point was rented, things remain the

8   same.  That the one who assigned the shifts was the runner, who

9   was Rolando, and his brother Manny -- Manny's runner.  They're

10  not talking about the fact that this person -- this man sold

11  his rights as some other persons are alleging.  That he does

12  with those rights whatever he pleases.  That's the most I can

13  explain regarding what was testified about here.

14          And I want to thank you for being so patient with me,

15  because I know it hasn't been easy.  But my situation, you

16  know, you have to understand it a little bit.  And I want to

17  thank my family for having supported me in this situation at

18  all times.  And then ask very respectfully of this Honorable

19  Court that it consider at the moment of imposing my sentence

20  that according to what was testified by the witnesses, my

21  participation was minimum.  And thank you for listening to me,

22  your Honor.

23          MR. DOLZ-SANCHEZ:  Briefly, your Honor.

24          THE COURT:  Mr. Dolz.

25          MR. DOLZ-SANCHEZ:  Yes.  Even though how despicable

1    the actions might have been of this group of Defendants and the
2    -- the acts of -- alleged against this Defendant, there's
3    evidence in the Presentence Investigation Report that this
4    person was a useful citizen at a point in time.
5              THE COURT:  Was what?
6              MR. DOLZ-SANCHEZ:  A useful citizen.  He was a police
7    officer for a number of years, he was an undercover agent for a
8    number of years, he made a number of arrests over those years,
9    and there's years he went to school, he finished a college
10   degree.  So in my estimation, your Honor, it's like the -- like
11   the butterfly that flew too close to the flame and got burned.
12   I think that this person can be rehabilitated because he was
13   a -- a good person at one point in time.  And seriously
14   speaking, your Honor, I don't think a term of imprisonment of
15   life, like the Government is asking, would serve the services
16   of the community, of the justice system, and with that, your
17   Honor, I move for a variance, because I don't think this person
18   deserves a term of life imprisonment.  I think he can serve
19   time and come back to the community and be useful again because
20   he was for a number of years, your Honor.
21             THE COURT:  Thank you.
22             Mr. Meeks, anything?
23             MR. MEEKS:  Your Honor, I wanted to add a few points.
24   One thing I wanted to highlight that I forgot before is that
25   the Sentencing Memorandum filed by the United States uses what

1    is the most current version of the United States Sentencing

2    Guidelines and the table therein, which reflects a Level 38

3    for 4.5 kilograms of cocaine base or more.  Just so that the

4    Court is aware -- Well, I'm sure the Court is aware.  But to

5    kind of give some guidance.

6             At the beginning of this month, President Obama signed

7    the Fair Sentencing Act of 2010 and that changed the ratio

8    between cocaine sentencing and crack cocaine sentencing.  To

9    date, that has not been made retroactive, so it's not

10   applicable to this Defendant's sentence.  Based on the

11   Sentencing Memorandum filed by the United States, however, the

12   reasonable estimate of the crack cocaine attributable to this

13   Defendant is 59.31 kilograms of crack cocaine.  And the

14   Sentencing Guidelines, as they are currently, top out at 4.5

15   kilograms.  When they are changed, they will top at 8.4

16   kilograms.  So even if the new law were attributable to this

17   Defendant, it would not give him any greater effect.

18            I do want to address Attorney Dolz' request for a

19   departure from the Guidelines, because the United States'

20   position is that no departure is warranted.  Specifically, the

21   United States would highlight the fact that although Mr. Dolz

22   and the Defendant may try to minimize his role -- and I think

23   the Defendant said specifically that the testimony of the

24   witnesses was that his participation was minimum.  I think,

25   actually, the testimony was to the contrary.  Not only was

1    there testimony from Ms. Frances Alvarez that the Defendant was

2    the supplier of cocaine quantities so that crack could be made

3    before he became the crack cocaine and marijuana owner of the

4    drug point -- of the crack cocaine and marijuana drug points in

5    Altos de Cuba, it was also testified that the Defendant was a

6    frequent figure in the drug point and would have meetings with

7    other leaders and owners.

8            Specifically, I'm referring to the time that there was

9    an altercation between Omar Lexus and Pepon.  The Defendant was

10   there and was on the scene to accompany Omar Lexus to a meeting

11   with Pepon.  So this is not minimum participation.

12           Additionally, there was testimony that this Defendant

13   used the threat of deadly force to intimidate and interrogate

14   a drug user and subordinate of another drug point owner when

15   he believed that an individual named Moises had provided

16   information to the police.  There was testimony, I believe,

17   from two different Government's witnesses that he confronted

18   Moises and held him at gunpoint and questioned him as to

19   whether he had been providing such information.

20           And while Mr. Dolz highlights the Defendant's previous

21   law enforcement experience as a life or years better lived in

22   the past, that is a reason from the Government's standpoint to

23   highlight that this Defendant is very well deserving of the

24   life sentence of imprisonment because you have an individual

25   who protected the public trust, and instead of continuing to

1  follow along that path -- and even though he worked undercover

2  in these sorts of environments and in an attempt to help law

3  enforcement -- he then decided that that was the better life

4  and crossed over to the other side of the tracks.

5          So for all of those reasons and everything cited in

6  the United State's Sentencing Memorandum, this Defendant is

7  also deserving of life imprisonment.

8          THE COURT:  Mr. Dolz or Mr. Rosario, anything else?

9          MR. DOLZ-SANCHEZ:  I can't find the exact page,

10  but there was an incident -- there's an incident in the

11  Presentencing Report which states that as precisely because

12  of -- as a consequence of being a police officer, this person

13  apparently saw one of his companions shot himself, and he had

14  to be sent to the State Insurance Fund, and that he suffered

15  mentally; he was separated from the Police of Puerto Rico

16  because of that condition.

17          What Meeks says is correct.  But I'm saying that there

18  is some rehabilitative value in this person.  That a term of

19  life imprisonment is not going to serve any purpose at all.

20  That's why I'm asking for a variance, your Honor.

21          THE COURT:  All right.

22          On April 20, 2010, Defendant Wilfredo Rosario-Camacho

23  was found guilty as to Counts 1 through 6 of the Indictment in

24  Criminal Case Number 08-310.  Counts 1 through 5 charge a

25  violation of Title 21, United States Code, Sections 841(a)(1),

1   846, and 860.   Count 6 charges a violation of Title 18, United

2   States Code, Sections 924(c)(1)(A) and 924(o).   All Class A

3   felonies.

4          The 2009 Edition of the Sentencing Guidelines were

5   applied in this case pursuant to Sentencing Guideline Section

6   1B1.11(a).   Pursuant to Sentencing Guideline Section 3D1.2(d),

7   rules relative to grouping of closely related counts, Counts 1

8   through 5 were grouped together because the offense level is

9   determined largely on the amount of controlled substances

10  involved.

11         Count 6 was grouped together with Counts 1 through 5

12  under the provisions of Sentencing Guidelines Section 3D1.2(c)

13  because that count embodies conduct that is treated as a

14  specific offense characteristic in, or other adjustment to, the

15  guideline applicable to Counts 1 through 5.

16         Based on the provisions of the Sentencing Guideline

17  Section 2D1.1, a Base Offense Level of 38 has been determined

18  because the offense involved more than 4.5 kilograms of cocaine

19  base; specifically, more than 50 kilograms of cocaine base.

20  Because the offense took place within 1,000 feet of a protected

21  location, a two-level increase is warranted pursuant to

22  Sentencing Guideline Section 2D1.2(a)(1), establishing a Base

23  Offense Level of 40.   Because Mr. Rosario had knowledge that

24  members of the conspiracy would carry firearms and it was

25  reasonably foreseeable that dangerous weapons would be used and

1    possessed in the conspiracy, a two-level increase is applied
2    pursuant to Sentencing Guideline Section 2D1.1(b)(1).  Indeed,
3    that was the testimony at trial -- There was testimony at trial
4    that Mr. Rosario's altercation with a person called Moises,
5    Mr. Rosario accused Moises of being a police informant while
6    pointing a weapon at him.  As evidenced during the trial,
7    Mr. Rosario was the owner of the crack cocaine and marijuana
8    drug points since 2007 and employed runners and sellers in
9    order to maintain those drug points operated 24 hours a day,
10   seven days a week, so a four-level increase is applied pursuant
11   to Sentencing Guideline Section 3A1.1(a) [sic].  There are no
12   other applicable guideline adjustments.  The Total Offense
13   Level is 46.  Chapter 5 of the Sentencing Guideline
14   establishes, however, that a Base Offense Level of more than 46
15   is to be treated as an Offense Level of 43.
16           I'm sorry.  Offense Level more than 43 is to be
17   treated as an Offense Level of 43.  Therefore, based on a Total
18   Offense Level of 43 and a Criminal History Category of I, the
19   guideline imprisonment range in this particular offense is
20   imprisonment for life; with a fine range of 25,000 to eight
21   million dollars; plus a supervised release term of at least ten
22   years as to Counts 1 through 5, and at least two but not more
23   three years as to Count 6.
24           Mr. Rosario is a 30-year old former police officer who
25   resigned from the force and became one of the leaders of a

1   dangerous Drug Trafficking Organization in Altos de Cuba.  He

2   was raised in a healthy and affluent environment, attended

3   college, and was given every opportunity to lead a law abiding

4   and productive life but decided not to do so.

5        To impose sentence, the Court has considered the

6   nature and circumstances of the offense and Mr. Rosario's

7   history and characteristics.  In order to reflect the

8   seriousness of the offense, to promote respect for the law, and

9   provide just punishment of the offense, it's the judgment of

10  the Court that Wilfredo Rosario-Camacho is hereby committed to

11  the custody of the Bureau of Prisons to be imprisoned for the

12  remainder of his natural life as to Counts 1 through 5, and 240

13  months as to Count 6, the terms to be served concurrently with

14  each other.

15        If ever released from confinement, Mr. Rosario shall

16  be placed on supervised release for a term of ten years as to

17  Counts 1 through 5 and three years as to Count 6, all to be

18  served concurrently with each other and under the following

19  terms and conditions:

20        He shall not commit another federal, state, or local

21  crime and shall observe the standard conditions of supervised

22  release recommended by the United States Sentencing Commission

23  and adopted by this Court;

24        He shall not unlawfully possess controlled substances;

25        He shall refrain from possessing firearms, destructive

1  devices, and other dangerous weapons;

2        He shall refrain from the unlawful use of controlled

3  substances and shall submit to a drug test within 15 days of

4  release from imprisonment.  After his release, he shall submit

5  to random drug testing, no less than three samples during the

6  supervision period, but not to exceed 104 samples per year,

7  under the coordination of the probation officer.  If any sample

8  detects substance abuse, Mr. Rosario shall participate in an

9  inpatient or an outpatient substance abuse treatment program

10  for evaluation or treatment as arranged by the probation

11  officer until duly discharged.  Mr. Rosario is required to

12  contribute to the cost of services rendered by means of

13  co-payment in an amount arranged by the probation officer

14  based on his ability to pay or the availability of third-party

15  payment;

16        He shall provide the probation officer access to any

17  financial information upon request and shall produce evidence

18  to the probation officer to the effect that income and other

19  tax returns have been duly filed as required by law;

20        He shall submit his person, residence, office, or

21  vehicle to a search conducted by a United States Probation

22  Officer at a reasonable time and in a reasonable manner based

23  upon reasonable suspicion of contraband or of evidence of a

24  violation of a condition of release.  Failure to submit to a

25  search may be grounds for revocation of release.  Mr. Rosario

1  shall warn any other resident that the premises may be subject

2  to searches pursuant to this condition;

3          He shall cooperate in the collection of a DNA sample

4  as directed by the probation officer pursuant to the Revised

5  DNA Collection Requirements in Title 18, United States Code,

6  Section 3563(a)(9).

7          Having considered Mr. Rosario's financial condition,

8  the Court finds that he does not have ability to pay a fine so

9  a fine is not imposed.  A special monetary assessment in the

10  amount of $100 is imposed as to each count, however, for a

11  total of $600 as required by law.

12          (The Courtroom Deputy Clerk speaks to the Judge off

13  the record.)

14          (The Probation Officer approaches the bench to speak

15  to the Judge off the record.)

16          (Respite.)

17          THE COURT:  All right.  Ms. Valentin has reminded me

18  that the four-level increase is applied pursuant to Sentencing

19  Guideline Section 3B1.1(a), not 3A1.1(a).

20          Mr. Rosario, you have a right to appeal because you

21  were found guilty after a plea of not guilty.  A Notice of

22  Appeal must be filed in District Court within ten days from the

23  date when the judgment of the Court will be entered.  You have

24  a right to appeal -- for leave to appeal *in forma pauperis* if

25  you are unable to pay the cost of an appeal.

1          Because you are represented by Court-appointed

2     counsel, he will continue to represent you through appeal, if

3     any, unless a substitute counsel is later appointed at your

4     request.

5          You will be given credit toward your sentence for any

6     days spent in federal custody in connection with the offenses

7     to which sentence has been imposed.

8          The Court directs that the transcript of the

9     sentencing proceedings be forwarded to the Sentencing

10    Commission, the United States Bureau of Prisons, and the

11    probation office within 30 days.

12         Anything else, Counsel?

13         MR. DOLZ-SANCHEZ:  No, your Honor.  Permission to

14    withdraw.

15         MR. MEEKS:  None from the Government.

16         THE COURT:  Okay.

17

18

19

20         (The hearing of this cause concluded at 12:25 p.m., on

21    August 18, 2010.)

22

23

24

25

1                    **R E P O R T E R ' S     C E R T I F I C A T E**

2
   UNITED STATES DISTRICT COURT )
3                               ) ss.
   OF PUERTO RICO               )

4

5        I, **ROLAYNE M. VOLPE**, Certified Court Reporter, CCR, and

6   Registered Professional Reporter, RPR, do hereby certify that

7   the transcript of the foregoing proceedings accurately reflects

8   the events that occurred before me to the best of my ability at

9   the time and place set out on the caption hereto, the witnesses

10  having been duly cautioned and sworn, or affirmed, to tell the

11  truth, the whole truth, and nothing but the truth.

12       I FURTHER CERTIFY that I am neither counsel for, related

13  to, nor employed by any of the parties to the action in which

14  these proceedings were taken or to any attorney or counsel

15  employed by the parties hereto, nor financially interested,

16  directly or indirectly, in the outcome of this action.

17       CERTIFIED AND SIGNED on this 24th day of January, 2011.

18

19                                      S/: _Rolayne M. Volpe_
20                                      ROLAYNE M. VOLPE, CCR, RPR
                                        Certified Court Reporter and
21                                      Registered Professional Reporter

22

23

24

25


                       ROLAYNE M. VOLPE, CCR, RPR
         COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
                             787-772-3482