1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF PUERTO RICO

3

4    UNITED STATES OF AMERICA,      )
                                    )
5                  Plaintiff,       )  Case No. 08-0310
                                    )
6            vs.                    )
                                    )
7    WILFREDO ROSARIO-CAMACHO,      )
     LUIS RODRIGUEZ-SOSTRE,         )
8    JOSUE PEREZ-MERCADO,           )
     RAMON MAYSONET-SOLER,          )
9    JOSE NEGRON-SOSTRE,            )
                                    )
10                 Defendants.      )

11

12                      EVIDENTIARY HEARING

13           BEFORE THE HONORABLE FRANCISCO A. BESOSA

14                    HATO REY, PUERTO RICO

15              WEDNESDAY, JULY 6, 2011, 9:20 A.M.

16

17   APPEARANCES:

18   FOR THE PLAINTIFF:        OLGA CASTELLON,
                               **TIMOTHY HENWOOD,**
19                             ASSISTANT U.S. ATTORNEYS

20   FOR THE DEFENDANTS:       FRANCISCO DOLZ-SANCHEZ, ESQ.
                               MARIANGELA TIRADO-VALES, ESQ.
21                             MIRIAM RAMOS-GRATEROLES, ESQ.
                               ALEXANDER ZENO, ESQ.
22                             RAMON GARAY-MEDINA, ESQ.
                               JUDITH MIZNER, ESQ.
23                             **JORGE RIVERA ORTIZ, ESQ.**
                               **ALLISON KOURY, ESQ.**
24                             **JUAN HERNANDEZ, ESQ.**
                               **IGNACIO FERNANDEZ, ESQ.**
25

1          **THE CLERK:**   Criminal 08-310, United States of America

2    versus Wilfredo Rosario Camacho, Luis Rodriguez Sostre, Josue

3    Perez Mercado, Ramon Maysonet Soler, Jose Negron Sostre for

4    evidentiary hearing.

5          On behalf of the Government, Assistant U.S. Attorneys

6    Olga Castellon and Timothy Henwood.

7          On behalf of Defendants, attorneys Francisco Dolz,

8    Judith Mizner, Jorge Rivera Ortiz, Mariangela Tirado, Allison

9    Koury, Miriam Ramos, Alexander Zeno, Juan Hernandez Lopez de

10   Victoria, Ignacio Fernandez and Ramon Garay.

11         Defendants are present and assisted by the court

12   interpreter.

13         **MS. CASTELLON:**   Good morning, Your Honor, AUSA Olga

14   Castellon for the Government.   We are ready to proceed.

15         **MR. FERNANDEZ:**   Good morning, Your Honor, Ignacio

16   Fernandez on behalf of Jorge Negron -- I'm sorry, Jose Negron

17   Sostre.   We're ready to proceed.

18         **MR. HERNANDEZ:**   Good morning, Your Honor, Juan J.

19   Hernandez Lopez de Victoria on behalf of Ramon Maysonet Soler.

20   We're ready to proceed.

21         **MS. MIZNER:**   Good morning, Your Honor, Judith Mizner

22   on behalf of Wilfredo Rosario Camacho.   We're ready to

23   proceed.

24         **MR. RIVERA:**   Good morning, Your Honor, Attorney Jorge

25   Rivera on behalf of Luis Rodriguez Sostre.   We're ready to

1    proceed.

2         **MS. KOURY:**  And Allison Koury on behalf of Mr. Perez

3    Mercado.  We're ready.

4         **THE COURT:**  First I want to welcome Ms. Mizner and

5    Ms. Koury to this district.  We have here this evidentiary

6    hearing to supplement the record as requested by Defendants.

7         Mr. Fernandez, you were the person who first requested

8    this hearing.  How would you like to proceed?

9         **MR. FERNANDEZ:**  Well, I would suggest that we present

10   the witnesses that we have subpoenaed and we have contacted,

11   and then just proceed normally through that.  There is a

12   housekeeping matter, which I don't know --

13        **THE COURT:**  Of course.  Go ahead.

14        **MR. FERNANDEZ:**  Okay.  I was talking to my brothers

15   for the Government regarding the U.S. Marshals that were

16   subpoenaed by the Government.  Neither the Government nor I

17   has had a chance to interview them.  So, I mean, obviously I'm

18   very hesitant to call a witness which I haven't interviewed

19   before.

20        I'm not sure how Your Honor would like to address that

21   issue regarding the marshals, if Your Honor would like the

22   Government -- everybody to interview them at the same time in

23   chambers or -- I don't know.

24        **THE COURT:**  Is this necessary?  I don't think it's

25   necessary.

1          **MS. CASTELLON:**  Your Honor, for the Government, AUSA

2    Olga Castellon.  I understand that marshals that are here

3    present, one of them was a former security officer from the

4    court.  The rest were the marshals that were assigned by the

5    U.S. Marshal to be present on the day of January 20th, 2010,

6    during the proceedings of the voir dire, which is basically

7    the controversy and what was presented to the Court.

8          I understand that they could be called.  They

9    shouldn't be interviewed prior to the commencement of this

10   hearing because I think it's a seeking truth hearing, so --

11         **THE COURT:**  Well, my concern is -- and that's the

12   reason I asked you how you wanted to proceed -- was the fact

13   that some of these marshals have been subpoenaed.  And let me

14   ask who -- Mr. Maldonado.

15         **DEPUTY MARSHAL:**  Yes, Your Honor.

16         **THE COURT:**  The marshals who have been subpoenaed,

17   who will be testifying, I would imagine would be outside the

18   courtroom until they are called to testify.  Do you have

19   sufficient marshals in here, other than the ones that have

20   been subpoenaed to testify?

21         **DEPUTY MARSHAL:**  Yes, Your Honor.

22         **THE COURT:**  Fine.  That was my concern.

23         The other concern I have is, obviously, I would

24   imagine that the witnesses would remain in the witness room, or

25   rooms -- I don't know how many witnesses there are -- until

1  they are called.

2          **MR. FERNANDEZ:**  Yes.

3          **THE COURT:**  Okay.

4          **MR. FERNANDEZ:**  Just for the record, the CSO, we will

5  call.

6          **THE COURT:**  Yes, I know.  I know.

7          **MR. FERNANDEZ:**  I was referring basically to --

8          **THE COURT:**  Mr. Sierra?

9          **MR. FERNANDEZ:**  -- the U.S. Marshals.

10          **THE COURT:**  Right.  No, but my concern was that the

11 marshals had here sufficient personnel, as they usually do for

12 security reasons, other than the marshals that will testify.

13 And Mr. Maldonado has said that he does.  All right.

14          **MS. CASTELLON:**  I ask Brother Counsel if he has any

15 of the witnesses present here in the courtroom, so they can

16 step outside.

17          **THE COURT:**  Anybody who is going to be a witness,

18 please go to the witness room.

19          **MR. FERNANDEZ:**  Yes, family members, they don't

20 understand English, so I'm going to ask them in Spanish.  If I

21 may, Your Honor?

22          **THE COURT:**  Of course.  Or have the marshals tell

23 them.

24          **MR. FERNANDEZ:**  Oh, okay.

25          **THE COURT:**  Those who will be witnesses.

1          **MR. FERNANDEZ:**  Yes, Your Honor.

2          **DEPUTY MARSHAL:**  They are all outside.

3          **MR. FERNANDEZ:**  Oh, they're all outside?  Thank you,

4   Marshal.

5          Marshal, is Roberto Santiago outside?  Okay, yes.

6          There is a witness that we are not going to call, who

7   had been subpoenaed, we place him at the -- you know, he's

8   outside, if the Government wishes to interview him or to call

9   him, you know, he's outside.  Otherwise, we would ask the Court

10  to excuse him.

11         **THE COURT:**  All right.  Now, the next question I have

12  is -- Mr. Sierra is a witness, right?

13         **MR. FERNANDEZ:**  Yes.

14         Mr. Sierra, please, could you wait outside?  I'm

15  sorry.

16         **THE COURT:**  All right.  Now, there are five counsel

17  for the Defense.  I would imagine that -- I don't know who is

18  going to be the main counsel who will do the questioning, and

19  then what I don't -- what I wouldn't want is a repetition of

20  the interrogatory by other counsel.

21         If you have any particular question that you think

22  should be asked that wasn't, please go ahead, but please don't

23  repeat matters that have already been covered.  Is that okay?

24         **MR. FERNANDEZ:**  Yes.  They can -- you know, whoever

25  is asking the question, we can walk up and give him or her a

1    piece of paper and we can speed up things that way.

2         THE COURT:  Well, whoever needs reminders, that's

3    fine.

4         Mr. Fernandez, your first witness.

5         MR. FERNANDEZ:  Mr. Sierra.

6         MR. RIVERA:  Your Honor, before we start, could we

7    approach for a second?

8         THE COURT:  Of course.

9         (Whereupon the following proceedings took place at

10   sidebar:)

11        MR. RIVERA:  Jorge Rivera on behalf of Luis Rodriguez

12   Sostre.  My question is the following:  We're going to try not

13   to repeat questions, okay, but the family members basically

14   are going to have more or less the same information.

15        THE COURT:  You may want to try to reach an agreement

16   with the Government as to whether any particular witness would

17   have testified in this manner.

18        MR. FERNANDEZ:  They haven't had a chance to

19   interview the witnesses, which they can if they want to.  I

20   have no objection, of course.  So if they wish to do that, we

21   could certainly all interview them together.

22        THE COURT:  I think what counsel was trying to get at

23   is, not to have five witnesses say the same thing.

24        MR. FERNANDEZ:  Yes.

25        MR. RIVERA:  But what the family members -- I may be

1   wrong, I don't know, but it would seem to me that there would

2   be some repetition as to the events of that day.

3           **THE COURT:**  It could be, depending on the particular

4   family member.

5           **MS. MIZNER:**  I think all of them will be testifying

6   that they were not allowed --

7           **THE COURT:**  Yeah, well, I'm sure that's the basic

8   testimony of all of them.

9           **MR. RIVERA:**  Yeah.  Okay.

10          **THE COURT:**  Unless they have any particular testimony

11  as to who didn't allow them or why they weren't allowed,

12  that's fine.  If you have three family members saying that "I

13  wasn't allowed into court," the Government may stipulate that

14  everybody else is going to say the same thing except any

15  particular -- particulars pertaining to that particular family

16  member.

17          **MS. CASTELLON:**  For the Government, Olga Castellon.

18  I have asked Counsel Fernandez regarding the witnesses that

19  are going to be called to the stand.

20          I understand that they have submitted only two

21  affidavits for the attorneys --

22          **THE COURT:**  Right.

23          **MS. CASTELLON:**  -- for the record, which is a Miriam

24  Ramos Grateroles and Counsel Mariangela Tirado.

25          And as to the witnesses that are relatives, are only

```
 1  for Maribel -- I understand Maribel Rodriguez, who is Defendant

 2  Wilfredo Rosario's sister.

 3            MS. MIZNER:  Yes.

 4            MS. CASTELLON:  And there is another one that

 5  submitted, which is Counselor Rivera's client's sister.

 6            MR. RIVERA:  The wife.  The wife.

 7            MS. CASTELLON:  The wife, that she also submitted

 8  affidavit.

 9            I don't know the names of the other witnesses who will

10  be taking the stand today.  I understand counsel stated that

11  there are three more that they haven't submit any affidavit,

12  and I don't know the names.

13            THE COURT:  Well, the affidavit is hearsay anyway.

14            MS. CASTELLON:  I know, but I don't know the names.

15            THE COURT:  Oh, I see.

16            MS. CASTELLON:  Aside from the fact that I know the

17  names of the ones that were submitting affidavits, I don't

18  know who else is going to be testifying of the relatives.

19            THE COURT:  Is Mr. Maysonet's wife going to testify?

20            MR. HERNANDEZ:  Yes.

21            MS. CASTELLON:  And who else?

22            MS. MIZNER:  Zuheily Otero, who is a friend --

23            MR. HERNANDEZ:  And the attorneys.

24            THE COURT REPORTER:  Ms. Mizner, I'm sorry, can you

25  repeat that?
```

1    **MS. MIZNER:**  I'm sorry, Zuheily Otero, who is a

2  friend of Mr. Rosario's, will be testifying.

3    **MR. HERNANDEZ:**  And the attorneys.

4    **THE COURT:**  How many -- well, let me make one thing

5  clear about the attorneys.  Their affidavit basically states

6  that it's customary in this court -- "this court" being the

7  district -- to close the proceedings for jury selection.  I'm

8  not interested in that.

9    I'm interested in what happened on January 20th, 2010.

10    **MR. FERNANDEZ:**  We are too, Your Honor.

11    **THE COURT:**  Okay.  It really doesn't matter to me

12  whether this has happened before, which I know it has happened

13  before because I know about Judge Cerezo's case.

14    **MR. FERNANDEZ:**  Yes.

15    **THE COURT:**  In that case the attorney did make an

16  objection and it was denied.

17    I don't think the record shows in this case that I

18  closed the courtroom.

19    **MR. FERNANDEZ:**  No, Your Honor.

20    **THE COURT:**  You know, I don't know what the marshals

21  did.  I haven't spoken to the marshals.  I certainly haven't

22  spoken to Mr. Sierra, because, as you know, he no longer works

23  here.

24    **MR. FERNANDEZ:**  Yes, sir.

25    **THE COURT:**  But I just wanted to let you know that

1    I'm not interested in the attorneys testifying as to the fact

2    that this has happened before in this district.

3            As a matter of fact, as I said in my order -- I don't

4    know if you recall the footnote.

5            **MR. FERNANDEZ:**  Yes.  I know.

6            **THE COURT:**  It may be a 2255 on their part.  So I

7    don't know if you want to bring that up or not.

8            **MS. MIZNER:**  Sir, it may also be relevant to a

9    question of waiver or why an attorney did not object, if it

10   was, in their view, a practice in their district, they may

11   have viewed an objection --

12           **THE COURT:**  Well, whether it's a practice in the

13   district or not, it would be an unconstitutional practice, and

14   I don't think that would -- you know.

15           **MR. FERNANDEZ:**  Yeah, the only reason we would bring

16   that up -- and I join my sister -- is precisely that, because

17   we want --

18           **THE COURT:**  What you're saying is that -- what you're

19   saying is that they didn't do it because it would have been

20   futile?

21           **MS. MIZNER:**  Yes, sir.  In their view.

22           **MR. RIVERA:**  In their view.

23           **MS. MIZNER:**  Based on their prior experience.

24           **MR. RIVERA:**  Experience in the district.

25           **MS. KOURY:**  And that would go to whether it was --

1          **THE COURT:**  Come a little closer to the microphone.

2          **MS. KOURY:**  Allison Koury.

3          Your Honor, that would go to the question of whether

4     it was an intentional or knowing or tactical decision, so it

5     has -- the history, a brief history --

6          **THE COURT:**  I don't know, they open themselves up to

7     some tough cross examination.  But, I don't know, we'll see

8     how it goes.

9          **MR. FERNANDEZ:**  I mean, we're not going to waste the

10    Court's time on that very long.

11         **THE COURT:**  I know you're not going to waste the

12    Court's time.

13         **MR. FERNANDEZ:**  I know, Your Honor.  But it's just

14    going to be somewhat of one or two questions regarding that,

15    and that's is it.  And I can assure you, I will move on.

16         But I think it's important to give the Court a sense

17    of --

18         **THE COURT:**  Well, let's see how it goes.

19         **MS. CASTELLON:**  And just for the record, this

20    prosecutor has not interviewed any of the marshals either,

21    because I understand that what we are trying here is to find

22    the truth.

23         **THE COURT:**  No one is saying that if you would

24    interview the marshals, they would say anything but the truth.

25         **MS. CASTELLON:**  I know.  I know.  But I know the

1  counselor has stated that he has not had the opportunity to

2  interview the witnesses, and just for the record, we haven't

3  either.

4       **MR. FERNANDEZ:**  I trust my sister completely.

5       **THE COURT:**  This isn't a civil case where you can

6  have a deposition or something.

7       **MR. FERNANDEZ:**  Oh, no, no, no, no, it's true.  But,

8  you know, it's my responsibility --

9       **THE COURT:**  I understand.

10      **MR. FERNANDEZ:**  -- to try.

11      **THE COURT:**  I understand.  All right.  Okay.  Let's

12  go.

13           (Proceedings held in open court.)

14      **THE COURT:**  Please take Mr. Sierra's oath.

15      **THE CLERK:**  Raise your right hand, please.

16                CARLOS A. SIERRA-MEDINA,

17  after having first been duly sworn to state the truth, the

18  whole truth and nothing but the truth, testified as follows:

19      **MR. FERNANDEZ:**  May it please the Court.

20      **THE COURT:**  You may proceed, Mr. Fernandez.

21                DIRECT EXAMINATION

22  **BY MR. FERNANDEZ:**

23  **Q.**  Mr. Sierra, an honor to see you again.

24      Could you please state your name for the record.

25  **A.**  My name is Carlos Antonio Sierra Medina.

CARLOS SIERRA – (DIRECT BY MR. FERNANDEZ)

1  **Q.**  Could you please state your last employment.

2  **A.**  Here, as a court security officer.

3  **Q.**  What were your duties as a court security officer?

4  **A.**  Well, I will provide security for the court and for the

5  premises of the court and for the functionaries that work in

6  the court.

7  **Q.**  And how long were you a court security officer?

8  **A.**  I was a court security officer for 19 years.

9  **Q.**  And to what judges were you assigned throughout these 19

10 years?

11 **A.**  I was assigned to various judges, but mainly with Your

12 Honor, Judge --

13 **Q.**  Besosa?

14 **A.**  Besosa.

15      **MR. FERNANDEZ:**  Your Honor, if I may cut to the

16 chase.

17      **THE COURT:**  Yes, you better.

18      **MR. FERNANDEZ:**  Yes, to be brief.

19 **BY MR. FERNANDEZ:**

20 **Q.**  Sir, do you recall prior to 2010, what was the practice

21 during voir dire regarding whether or not the public was

22 allowed into the courtroom during voir dire?

23 **A.**  Well, mainly because of the security reasons and space

24 reasons, the jurors will, you know, will take the whole court,

25 unless it was arranged by the attorneys and the judge for the

CARLOS SIERRA - (DIRECT BY MR. FERNANDEZ)

1  family to be inside.

2  **Q.**  How many trials did you participate in in your 19 years?

3  **A.**  I don't remember.

4  **Q.**  Twenty?

5  **A.**  Perhaps 20 or more.  I don't remember.

6  **Q.**  And in those 20 or more trials, do you recall whether the

7  family members were actually allowed into the courtroom during

8  voir dire, and I'm just talking voir dire, not the rest of the

9  trial?

10  **A.**  Well, in some of them, sure, when the attorneys and the

11  judges would get together and allow.  It was their thing.  I

12  was just receiving orders.  But the tendency was that, because

13  of the space and security, the family will not be allowed.

14  **Q.**  That was the general rule?

15  **A.**  I wouldn't call it a general rule, but it was --

16  throughout the years, it was what was done.

17  **Q.**  Did that change at any time?

18  **A.**  As I told you, it changed when the judge and the

19  attorneys --

20  **Q.**  I'm sorry to interrupt you.  When you mention the

21  tendency, did the tendency that you experienced as a court

22  security officer change at some point, and I mean after 2010?

23  **A.**  I don't recall.  I don't recall it changed.

24  **Q.**  Do you recall -- when was your last trial here in court?

25  **A.**  It was about -- it was the Martinez trial.

CARLOS SIERRA – (DIRECT BY MR. FERNANDEZ)

1   **Q.**  You mean this case?

2        **THE COURT:**  No, the Martinez, Hector Martinez trial.

3        **THE WITNESS:**  Hector Martinez.

4   **BY MR. FERNANDEZ:**

5   **Q.**  Oh, I'm sorry, the Hector Martinez trial.  Okay.

6   What date was that, approximately?

7   **A.**  I don't remember.

8   **Q.**  Do you recall, was there any change in the tendency after

9   the Braulio Agosto case came down?

10  **A.**  I don't know because I didn't see the Braulio Agosto, but

11  if you -- what you mean is that the tendency for the family --

12  **Q.**  Yes.

13  **A.**  -- stay outside, yes, it was a practice that the family

14  would stay because of space and security.

15  **Q.**  Now, getting to this case, did you participate as a court

16  security officer in this case, 08-310?

17  **A.**  Yes, sir.

18  **Q.**  Were you present during the voir dire?

19  **A.**  Excuse me?

20  **Q.**  Were you present in court during voir dire?

21  **A.**  Yes.

22  **Q.**  Do you recall whether or not the family members were

23  allowed inside?

24  **A.**  I don't -- I can't -- I don't recall.  I know the Judge

25  met with the attorneys, but to tell you and to avow that I

CARLOS SIERRA – (DIRECT BY MR. FERNANDEZ)

1  remember if the family were in the courtroom, I can't tell

2  you.

3  **Q.**  Okay, fair enough.

4       **MR. FERNANDEZ:**  Could I have a moment to confer?

5       **THE COURT:**  Of course.

6  **BY MR. FERNANDEZ:**

7  **Q.**  Sir, do you recall whether or not you behaved, in this

8  case, or you took any actions contrary to the tendency that

9  you referred to?

10 **A.**  I don't remember.  The only thing I remember in this case

11 is that when the case started, there was one of the family

12 that had small kids, and we -- the kids would interfere with

13 the trial, and we asked the family to --

14 **Q.**  No, but I'm just talking about voir dire, not the trial.

15      So the answer -- just to repeat the question, do you

16 recall whether or not -- strike that.

17      You mentioned a tendency before, correct?

18 **A.**  Uh-huh.

19 **Q.**  Of leaving the families out.  Is that correct?

20 **A.**  Yes.

21 **Q.**  Do you remember any actions that you took in this trial

22 during voir dire that were contrary to that tendency?

23 **A.**  I don't remember.

24 **Q.**  Thank you, sir.

25      **MR. FERNANDEZ:**  Nothing further, Your Honor.

CARLOS SIERRA - (DIRECT BY MR. FERNANDEZ)

1    **THE COURT:**  Any other questions by counsel?

2    **MR. HERNANDEZ:**  Not at this point, Your Honor.

3    **THE COURT:**  Cross examination, please.  Mr. Henwood.

4                    CROSS EXAMINATION

5    **BY MR. HENWOOD:**

6    **Q.**  Good morning, Mr. Sierra.

7    **A.**  Good morning, sir.

8    **Q.**  Sir, you mentioned that, on questions from counsel, that

9    while you were working as a courtroom security officer, during

10   the voir dire, there would be occasions when access from

11   people coming in and out were sometimes limited based on

12   security and space issues; is that correct?

13   **MR. HERNANDEZ:**  Objection, Your Honor.  He never

14   mentioned people coming in and out in his answers.

15   **THE COURT:**  Well, he didn't precisely say that.  But

16   I think that's what the situation is.

17   **BY MR. HENWOOD:**

18   **Q.**  Would that be fair to say?  The question is that when you

19   were doing your job as a CSO, your job was to make sure that

20   this room was secure and that there was access, or spacing

21   issues did not become a problem for the Judge; is that

22   correct?

23   **A.**  Yeah, you could say that.

24   **THE COURT:**  Well, I think the space issue is -- if

25   we're talking about voir dire, the space issue is because of

CARLOS SIERRA - (CROSS BY MR. HENWOOD)

1  the number in the jury venire.

2          **MR. HENWOOD:**  That's what I'm going to get to, Judge.

3          **THE COURT:**  Okay.

4  **BY MR. HENWOOD:**

5  **Q.**  And describe to us, in a multi-defendant case, based on

6  your training and experience, how many people would generally

7  be inside a courtroom like this one where the jury was

8  selected, at the beginning of the voir dire process?

9  **A.**  How many people -- how many jurors?

10  **Q.**  How many potential jurors?

11  **A.**  Sixty, seventy.  It all depends on the magnitude of the

12  trial.

13  **Q.**  And the number of defendants that are going to be --

14  **A.**  And the number of defendants.

15  **Q.**  -- going to trial; is that a consideration?

16  **A.**  Yes.

17  **Q.**  So it's fair to say that during those times, at the

18  beginning and during the voir dire process, that the entire

19  courtroom was full of potential jurors, correct?

20  **A.**  It might be.  I can't remember, but I know there were a

21  lot of jurors because of the number of defendants and the...

22  **Q.**  And you also mentioned that you've done maybe 20 trials

23  throughout your 19 years here as a CSO; is that correct?

24  **A.**  I didn't say 20 trials; I don't remember, but it's...

25  **Q.**  But you've done quite a few, correct?

CARLOS SIERRA - (CROSS BY MR. HENWOOD)

1  A.  Yeah.

2  Q.  I want to turn your attention to one in particular, not

3  this case, but a case that Judge Besosa --

4        THE COURT:  Excuse me, Mr. Henwood.

5        Do you recall, Mr. Sierra, during the voir dire of

6  this case -- I mean, it wasn't in this courtroom, it was in

7  courtroom 4, which is similar to this courtroom and I think

8  it's got about the same number of benches.

9        Do you recall if the jury venire, the jurors that were

10  called, took up the entire courtroom other than the bench where

11  the Defendants were sitting and the bench where the marshals

12  were sitting; do you recall?

13        THE WITNESS:  There is -- I don't recall, but it

14  might have been that they were put, because there were so

15  many, they were put in another courtroom.  It usually happens

16  in this type of trial.

17        MR. HERNANDEZ:  Your Honor, I do have an objection to

18  the answer.  He said that he did not recall, and then he said

19  that it might have been.

20        THE COURT:  Well, that's what he recalls.

21        MR. HERNANDEZ:  For the record.

22        THE COURT:  Go ahead, Mr. Henwood.

23  BY MR. HENWOOD:

24  Q.  Mr. Sierra, I want to turn your attention to a case

25  that --

CARLOS SIERRA - (CROSS BY MR. HENWOOD)

1          **THE COURT:**  Excuse me.  Excuse me.  Would counsel

2  approach.

3          (Whereupon the following proceedings took place at

4  sidebar:)

5          **THE COURT:**  The courtroom deputy has checked the

6  records and there were 75 jurors called for the jury venire.

7          Would you have any problem with me saying that?

8          **MR. FERNANDEZ:**  No.

9          **MS. CASTELLON:**  I think it's in the transcript at

10  some point, we have a discussion at the bench regarding the

11  amount of jurors and I think the number 75 came up.

12          **THE COURT:**  Okay.

13          **MS. MIZNER:**  Judge, does the record show that 75

14  showed up or is that --

15          **THE COURT:**  No, that's 75 showed up.

16          **MS. MIZNER:**  Okay.  Thank you.

17          **MR. FERNANDEZ:**  No problem.

18          **THE COURT:**  I don't know how many were called.

19          (Proceedings held in open court.)

20          **THE COURT:**  The record demonstrates that 75 jurors

21  were actually present on the date the jury selection began.

22          Go ahead, Mr. Henwood.  Sorry for the interruption.

23  **BY MR. HENWOOD:**

24  **Q.**  Now, sir, I want to turn your attention to another case --

25  not the one that brings you here today -- that you worked with

CARLOS SIERRA - (CROSS BY MR. HENWOOD)

1    Judge Besosa, it was the case of Felix Sanabria Morales.  It

2    was a case where I was one of the prosecutors, with Mr. Coker,

3    and the defense attorney was Fernando Carlo.  The case took

4    place in approximately 2009.

5       Do you recall that case?

6             **MR. HERNANDEZ:**  I have an objection on relevance.

7             **THE COURT:**  Well, we will see where this goes.  I

8    don't know where Mr. Henwood is going.

9             Do you recall that case, Mr. Sierra?

10            **THE WITNESS:**  I recall the case, but it isn't a

11   hundred percent in my memory.

12            **THE COURT:**  Well, let me ask you this, do you

13   remember the case of El Chapo?

14            **THE WITNESS:**  El Chapo, yes.

15            **THE COURT:**  That's the one we are talking about.

16            **THE WITNESS:**  Okay.

17            **THE COURT:**  Okay.  Go ahead.

18   **BY MR. HENWOOD:**

19   **Q.**  And in that case, sir, during the voir dire and the jury

20   selection, do you recall that -- and it was taking place in

21   what is now Judge Garcia's courtroom, it used to be Judge

22   Laffitte's.

23            **THE COURT:**  Courtroom number 6.

24   **BY MR. HENWOOD:**

25   **Q.**  Courtroom number 6, and there were a lot of people that

CARLOS SIERRA - (CROSS BY MR. HENWOOD)

1  came as potential jurors.  And in that case, do you recall

2  that defense counsel brought the record -- or brought up for

3  the record the fact that the defendant's family members didn't

4  have a place to sit in the courtroom, and Judge Besosa ordered

5  you to put some chairs, three additional chairs in the

6  courtroom for those family members?

7          **MS. MIZNER:**  Objection.

8  **Q.**  Do you recall that?

9          **MR. HERNANDEZ:**  Objection, relevance.

10         **THE COURT:**  Overruled.  Overruled.  You mentioned at

11 sidebar that you wanted some of this testimony as to the

12 proceedings in this district.

13         **MR. HERNANDEZ:**  As to this case.

14         **THE COURT:**  So I'm going to allow the question.

15         **THE WITNESS:**  Yes, now that I remember, we took

16 chairs from other courtrooms and put them.

17 **BY MR. HENWOOD:**

18 **Q.**  So in that case, when it was brought to the Court's

19 attention and your attention by defense counsel, arrangements

20 were made for the family members, correct?

21 **A.**  Okay.  As I told the attorney, when the attorneys and the

22 judge get together and they arrange that the family could be

23 in the trial, yes.

24 **Q.**  And during the jury selection, Mr. Sierra, when you worked

25 with Judge Besosa during jury selections, during the voir dire

CARLOS SIERRA - (CROSS BY MR. HENWOOD)

1  in this case, where were you situated or located?  Were you

2  inside the courtroom or were you outside the courtroom?

3  **A.**  I'm inside the courtroom, and I run with the microphone

4  and the questions, and more--my attention is more to the front

5  than in the back.

6      In a criminal case, there are deputies that could tell

7  you, because they are more -- they are more in the attention

8  of the door.

9  **Q.**  And do you recall standing post or standing guard,

10  throughout the jury selection process, outside of the

11  courtroom during this particular case?

12  **A.**  I don't understand the question.

13  **Q.**  Did you stand outside the courtroom -- in the courtroom

14  where you actually selected the trial, I think it was a couple

15  more down, during the jury selection process were you outside

16  the courtroom at any point?

17  **A.**  No.

18  **Q.**  No.  And you weren't standing out by the door at any

19  point?

20  **A.**  No, I would be near the door because of the jurors are in

21  different places in the courtroom.

22  **Q.**  But the main part of your work was up here dealing with

23  the jurors, correct?

24  **A.**  (Nodding in the affirmative.)

25          **MR. HENWOOD:**  Nothing further, Your Honor.

CARLOS SIERRA - (CROSS BY MR. HENWOOD)

1          **THE COURT:**  Any redirect?

2          **MR. FERNANDEZ:**  Yes.

3          **THE COURT:**  Mr. Fernandez.

4          **MR. FERNANDEZ:**  Very briefly.

5          **THE COURT:**  Always very briefly.

6          **MR. FERNANDEZ:**  Yeah, I know, Your Honor.  I think I

7   have been so far.

8          **THE COURT:**  Go ahead.

9                        REDIRECT EXAMINATION

10  **BY MR. FERNANDEZ:**

11  **Q.**  Sir, Your Honor mentioned that there were 75 potential

12  jurors on this case.

13      Now, in your experience, would 75 potential jurors take up

14  the whole courtroom, all the benches and all the jury seats,

15  except, of course, where the defendants and the marshals were

16  sitting?

17  **A.**  Yes, I think so.  I think that 75 will take the whole...

18  **Q.**  Do you recall in this case whether any of the attorneys

19  spoke to the Judge or spoke to you regarding the family

20  members, that provisions be made so they could come in,

21  despite the fact that the courtroom was full?

22  **A.**  I know they met with the Judge, but I don't -- you know, I

23  wasn't there, I can't recall.

24  **Q.**  When a juror was dismissed, did you walk the juror out?

25  **A.**  Excuse me?

CARLOS SIERRA – (REDIRECT BY MR. SIERRA)

1  **Q.**  When a juror, a potential juror was dismissed, did you

2  walk him out?

3  **A.**  Open the door and the juror could go.

4  **Q.**  Was the door locked or open?

5  **A.**  Excuse me?

6  **Q.**  The door, was it locked or open -- or unlocked, I'm sorry.

7  **A.**  Unlocked.

8  **Q.**  Unlocked.  Okay.  Who had control of the door?  I mean,

9  who would let people come in and out of the courtroom during

10 voir dire?

11 **A.**  Well, various persons; the deputies, they are guarding the

12 defendants, and myself.

13 **Q.**  Do you recall if people could just walk in during --

14 **A.**  No, I don't -- I can't recall that.

15         **MR. FERNANDEZ:**  Thank you, Your Honor.

16         Nothing further.

17         **THE COURT:**  Thank you, Mr. Sierra.  You're excused.

18         **THE WITNESS:**  Let me say that it was an honor to

19 serve in this court, Judge.

20         **THE COURT:**  Thank you.  You're excused.

21         Next witness, please.

22         **MS. MIZNER:**  Your Honor, I ask that Maribel

23 Rodriguez --

24         **THE COURT:**  Maribel Rodriguez.

25         **MS. CASTELLON:**  Your Honor, before Sierra is about to

CARLOS SIERRA - (REDIRECT BY MR. SIERRA)

1  get excused, can he -- can he be around just in case the

2  Government wants to re-call him?

3          **THE COURT:**  Of course.  Please tell Mr. Sierra not to

4  leave.

5          **THE CLERK:**  Raise your right hand, please.

6                          MARIBEL RODRIGUEZ,

7  after having first been duly sworn to state the truth, the

8  whole truth and nothing but the truth, testified with the

9  interpreter as follows.

10         **THE WITNESS:**  Do I have to answer "yes", or -- I

11  swear.

12         **THE COURT:**  That's fine.

13         **MR. FERNANDEZ:**  Your Honor --

14         **THE COURT:**  Yes.

15         **MR. FERNANDEZ:**  -- we have the pleasure of Attorney

16  Candice Pimentel.  She's in the mentoring program.  She asked

17  me to sit at Defense table, and if Your Honor so permits, we

18  will be happy to have her.

19         **THE COURT:**  Candice Pimentel?

20         **MS. PIMENTEL:**  Yes.  Thank you.

21         **THE COURT:**  Of course.  I've heard a lot of good

22  things about Ms. Pimentel by one of her professors.

23         **MS. PIMENTEL:**  Oh, really?

24         **THE COURT:**  Not about you, Mr. Fernandez.

25         **MR. FERNANDEZ:**  Well...

MARIBEL RODRIGUEZ - (DIRECT BY MS. MIZNER)

1        **MS. PIMENTEL:**  Maybe I shouldn't be sitting next to

2    him, right?

3        **MR. FERNANDEZ:**  It's all lies, Your Honor.

4        **THE COURT:**  All right.  Go ahead, Ms. Mizner.  Thank

5    you.

6                    <u>DIRECT EXAMINATION</u>

7    **BY MS. MIZNER:**

8    **Q.**  Good morning.  Could you please state your name for the

9    record.

10   **A.**  Maribel Rodriguez.

11   **Q.**  And do you know any of the Defendants in this case?

12   **A.**  Yes.

13   **Q.**  Whom do you know?

14   **A.**  My brother.

15   **Q.**  And your brother's name is?

16   **A.**  Wilfredo Rosario Camacho.

17   **Q.**  And did you attend your brother's trial in this

18   courthouse?

19   **A.**  Yes.

20   **Q.**  Did you come to the courthouse the day that the jury was

21   selected?

22   **A.**  Yes.

23   **Q.**  And do you remember the date?

24   **A.**  Yes.

25   **Q.**  And it was?

MARIBEL RODRIGUEZ - (DIRECT BY MS. MIZNER)

1   **A.**   The 20 of January 2010.

2   **Q.**   And what time did you arrive at the courthouse?

3   **A.**   About 8:30.

4   **Q.**   Where did you go when you arrived?

5   **A.**   When we came inside here?

6   **Q.**   When you arrived at the courthouse.

7   **A.**   We came to the hallway.

8   **Q.**   And what happened while you were in the hallway?

9   **A.**   We were waiting, and then we saw the process when the jury

10  was getting inside of the courtroom.

11  **Q.**   And where were you at that time?

12  **A.**   I was in the hallway.

13  **Q.**   Continue describing what happened.

14  **A.**   Sitting right in front of the door.

15  **Q.**   Which courtroom?  It was not this courtroom, was it?

16  **A.**   No, it was the last one, I believe it's number 6, but I'm

17  not sure.

18  **Q.**   So you were sitting outside and the potential jurors

19  came -- went into the courtroom?

20  **A.**   Yes.

21  **Q.**   And what happened after that?

22  **A.**   I tried to get into, but they were -- it could be security

23  officers, marshals, standing in the door, where they open the

24  door, I'm not sure if they were coming outside or if they open

25  the door because I was there, but they asked me if I was a

MARIBEL RODRIGUEZ - (DIRECT BY MS. MIZNER)

1   jury, and I said, "No, I'm a family member of," and they

2   didn't even let me finish.

3       He said, "Okay, well, family members are not allowed until

4   we're finished."

5               THE COURT:  Let me ask you this, Ms. Rodriguez.

6               THE WITNESS:  Yes.

7               THE COURT:  Was this when the jurors were being

8   brought into the courtroom or after they had been seated?

9               THE WITNESS:  It was a lot of, like, people coming

10  inside, outside, so I couldn't remember exactly, but most of

11  the people were, like, inside.

12  BY MS. MIZNER:

13  Q.  Was the door open or shut when you came up to the door?

14              THE COURT:  You mean locked or unlocked?

15              MS. MIZNER:  I guess first whether it was just open

16  or shut when she approached.

17              THE WITNESS:  Yeah, it was shut.  I was about to

18  open, but I'm assuming they -- I mean, he saw me and he opened

19  the door.

20  BY MS. MIZNER:

21  Q.  You never actually pulled the door?

22  A.  Maybe.  I'm not sure, but...

23  Q.  In any event, and you don't -- do you remember what the

24  person who was in here, who was at the door, was wearing?  Was

25  it a uniform or a suit?

MARIBEL RODRIGUEZ - (DIRECT BY MS. MIZNER)

1  A.   It was like a suit.

2  Q.   Did he have a name tag or any identification on his suit?

3  A.   At that time, I didn't actually -- everything happened so

4  fast.

5  Q.   So you -- when you approached the door and either started

6  to open it or it was opened and someone was coming out, that

7  person told you what?

8  A.   If I was from the jury, and I immediately respond, "No,

9  I'm a sister of," and I don't even think he let me finish who

10  I was, sister of who, but he informed me immediately that, you

11  know, I was not allowed until they finished.

12  Q.   So after you were told that you could not come into the

13  courtroom, where did you go?

14  A.   I went back to the bench.  I sit down right in front of

15  the courtroom.

16  Q.   And how long did you stay there?

17  A.   We were there all the day.  It was a very long day.

18  Q.   And did you ever try to go back into the courtroom that

19  day?

20  A.   No, because he informed me that I wasn't allowed, but...

21  Q.   Did anyone ever come out and tell you that you could come

22  into the courtroom?

23  A.   No.

24  Q.   Did you see anything at any time during that day about the

25  courtroom door?

MARIBEL RODRIGUEZ - (DIRECT BY MS. MIZNER)

1    A.   Yes.

2    Q.   And what did you see?

3    A.   Sometime -- in a certain time, actually, someone was

4    blocking the glass of the doors with paper, I guess they taped

5    paper on it so we couldn't see inside.  And I'm assuming --

6    well, I can't say.

7    Q.   Were people -- were there other people outside with you?

8    A.   Yes.

9    Q.   And did any of them approach the door and look into the

10   window?

11   A.   Yes.  We were like -- since we couldn't go inside, at

12   least we -- we were like passing through and trying to at

13   least see what was going on inside or to look at them.

14            MS. MIZNER:  May I have one moment, Your Honor?

15            THE COURT:  Yes, of course.

16            (Pause.)

17   BY MS. MIZNER:

18   Q.   When you say "we were outside," who were you outside with?

19   A.   Family members and friends and other persons from the

20   other codefendants.

21   Q.   Did you see people coming out of the courtroom while you

22   were sitting outside?

23   A.   Coming out of the courtroom?

24   Q.   Coming outside of the courtroom at any time during the day

25   while you were --

MARIBEL RODRIGUEZ - (DIRECT BY MS. MIZNER)

1   A.  Yes, yes.

2   Q.  But you were not allowed into the courtroom at any time

3   during that day?

4   A.  Yes, I didn't saw any -- at least of the people that I

5   knew at that time, weren't going inside, that I noticed.

6   Q.  You were not allowed inside?

7   A.  I was not at any time.

8           MS. MIZNER:  Thank you.

9           THE COURT:  Anybody else, Defense?

10          Cross examination.  Ms. Castellon.

11                    CROSS EXAMINATION

12  BY MS. CASTELLON:

13  Q.  Mrs. Rodriguez, who was representing your brother,

14  Wilfredo Rosario Camacho?

15  A.  Attorney Dolz, Francisco.

16  Q.  Did you see him on that day?

17  A.  Yes.

18  Q.  You mentioned that you came to the court on that day at

19  8:30, approximately, correct?

20  A.  Uh-huh, yes.

21  Q.  Did you talk to Mr. Dolz prior to the commencement of the

22  jury selection?

23  A.  Don't remember.

24  Q.  Did you ask him what was going to happen regarding the

25  court proceedings on that day?

MARIBEL RODRIGUEZ - (CROSS BY MS. CASTELLON)

1   **A.**  Before or during?

2           **THE COURT:**  That day.

3           **THE WITNESS:**  On that day, okay.  Since I was not

4   allowed --

5   **BY MS. CASTELLON:**

6   **Q.**  No, the question is:  Did you talk to Mr. Dolz prior to

7   the commencement of the proceedings on that day?

8   **A.**  Don't remember.

9   **Q.**  You don't know if you talked to Mr. Dolz?

10          **MR. FERNANDEZ:**  Objection, Your Honor.  That's not

11  what she answered.  We have to -- I mean, let's be specific.

12          **THE COURT:**  She said she can't remember if she talked

13  with Mr. Dolz before the proceedings.

14          **MR. FERNANDEZ:**  Before the proceedings.

15          **THE COURT:**  Yeah.

16          **THE WITNESS:**  Yes, before.

17  **BY MS. CASTELLON:**

18  **Q.**  Ma'am, aside from you, who were the other relatives that

19  came with you on that day?

20          **THE COURT:**  You mean relatives of Mr. --

21          **MS. CASTELLON:**  Wilfredo Rosario Camacho.

22          **THE COURT:**  -- Rosario?  Okay.

23          **THE WITNESS:**  My mother.

24  **BY MS. CASTELLON:**

25  **Q.**  What's her name?

MARIBEL RODRIGUEZ - (CROSS BY MS. CASTELLON)

1  A.  Carmen Camacho.

2  Q.  Who else?

3  A.  And a friend of our family.

4  Q.  A friend of the family?

5  A.  Yes.

6  Q.  Not a relative; a friend?

7  A.  A friend.

8  Q.  What's her name or his name?

9  A.  Her name is Zuheily Otero.

10  Q.  Anybody else?

11        THE COURT:  Is this the wife of Mr. Maysonet, Zuheily

12  Otero?

13        THE WITNESS:  My -- oh, no, no, no.

14  BY MS. CASTELLON:

15  Q.  So she's a friend of your family?

16  A.  Yes.

17  Q.  So on that day, do you recall seeing your mother, Carmen

18  Camacho, or Zuheily, talking to Mr. Dolz?

19  A.  Don't remember.

20  Q.  Do you recall when did the proceedings started in this

21  courtroom, the jury selection, the time?

22  A.  Where?

23  Q.  When, on that day.

24  A.  I'm confused, you said when?

25  Q.  When, what time, the time.

MARIBEL RODRIGUEZ - (CROSS BY MS. CASTELLON)

1   **A.**   Oh, in the morning.

2   **Q.**   Around -- do you have the time, the hour?

3   **A.**   I remember that beginning of those days, I believe --

4   **Q.**   No, I'm asking you regarding January 20.

5   **A.**   In the morning.

6   **Q.**   Any specific time?

7   **A.**   Before noon, for sure, and after 9.

8   **Q.**   Do you -- and you mentioned that you were not allowed to

9   go inside the courtroom that the voir dire was being

10  conducted, correct?

11  **A.**   Yes.

12  **Q.**   How many times did you ask that person to go in?

13  **A.**   Which person?

14  **Q.**   The person that you say that didn't allow you to go into

15  the courtroom.

16  **A.**   Once.

17  **Q.**   Can you tell this Court who was that person?

18  **A.**   By name?  No.

19  **Q.**   Can you describe that person physically?

20  **A.**   He was in a suit and I'm assuming -- well, normal height;

21  no.

22  **Q.**   Let me ask you, Mrs. Maribel Rodriguez, how many days did

23  you come to this courtroom to be present in the proceedings

24  against your brother?

25  **A.**   A lot.

1    **Q.**  Many times, correct?

2    **A.**  Yes.

3    **Q.**  More than 20?

4    **A.**  Could be.

5    **Q.**  You are aware that this trial lasted three months,

6    correct?

7    **A.**  Yes.

8    **Q.**  And during those three months, how many times did you go

9    in?

10   **A.**  Many times.

11   **Q.**  And basically, you saw the same persons, the same security

12   officers and the marshals through all the trial, correct?

13          **MR. FERNANDEZ:**  Objection, assuming facts not in

14   evidence, Your Honor, whether the same marshals --

15          **THE COURT:**  Well, that may be true, but that's a

16   question -- the question should be posed in a different way.

17          This person whom you say did not allow you into the

18   courtroom, Ms. Rodriguez, did you see that person during the

19   days that you were present during the trial?

20          **THE WITNESS:**  To be honest --

21          **THE COURT:**  I hope so.

22          **THE WITNESS:**  -- in those first days that we came, I

23   mean, everything was new, at least for me.  So we were like

24   very nervous of everything that was happening.  But I know for

25   sure it was an employee, because that person was in a suit and

MARIBEL RODRIGUEZ - (CROSS BY MS. CASTELLON)

 1  was questioning who was going in.

 2          So I don't think any -- I mean, I don't think, at

 3  least, that I can do that.  I have to be an employee to be able

 4  to do something like that.

 5  **Q.** Did you see that person --

 6          **THE COURT:**  You couldn't tell us if this person -- if

 7  you saw him during those days that you were during the trial.

 8          **THE WITNESS:**  They changed so many times at the

 9  beginning that...

10          **THE COURT:**  Thank you.

11  **BY MS. CASTELLON:**

12  **Q.** So can you describe that person to the Court?

13  **A.** I already did.

14          **MR. FERNANDEZ:**  Asked and answered.

15          **THE COURT:**  Asked and answered.  She said someone in

16  a suit, in a regular tie.

17  **BY MS. CASTELLON:**

18  **Q.** Was it a marshal?

19  **A.** He was in a suit standing at the door.

20  **Q.** Did you tell, at any point during that day, Mr. Dolz what

21  was going on, the fact that you were not allowed to go inside

22  the courtroom?

23  **A.** If I talked to him?

24  **Q.** Did you tell Mr. Dolz, the attorney for your brother,

25  Wilfredo Rosario, what was going on?

1   **A.**   Yes.

2   **Q.**   When?

3   **A.**   As soon as I saw him.

4        **THE COURT:**  Excuse me.  What was going on in the

5   sense that they weren't being allowed into the courtroom?

6        **MS. CASTELLON:**  They were not being allowed inside

7   the courtroom.

8        **THE COURT:**  That's the question.

9        **THE WITNESS:**  Yes, I talked to him as soon as I saw

10  him and get his attention.

11  **BY MS. CASTELLON:**

12  **Q.**   When was that?

13  **A.**   That day.

14  **Q.**   What time?

15  **A.**   I know it was not too late in the afternoon, but -- I

16  don't use a watch and I don't have my cell phone, so I

17  couldn't tell the time.

18  **Q.**   No, I'm asking you, do you recall -- you mentioned that

19  the proceedings started in the morning, so there was a lunch

20  break, correct?

21  **A.**   I will think so.

22  **Q.**   Did you at any point during that lunch break talk to

23  Mr. Dolz?

24  **A.**   I talked to him.

25  **Q.**   Did you tell him what was going on outside the courtroom?

MARIBEL RODRIGUEZ - (CROSS BY MS. CASTELLON)

1  **A.**  That they didn't let me go in?

2  **Q.**  Yes.

3  **A.**  That's correct.  Yes, I informed him and I questioned him.

4  **Q.**  Did you -- what did he say?

5  **A.**  He said that -- exactly what he said, he said, "Don't

6  worry, just wait in here, outside.  It's the procedure, family

7  members are not allowed until we finish with the selection of

8  the jury."

9  **Q.**  And when did that conversation happen?

10  **A.**  That day.

11  **Q.**  Where?

12  **A.**  Out in the hallway.

13  **Q.**  Outside the courtroom?  Outside?

14  **A.**  Yes, because I wasn't allowed to be inside.

15  **Q.**  Who else was there in that conversation?

16  **A.**  Me.

17  **Q.**  You're shrugging; what?

18  **A.**  I said me.

19  **Q.**  Only you?

20  **A.**  Yes.

21  **Q.**  When that was discussed?

22  **A.**  Yes.

23  **Q.**  And you mentioned that something was covering the glass

24  windows that are located in the door of the courtroom,

25  correct?

MARIBEL RODRIGUEZ - (CROSS BY MS. CASTELLON)

1  **A.**  Can you repeat that again?

2  **Q.**  You mentioned in your testimony that something was

3  covering the glass windows for the doors.

4  **A.**  Yes.

5  **Q.**  And that happened through all the day?

6  **A.**  Don't remember.  I remember looking at those papers in the

7  window because we couldn't see inside, but I cannot tell you

8  at what time they took those papers off the windows.

9  **Q.**  Have you discussed this matter after your brother was

10  convicted?

11          **MR. HERNANDEZ:**  Objection.

12          **THE COURT:**  What was the question, again?

13          **MS. CASTELLON:**  Has she discussed this matter with

14  counselors -- and I'm asking and rephrasing the question --

15  with counselors after your brother was convicted.

16          **THE COURT:**  After the case was over?

17          **MS. CASTELLON:**  After the case was done and her

18  brother was convicted.

19          **THE WITNESS:**  With what lawyer?

20  **BY MS. CASTELLON:**

21  **Q.**  With the attorneys that represents your brother.

22  **A.**  He only have one.

23  **Q.**  Which is?

24  **A.**  Dolz.

25          **THE COURT:**  Mr. Dolz.  Now, the question is whether

MARIBEL RODRIGUEZ - (CROSS BY MS. CASTELLON)

1  you discussed this issue with Mr. Dolz after the trial was

2  over.

3        Since the day the trial was over until today, have you

4  discussed this matter about not being allowed in, with

5  Mr. Dolz?

6        **THE WITNESS:**  No.

7  **BY MS. CASTELLON:**

8  **Q.**  And you submitted an affidavit, correct?

9  **A.**  Yes.

10  **Q.**  Who wrote that affidavit, Mrs. Rodriguez?

11  **A.**  I provided with the information to my brother's attorney,

12  and they wrote it for me.

13        **THE COURT:**  Mr. Dolz?

14        **THE WITNESS:**  Based on my information, and they wrote

15  the affidavit for me and they send it to me to make sure that

16  that was exactly what happened.

17        And I went on base and signed the affidavit with a

18  notary.

19  **BY MS. CASTELLON:**

20  **Q.**  A notary?

21  **A.**  Yes.

22  **Q.**  So what you subscribed in front of a notary --

23        **THE COURT:**  Excuse me.  When you said that you

24  provided it to the attorney, was it Mr. Dolz or another

25  attorney?

MARIBEL RODRIGUEZ - (CROSS BY MS. CASTELLON)

1          **THE WITNESS:**  No, Ms. Judith Mizner.

2          **THE COURT:**  Ms. Mizner?

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  Okay.

5    **BY MS. CASTELLON:**

6    **Q.**  And she sent you the document for you to subscribe it

7    before the notary, correct?

8    **A.**  Yes, because they have the office symbol and they know how

9    to put it together.

10         **MS. CASTELLON:**  No further questions, Your Honor.

11         **THE COURT:**  Any redirect, Ms. Mizner?

12         **MS. MIZNER:**  No further questions.

13         **THE COURT:**  Thank you, Ms. Rodriguez.  You're

14   excused.

15         **MS. MIZNER:**  Your Honor, may she stay in the

16   courtroom now?

17         **THE COURT:**  Yes, of course.

18         Next witness.

19         **MS. MIZNER:**  Zuheily Otero.

20         **THE CLERK:**  Raise your right hand, please.

21                   <u>ZUHEILY OTERO GONZALEZ</u>,

22   after having first been duly sworn to state the truth, the

23   whole truth and nothing but the truth, testified with the

24   interpreter as follows.

25         **THE COURT:**  Ms. Otero, please speak into the

ZUHEILY OTERO - (DIRECT BY MS. MIZNER)

1  microphone.

2           **THE WITNESS:**  Okay.

3                     DIRECT EXAMINATION

4  **BY MS. MIZNER:**

5  **Q.**  Could you please state your name for the record.

6  **A.**  Zuheily Otero Gonzalez.

7  **Q.**  Do you know any of the Defendants in this case?

8  **A.**  Yes.

9  **Q.**  Who do you know?

10 **A.**  Wilfredo Rosario Camacho.

11 **Q.**  How do you know him?

12 **A.**  I'm his friend.

13 **Q.**  How long have you known him?

14 **A.**  More than ten years.

15 **Q.**  Did you attend his trial in this case?

16 **A.**  Correct.

17 **Q.**  Did you come to the courthouse the day the jury was

18 selected?

19 **A.**  Yes.

20 **Q.**  Do you remember the date?

21 **A.**  Yes.

22 **Q.**  What was that date?

23 **A.**  January 20, 2010.

24 **Q.**  What time did you arrive at the courthouse?

25 **A.**  At approximately 8:30.

ZUHEILY OTERO - (DIRECT BY MS. MIZNER)

1  **Q.**  Did you come with anyone else?

2  **A.**  Yes, with his family members.

3  **Q.**  Where did you go when you arrived in the courthouse?

4  **A.**  To courtroom number 4.

5  **Q.**  And where is courtroom number 4?

6  **A.**  At the end of the hallway.

7  **Q.**  And when you arrived outside that courtroom, what did you

8  do?

9  **A.**  I headed over to the courtroom marshal to ask him if I

10  could come into the courtroom for the jury selection, to which

11  he told me that I could not go in.

12  **Q.**  And was this person standing inside the courtroom or

13  outside the courtroom when you went over?

14  **A.**  Outside the courtroom.

15  **Q.**  And were you by yourself when you went over to the

16  courtroom?

17  **A.**  Yes.

18  **Q.**  Where did you go after you were told you could not go into

19  the courtroom?

20  **A.**  I proceeded to sit down on the benches that are located

21  outside the courtroom.

22  **Q.**  About what time was that, when you went over to try to get

23  into the courtroom?

24  **A.**  Well, the Defendants had already arrived, because I peeked

25  over into the door, and it was more or less around 10:00.

ZUHEILY OTERO - (DIRECT BY MS. MIZNER)

1  **Q.**  And while you were sitting outside, did you see people

2  going in and out -- other people going in and out of the

3  courtroom?

4  **A.**  The members of the jury.

5  **Q.**  And how long did you sit outside the courtroom?

6  **A.**  All day.

7  **Q.**  Did you take a lunch break?

8  **A.**  Yes.

9  **Q.**  And did you see anything about the door when you were

10  sitting outside?

11  **A.**  Yes, I did.

12  **Q.**  What did you see?

13  **A.**  That Mr. Sierra, the courtroom security officer, put some

14  papers up against the windows of the door.

15  **Q.**  And how did you know his name was Mr. Sierra?

16  **A.**  Because I had come on previous occasions to the status

17  conferences and he had identified himself.

18  **Q.**  Was Mr. Sierra the person who told you you could not come

19  into the courtroom?

20  **A.**  Correct.

21  **Q.**  And did anyone ever come out of the courtroom and tell you

22  that you could go into the courtroom at any time during that

23  day?

24  **A.**  No.

25        **MS. MIZNER:**  May I have one moment, Your Honor?

ZUHEILY OTERO - (DIRECT BY MS. MIZNER)

 1          **THE COURT:**  Any further questions from defense

 2  counsel?  Cross examination.

 3          **MR. HENWOOD:**  I think she's conferring.

 4          **THE COURT:**  Oh, I'm sorry.

 5          (Pause.)

 6          **MS. MIZNER:**  Thank you, Your Honor.  No further

 7  questions.

 8          **THE COURT:**  Cross examination, Mr. Henwood.

 9          Oh, I'm sorry, did you have any questions, sir?

10          **MR. RIVERA:**  I just jumped ahead.

11                          CROSS EXAMINATION

12  **BY MR. HENWOOD:**

13  **Q.**  Good morning, ma'am.

14  **A.**  Good morning.

15  **Q.**  Ms. Otero, you said that you're a friend of Mr. Wilfredo

16  Rosario Camacho?

17  **A.**  Correct.

18  **Q.**  Could you describe the nature of your relationship with

19  him?

20  **A.**  Well, we knew each other from school.

21  **Q.**  Do you have a sentimental relationship with him?

22  **A.**  Right now I do.

23  **Q.**  And when did that begin?

24  **A.**  Approximately almost a year ago.

25  **Q.**  Now, you said you came with some family members of

ZUHEILY OTERO - (CROSS BY MR. HENWOOD)

1  Mr. Rosario Camacho, correct?

2  **A.**   Correct.

3  **Q.**   Who were those family members?

4  **A.**   His mother and his sister.

5  **Q.**   Do you know their names?

6  **A.**   Yes.

7  **Q.**   What are their names?

8  **A.**   Maribel Rosario and Carmen Camacho.

9  **Q.**   Ma'am, did you discuss your testimony or what you would be

10  testifying about here in court today with anyone prior to

11  coming?

12  **A.**   Yes.

13  **Q.**   Who did you discuss your testimony with?

14  **A.**   With Judith Mizner.

15  **Q.**   And what did you talk about when you spoke with

16  Ms. Mizner?

17  **A.**   She interviewed me to verify whether I was present, to

18  which I told her that I was.

19  **Q.**   Did you do any -- did you write anything, any versions of

20  what took place on that day?

21  **A.**   No.

22  **Q.**   Do you know if she was taking notes when she interviewed

23  you?

24  **A.**   Yes.

25  **Q.**   Did you look at those notes?

ZUHEILY OTERO - (CROSS BY MR. HENWOOD)

1  A.  No.

2  Q.  Now, you stated that Mr. Sierra, you knew who he was

3  because you had attended a few of the status conferences or

4  one of the status conferences; is that correct?

5  A.  Yes, the conferences on the case.

6  Q.  And it was Sierra that told you you couldn't come in;

7  you're sure of that?

8  A.  Yes.

9  Q.  Where did that take place?

10  A.  In front of courtroom number 4.

11  Q.  So it was outside of the courtroom?

12  A.  Correct.

13  Q.  In the hallway?

14  A.  Right in front.

15  Q.  And you said it was Sierra that put the paper on the

16  glass; is that correct?

17  A.  Correct.

18  Q.  Was the paper on the glass the entire day?

19  A.  No.

20  Q.  When did the paper go up?

21  A.  When we came back from lunch.

22  Q.  Who did you eat lunch with that day?

23         MR. FERNANDEZ:  Objection, relevance, Your Honor.

24         THE COURT:  Well, we'll see where this goes.

25         THE WITNESS:  With the family members.

ZUHEILY OTERO - (CROSS BY MR. HENWOOD)

1   **BY MR. HENWOOD:**

2   **Q.**   Do you know who represented Wilfredo at the trial, who was

3   his trial counsel?

4   **A.**   Yes.

5   **Q.**   Who?

6   **A.**   Francisco Dolz.

7   **Q.**   Have you spoken with Mr. Dolz before?

8   **A.**   Yes, I have.

9   **Q.**   Did you speak to him the day of the jury selection?

10  **A.**   Yes, I spoke with him.

11  **Q.**   When?

12  **A.**   When we got there, I asked him if I could go in, to which

13  he also notified me that I could not go in.

14  **Q.**   Why did he say you couldn't go in?

15  **A.**   That it was a practice carried out in Puerto Rico; that it

16  was a process between the jury, the codefendants and the

17  attorneys.

18  **Q.**   So that was in the morning before the proceedings began?

19  **A.**   Correct.

20  **Q.**   Despite his words to you, though, you still tried to go

21  into the courtroom?

22  **A.**   Yes, I did.

23  **Q.**   And did you talk to him during the breaks or at the lunch

24  period?

25  **A.**   No.

ZUHEILY OTERO - (CROSS BY MR. HENWOOD)

1   **Q.**  Did you see Maribel having any conversations with him on

2   that date?

3   **A.**  Yes, I did.

4   **Q.**  Were you present with Maribel when he was explaining to

5   you that you wouldn't be able to go in to the jury selection

6   proceedings?

7   **A.**  No, I wasn't.

8   **Q.**  You had a separate conversation with him?

9   **A.**  Correct.

10           **MR. HENWOOD:**  Nothing further, Judge.

11           **THE COURT:**  Any redirect?

12           **MS. MIZNER:**  No, Your Honor.

13           **THE COURT:**  Thank you very much, Ms. Otero.  You are

14   excused.

15           **MR. RIVERA:**  Your Honor, the next witness is Damaris

16   Gonzalez.

17           **THE COURT:**  Damaris Gonzalez.

18           **THE CLERK:**  Raise your right hand, please.

19                   DAMARIS GONZALEZ GUITARD,

20   after having first been duly sworn to state the truth, the

21   whole truth and nothing but the truth, testified as follows:

22           **MR. RIVERA:**  May I proceed, Your Honor?

23           **THE COURT:**  You may proceed, Mr. Rivera.

24

25

DAMARIS GONZALEZ - (DIRECT BY MR. RIVERA)

1                          <u>DIRECT EXAMINATION</u>

2    **BY MR. RIVERA:**

3    **Q.**  Ms. Gonzalez, good morning.

4    **A.**  Good morning.

5    **Q.**  Could you please tell us your complete name for the

6    record.

7    **A.**  Damaris Gonzalez Guitard.

8           **THE COURT:**  Guitard, with a D at the end.

9    **BY MR. RIVERA:**

10   **Q.**  Do you know Mr. Luis Rodriguez Sostre?

11   **A.**  Yes, I do.

12   **Q.**  How are you related to him?

13   **A.**  My husband.

14   **Q.**  Now, taking your attention to January 2010, on

15   January 20th, 2010, did you have occasion to come to the

16   court?

17   **A.**  Yes.

18   **Q.**  For what reason?

19   **A.**  For the trial.

20   **Q.**  Whose trial?

21   **A.**  Of my husband.

22   **Q.**  When you say your husband, you mean Luis Rodriguez Sostre?

23   **A.**  Yes.

24   **Q.**  Do you remember at what time did you arrive at the

25   courthouse that day?

DAMARIS GONZALEZ - (DIRECT BY MR. RIVERA)

1   A.   Yes.

2   Q.   Can you tell us what time, please?

3   A.   8:30.

4   Q.   Now, that day, did you bring anything for Mr. Rodriguez

5   Sostre?

6   A.   Yes.

7   Q.   Can you tell us what did you bring for him?

8   A.   The clothing.

9   Q.   And what did you do with the clothing?

10  A.   I would give it over to the marshals.

11  Q.   Do you remember which marshal?

12  A.   There were several.

13  Q.   And that happened where?

14  A.   In the hallway.

15  Q.   The hallway when you come into the building or hallway --

16  A.   Yes, where we come in.

17  Q.   Now, that day, when did you leave this building, the

18  courthouse, at what time did you leave that day?

19  A.   8:30 at night.

20  Q.   Now, where were you during those hours?

21  A.   In front of the courtroom, sitting on the benches.

22  Q.   Why were you there?

23  A.   Well, I was waiting to be told one thing or another.

24  Q.   Like what?

25  A.   What they were going to do, if they were going to let us

DAMARIS GONZALEZ - (DIRECT BY MR. RIVERA)

1   go in or not.

2   **Q.**  And when you say "go in or not," are you talking about the

3   courtroom?

4   **A.**  Yes.

5   **Q.**  Did you at any time try to go into the courtroom that day?

6   **A.**  Yes.

7   **Q.**  What did you do?

8   **A.**  I was in the bathroom, and when I tried to go into the

9   courtroom, they told us that -- they told me I couldn't go in.

10  **Q.**  And that happened one time, two times, three times?

11  **A.**  One time.

12  **Q.**  Now, on the windows of the door, did you see anything?

13  **A.**  Not when we came in.  Not when we arrived.

14  **Q.**  But later on?

15  **A.**  Yes.

16  **Q.**  What did you see?

17  **A.**  They put white typewriter papers up against the window.

18  **Q.**  Did you see the person or persons that may have put that

19  paper on that window?

20  **A.**  Yes, I did.

21  **Q.**  And do you remember who that person was?

22  **A.**  Yes.

23  **Q.**  Do you know that person's name?

24  **A.**  No, I don't.

25  **Q.**  Can you describe that person to the Court?

DAMARIS GONZALEZ - (DIRECT BY MR. RIVERA)

1   **A.**   Yes, it was the courtroom security officer.

2   **Q.**   Physically, can you describe him?

3   **A.**   Yes, he was chubby, he had no hair.

4   **Q.**   And color skin?

5   **A.**   White.

6   **Q.**   Now, that day, do you know what happened inside

7   Judge Besosa's courtroom?

8   **A.**   No, I don't.

9   **Q.**   And why is that?

10  **A.**   I wasn't told anything.

11  **Q.**   But were you at any time inside the courtroom?

12  **A.**   No.

13  **Q.**   Do you remember what people were around you while you were

14  sitting or standing in front of the courtroom?

15  **A.**   Yes.

16  **Q.**   Can you tell us who?

17  **A.**   The other family members.

18  **Q.**   Whose family?

19  **A.**   Of the Defendants.

20  **Q.**   Now, do you recall who represented Mr. Rodriguez Sostre at

21  trial?

22  **A.**   Yes.

23  **Q.**   Can you tell us the lawyer's name?

24  **A.**   Attorney Tirado.

25  **Q.**   At any time did you talk to her about not being able to

DAMARIS GONZALEZ - (DIRECT BY MR. RIVERA)

1  come into the courtroom that day?

2  **A.**  No.

3  **Q.**  When was the first time that you found out that not being

4  inside the courtroom during the jury selection could have some

5  sort of impact, if any, on Mr. Rodriguez Sostre's case?

6  **A.**  When I was called by the lawyer.

7  **Q.**  Which lawyer?

8  **A.**  You.

9  **Q.**  Last question.  January 20, 2010, at any time were you

10 inside the courtroom?

11 **A.**  No.

12         **MR. RIVERA:**  No further questions, Your Honor.

13         **THE COURT:**  Ms. Castellon, cross examination.

14                    CROSS EXAMINATION

15 **BY MS. CASTELLON:**

16 **Q.**  Mrs. Gonzalez, you mentioned that you are the wife of

17 Mr. Rodriguez Sostre, correct?

18 **A.**  Yes.

19 **Q.**  And he is serving a life sentence, correct?

20 **A.**  Yes.

21 **Q.**  And he is in prison outside Puerto Rico?

22 **A.**  Yes.

23 **Q.**  You mentioned that you were aware that this could have an

24 impact on your husband's case after he was convicted?

25 **A.**  Yes.

DAMARIS GONZALEZ - (CROSS BY MS. CASTELLON)

1  **Q.**  And you mentioned that you didn't discuss this matter, the

2  fact that you were not allowed to go inside the courtroom on

3  that day, with Counsel Tirado.

4  **A.**  We did not discuss it.

5  **Q.**  And January 20th, you arrived early to this courtroom?

6  **A.**  Yes.

7  **Q.**  That was first day of trial for your husband?

8  **A.**  Yes.

9  **Q.**  That was a very important day for you?

10  **A.**  Yes.

11  **Q.**  And you wanted to be here present in the courtroom?

12  **A.**  Yes.

13  **Q.**  And you're telling this Court that you didn't complain to

14  the attorney who was representing your husband that you were

15  not allowed to go in?

16  **A.**  No, I did not complain.

17  **Q.**  You did not complain the 20th?

18  **A.**  No.

19  **Q.**  Nor in the morning, nor in the afternoon?

20  **A.**  No.

21  **Q.**  And through all the three-month trial, you didn't

22  complain?

23       **MR. RIVERA:**  Objection, Your Honor.  About what?

24       **THE WITNESS:**  No.

25

DAMARIS GONZALEZ - (CROSS BY MS. CASTELLON)

1      **MS. CASTELLON:**  About not being let in the courtroom.

2      **THE WITNESS:**  No.

3  **BY MS. CASTELLON:**

4  **Q.**  And you mentioned that other relatives were not allowed to

5  go inside the courtroom.

6  **A.**  Yes.

7  **Q.**  Who were they?

8  **A.**  Well, all of the other relatives of the Defendants.

9  **Q.**  Who were they?

10  **A.**  Well, Pepon's wife.

11  **Q.**  Names, ma'am?

12  **A.**  Suheil.  Tito's family members.

13  **Q.**  Tito being Wilfredo Rosario?

14  **A.**  Yes.  Josue's sister and myself.

15  **Q.**  And you mentioned that the person who did not allow you to

16  go inside the courtroom was the security officer.

17  **A.**  Yes.

18  **Q.**  And you described that person.

19  **A.**  Yes.

20  **Q.**  And you saw that person through all the trial?

21  **A.**  Yes.

22  **Q.**  Where was he standing on January 20th, when you mentioned

23  that the court security officer didn't allow you to go in?

24  **A.**  He was standing next to the jury.

25  **Q.**  Where?

DAMARIS GONZALEZ - (CROSS BY MS. CASTELLON)

1  **A.**  (Indicating).

2  **MS. CASTELLON:**  Just for the record, Your Honor, the

3  witness just pointed to the jury bench where they were seated.

4  **BY MS. CASTELLON:**

5  **Q.**  So you were inside the courtroom when you were not

6  allowed?

7  **A.**  No.

8  **Q.**  You mentioned that he was inside the courtroom?

9  **A.**  Who?

10  **Q.**  The security officer.

11  **A.**  The officer was; I wasn't.

12  **Q.**  And where did that event specifically, I'm asking you,

13  where did that person who didn't allow you to go in, where did

14  that happen?

15  **A.**  At the door.

16  **Q.**  At the door.  Inside the courtroom?

17  **A.**  No.

18  **Q.**  So he was outside the courtroom?

19  **A.**  No, I was outside.

20  **Q.**  And where was he?

21  **A.**  Standing in the doorway.  When we were trying to go in, he

22  would not let us.

23  **Q.**  When you say "we," you're referring to whom?

24  **A.**  Myself and the other family members of the codefendants.

25  **Q.**  Ma'am, who prepared your sworn statement?

DAMARIS GONZALEZ - (CROSS BY MS. CASTELLON)

1   **A.**   I did.

2   **Q.**   Did you write it down?

3   **A.**   I wrote it.

4   **Q.**   You typed it?

5   **A.**   No.

6   **Q.**   Who wrote it?

7   **A.**   The lawyer.

8   **Q.**   Who was the attorney?

9   **A.**   The lawyer.

10  **Q.**   Attorney Rivera?

11  **A.**   Yes.

12  **Q.**   He was the one who drafted the affidavit?

13  **A.**   No.

14  **Q.**   Who wrote it?

15  **A.**   The lawyer in Vega Baja, but I don't recall the name.

16  **Q.**   And the information that is contained in that sworn

17  statement, who provided it?

18  **A.**   I did.

19  **Q.**   Do you know what is a straight plea?

20          **MR. FERNANDEZ:**  Objection, relevance.

21          **THE COURT:**  I'm sorry, what was the question?

22          **MS. CASTELLON:**  The term straight plea.

23          **MR. FERNANDEZ:**  Objection, relevance.

24          **THE COURT:**  Approach the bench.

25          (Whereupon the following proceedings took place at

DAMARIS GONZALEZ - (CROSS BY MS. CASTELLON)

1   sidebar:)

2          **MR. FERNANDEZ:**  Your Honor, the attorney who is in

3   the mentoring program, she wants to come in.

4          **THE COURT:**  Who?

5          **MR. FERNANDEZ:**  The attorney who is in the mentoring

6   program, she asked me to ask you if she --

7          **THE COURT:**  Of course.

8          **MS. KOURY:**  I'm sorry, Judge, I didn't hear the

9   question.

10          **MS. CASTELLON:**  Does she know -- she has stated that

11   she was the one who provided the information for the affidavit

12   to be drafted.  And I got the objection from counselor --

13          **THE COURT:**  No, the question was --

14          **MS. CASTELLON:**  If she knows the term straight plea.

15          I'm referring to her sworn statement, Paragraph 3,

16   where she says that "The trial in criminal case 08-310 was

17   scheduled to start January 19th for three of the defendants.

18   Luis Sostre, German Hernandez and Jose Rodriguez decided not to

19   proceed to trial, instead they were advised about a straight

20   plea."

21          **MR. FERNANDEZ:**  I withdraw the objection.

22          **THE COURT:**  Okay.

23          (Proceedings held in open court.)

24          **THE COURT:**  The objection has been withdrawn.  So why

25   don't you repeat the question, please.

DAMARIS GONZALEZ - (CROSS BY MS. CASTELLON)

 1  **BY MS. CASTELLON:**

 2  **Q.**  What is a straight plea?

 3  **A.**  Well, something where we didn't reach an agreement.

 4  **Q.**  And you know the term "straight plea"?

 5  **A.**  Yes.

 6  **Q.**  And it's contained in your affidavit?

 7  **A.**  Yes.

 8  **Q.**  I'm going to ask one last question.  If you knew and it is

 9  your testimony today that the person who did not allow you to

10  go inside the courtroom was the court security officer, why

11  you didn't say that before?

12          **MR. HERNANDEZ:**  Objection, Your Honor, as to form;

13  before when?

14          **THE COURT:**  Before today.

15          **MS. CASTELLON:**  Before today.

16          **THE COURT:**  Let me see that affidavit.

17          **MS. CASTELLON:**  Let me rephrase.

18          (Pause.)

19          **THE COURT:**  All right.  Please rephrase the question.

20  **BY MS. CASTELLON:**

21  **Q.**  Mrs. Gonzalez, you subscribe, and you just testified that

22  you subscribed a sworn statement; correct?

23  **A.**  Yes.

24  **Q.**  And it was you who provided the information that is

25  contained in that affidavit?

DAMARIS GONZALEZ - (CROSS BY MS. CASTELLON)

1  A.   Yes.

2  Q.   Isn't it true that in that affidavit you don't mention

3  that the person who did not allow you to go inside the

4  courtroom was the security officer?

5  A.   Yes, I mentioned it.

6          THE COURT:  Excuse me.  Let me ask you this,

7  Ms. Gonzalez.

8          Mr. Velez, will you please stand.

9          The person who did not allow you into the courtroom,

10  Ms. Gonzalez, was he dressed like Mr. Velez?

11          THE WITNESS:  Yes.

12          THE COURT:  Thank you, Mr. Velez.

13  BY MS. CASTELLON:

14  Q.   And in your testimony you mentioned that it was one of the

15  marshals.

16  A.   Yes, for courtroom.

17          MS. CASTELLON:  I have no further questions.

18          THE COURT:  Any redirect, Mr. Rivera?

19          MR. RIVERA:  I have a few questions, yes.

20                      REDIRECT EXAMINATION

21  BY MR. RIVERA:

22  Q.   Ms. Gonzalez, did you have the opportunity to be in this

23  court on January 19, 2010?

24  A.   No.

25          THE COURT:  You mean the courtroom --

DAMARIS GONZALEZ - (REDIRECT BY MR. RIVERA)

1          **MR. RIVERA:**  Not in this courtroom, in the federal

2  building.

3          **THE COURT:**  The whole court.

4          **MR. RIVERA:**  Right.

5          **THE WITNESS:**  Yes.

6  **BY MR. RIVERA:**

7  **Q.**  The 19th, you were present?

8  **A.**  Yes, I was.

9  **Q.**  Why did you come to this building on January 19, 2010?

10 **A.**  Because the trial was going to begin.

11 **Q.**  Did the trial take place that day, did it start?

12 **A.**  No.

13 **Q.**  The information, did you provide to this counsel, did you

14 write it out?

15 **A.**  Yes.

16 **Q.**  In what language did you write that information?

17 **A.**  In Spanish.

18          **MR. RIVERA:**  Nothing further, Your Honor.

19          **THE COURT:**  Thank you very much, Ms. Gonzalez.

20          **MS. CASTELLON:**  Your Honor, if we may, can we get a

21 copy of that?

22          **THE COURT:**  Of the Spanish written?  Yes.  If you

23 have it.

24          **MR. RIVERA:**  I have it here.

25          **THE COURT:**  Please show it to the Government.

 1          **MR. RIVERA:**  (Handing.)

 2          **MS. CASTELLON:**  Can we approach?

 3          **THE COURT:**  Of course.

 4          (Whereupon the following proceedings took place at

 5   sidebar:)

 6          **MS. CASTELLON:**  Just for the record, I'm referring to

 7   the document that was just provided to us regarding

 8   Mrs. Damaris Gonzalez's testimony, written in Spanish by

 9   herself, and it has a date and we would like to address to the

10   attention the Court that she mentioned in that document that

11   the jury selection lasted two days.

12          **THE COURT:**  Let me see.  And?

13          **MS. CASTELLON:**  And the sworn statement subscribed by

14   Damaris Gonzalez that is part of the record states that the

15   jury selection was postponed for the following date,

16   January 20th and 21.  And she says that on those days, which

17   she's not referring to a single day, she's referring to two

18   days, the jury selection took place.  It's contrary to the

19   testimony that is presented that it was one day.

20          **THE COURT:**  So what do you want to do?

21          **MS. CASTELLON:**  I'm going to cross examine, but I'm

22   going to request that this document, the document that it was

23   written, handwritten by this witness, to be also -- to be

24   translated and be part of the record, because it's totally

25   inconsistent with what is stated in the sworn statement and

1  her testimony here in the courtroom.

2         THE COURT:  Well, I don't know if it's totally

3  inconsistent.

4         MS. CASTELLON:  She's saying that one day it happened

5  the jury selection and the day after was the day that the

6  courtroom was closed, the papers was placed on the glass

7  windows.

8         MR. RIVERA:  If I'm not mistaken --

9         THE COURT:  Hold on.

10        All right.  We will mark it as part of the record, but

11 you're going to have to get the translation.

12        MS. MIZNER:  Your Honor, was the jury called to come

13 into court on the 19th?

14        THE COURT:  Let me -- I don't recall.  Let me ask my

15 courtroom deputy.

16        (Pause.)

17        We're going to have to ask the jury clerk to see

18 whether jurors were actually requested to come in on the 19th,

19 but what my courtroom deputy tells me, and my recollection is,

20 that they were not brought to the courtroom because we took

21 these pleas, and what we did was -- I probably told them to

22 come the next day.

23        MS. CASTELLON:  If I may, Your Honor.

24        THE COURT:  We'll find out.

25        MS. CASTELLON:  I remember from reading transcripts

1  of the jury selection, that one of the jurors is asked

2  regarding an incident; that there was an objection, that he

3  was discussing -- that he knew one of the Defendants and that

4  he discussed that with the fellow members of the jury panel.

5  And he mentioned that they were in an assembly room that they

6  had the day before.  So that situation is addressed, that they

7  were outside the courtroom, that they were in the assembly

8  room.

9          **THE COURT:**  They were in the jury assembly room.

10          **MS. CASTELLON:**  But not here.

11          **THE COURT:**  But they were not brought into court

12  because we were going to take those straight pleas.

13          **MS. MIZNER:**  Thank you, Your Honor.

14          **MR. RIVERA:**  Which is what she says in the affidavit.

15          **THE COURT:**  Well, no, but I think what Ms. Castellon

16  is saying, it says here -- and I'm translating as well as I

17  can -- it says:  While the selection was being conducted in

18  courtroom number 3 of Judge Francisco Besosa, we were not

19  allowed to enter the courtroom, and on the next day, they

20  placed white paper -- white typewritten paper -- typewriter

21  paper in the windows of both doors to obstruct the vision of

22  the family members to the courtroom.  That's what it says.

23          **MR. RIVERA:**  It's consistent with her testimony, if

24  it's one day, you know, it's proceedings.

25          **THE COURT:**  No, I think there may be a difference.

1  So we will mark that for the record and have that translated

2  by tomorrow.

3          **MS. CASTELLON:**  Your Honor, I doubt we will have it

4  by tomorrow.  I have to make the request.

5          **MR. HENWOOD:**  Can we have the interpreter read it, it

6  will take a minute or two minutes, at the end of the

7  proceedings?

8          **THE COURT:**  Yes, we can do that.

9          (Proceedings held in open court.)

10                     RECROSS-EXAMINATION

11  BY MS. CASTELLON:

12  **Q.**  Mrs. Gonzalez --

13          **MS. CASTELLON:**  Can we have the document marked so we

14  can show it to the witness?

15          **THE COURT:**  Of course.  Any objection?

16          **MR. FERNANDEZ:**  No, Your Honor.

17          **MR. RIVERA:**  No, Your Honor.

18          **THE CLERK:**  Government's Exhibit 1.

19          **THE COURT:**  Government Exhibit 1.

20  BY MS. CASTELLON:

21  **Q.**  Mrs. Gonzalez, we are handing you what has been marked as

22  Government's Exhibit 1.

23      Do you recognize the document?

24  **A.**  Yes.

25  **Q.**  What is it?

DAMARIS GONZALEZ – (RECROSS BY MS. CASTELLON)

1  **A.**  What I wrote.

2  **Q.**  It is what you wrote and you gave to the attorney?

3  **A.**  Yes.

4  **Q.**  And it's your statement of what happened during jury

5  selection?

6  **A.**  Yes.

7  **Q.**  That document, Mrs. Gonzalez, you wrote specifically what

8  you recall that happened during jury selection?

9  **A.**  Yes.

10       **MS. CASTELLON:**  Can we approach the witness,

11  Your Honor, so we can have her to read out loud a portion of

12  the document?

13       **THE COURT:**  I think that if we start where I started

14  at sidebar, the sentence that starts with *Mientras*, have her

15  read it in Spanish and Mr. Kavelin can translate it.

16       **MS. CASTELLON:**  Your Honor, can we have her to read

17  out loud the whole document so we can have it on the record

18  and the translation at the time?

19       **THE COURT:**  Well, it's in evidence.  And we can have

20  Mr. Kavelin read an English translation into the record, but

21  as far as this particular item, yes, she can read that in

22  Spanish.

23  **BY MS. CASTELLON:**

24  **Q.**  Ma'am, can you read the part where it specifically

25  mentions the jury selection?

1  **A.**  Yes.

2         **THE COURT:**  Mr. Kavelin, where it starts *Mientras*

3  almost at the bottom.

4         Please read that in Spanish.

5         (Whereupon the witness read in Spanish the portion

6  referred to.)

7         **THE INTERPRETER:**  Does the Court wish the interpreter

8  to read the entire document or that portion?

9         **THE COURT:**  Just that portion now.

10         **THE INTERPRETER:**  "While said selection was being

11  carried out inside courtroom number 3 of Judge Francisco

12  Besosa, we were not allowed to go into the courtroom, and the

13  next day white typewriter paper was placed on the windows of

14  both doors in order to obstruct the view of the family members

15  into the courtroom."

16  **BY MS. CASTELLON:**

17  **Q.**  So, Mrs. Gonzalez, is it your testimony -- and which you

18  wrote down -- that that jury selection lasted two days?

19  **A.**  No.

20  **Q.**  I'm referring to the document.

21  **A.**  Yes, because the first day --

22  **Q.**  Which date it says that the jury selection was conducted?

23  **A.**  January 20th.

24  **Q.**  Any other day?

25  **A.**  No.

DAMARIS GONZALEZ - (RECROSS BY MS. CASTELLON)

1    **Q.**  Let me address your attention, then, specifically to the

2    document, it says 20 and 21.

3    **A.**  Yes.

4    **Q.**  So it says both days, correct?

5    **A.**  Yes.

6          **MS. CASTELLON:**  I have no further questions.

7          **MR. RIVERA:**  Your Honor, just give me a second.

8          Your Honor, can we have the document for a second?

9          **THE COURT:**  Of course.

10         (Pause.)

11                    RE-REDIRECT EXAMINATION

12   **BY MR. RIVERA:**

13   **Q.**  Ms. Gonzalez, more than a year has gone by since the trial

14   started last year, correct?

15   **A.**  Yes.

16   **Q.**  And your testimony before the Court is your best

17   recollection?

18   **A.**  Yes.

19   **Q.**  And the jury selection took place on what day?

20   **A.**  The 20th.

21         **MR. RIVERA:**  Nothing further, Your Honor.

22         **MS. CASTELLON:**  I have a question for her.

23         **THE COURT:**  Go ahead.

24

25

DAMARIS GONZALEZ – (RE-RECROSS)

1                          RE-RECROSS EXAMINATION

2    **BY MS. CASTELLON:**

3    **Q.**  But that isn't what you wrote and what you swore on your

4    affidavit that is part of the record in this case?

5    **A.**  Yes.

6    **Q.**  That it's consistent?

7    **A.**  I wrote it.

8            **THE COURT:**  Thank you very much, Ms. Gonzalez.

9    You're excused.

10           Before we proceed, Mr. Kavelin, would you please read

11   this entire document for the record.

12           **THE INTERPRETER:**  Yes, Your Honor.

13           **THE COURT:**  Into English, translate it into English.

14           **THE INTERPRETER:**  May 10th, 2011.  I, Damaris

15   Gonzalez Guitard, 28 years of age, married, legal, and

16   resident of --

17           **THE COURT:**  Married legally.

18           **THE INTERPRETER:**  Well, legally married and resident

19   of 850 Mercurio Street, Sandin Barriada, Vega Baja, Puerto

20   Rico, 00693.

21           I declare that on January 19th, 2010, I -- there was a

22   trial scheduled to begin, but three of the defendants, Luis M.

23   Sostre, German Hernandez and Jose Rodriguez, decided not to go

24   to trial and were given orientation about a straight plea,

25   which they were in agreement with said orientation.

1    In this way the selection of the jury was postponed

2  for the following day, January 20th, 2010, and on January 21,

3  2010.  During these days, the selection of the jury was held

4  against my husband, Luis O. Rodriguez Sostre, and the other

5  defendants, Josue Perez Mercado, Ramon Maysonet Soler, Jose

6  Negron Sostre and Wilfredo Rosario Camacho.

7    While said jury selection was being done in courtroom

8  number 3 of Judge Francisco Besosa, we were not allowed to go

9  into the courtroom.  And the following day, white typewriter

10  paper was placed on the windows of both doors to obstruct the

11  view of the family members into the courtroom.

12    Cordially, Damaris Gonzalez.

13    Signed, Damaris Gonzalez.

14    **THE COURT:**  Thank you.

15    **MS. CASTELLON:**  Just for record, the document that we

16  were referring that is Mrs. Gonzalez Guitard's sworn

17  statement, is part of the document submitted.  And I don't

18  have the docket number, but it's the response submitted by

19  Luis Rodriguez Sostre.  Luis Rodriguez Sostre replied to the

20  United States' Response in Opposition to Defendant's Motion to

21  Supplement Record On Appeal.  I don't have the docket number,

22  but that document, that sworn statement, it's contained in

23  that response.

24    **THE COURT:**  All right.  Thank you.

25    Next witness, please.  Mr. Hernandez.

```
1          MR. HERNANDEZ:  The next witness will be Suheil Rosa.

2          THE CLERK:  Raise your right hand, please.

3                       SUHEIL ROSA NIEVES,

4  after having first been duly sworn to state the truth, the

5  whole truth and nothing but the truth, testified as follows.

6          THE COURT:  Ms. Rosa, if at any moment you would

7  prefer to answer in Spanish or you need assistance in a

8  particular word, Mr. Kavelin will help you.

9          THE WITNESS:  Thank you.

10         THE COURT:  Please go ahead, Mr. Hernandez.

11         MR. HERNANDEZ:  Thank you, Your Honor.  I request the

12 Court's indulgence if I'm a little bit slow, I'm dealing with

13 the flu.

14                     DIRECT EXAMINATION

15 BY MR. HERNANDEZ:

16 Q.  Good morning, ma'am.  Your name, please.

17 A.  Good morning.  My name is Suheil Rosa.

18 Q.  Second last name?

19 A.  My second last name, Nieves.

20 Q.  Ms. Rosa, do you know any of the Defendants in this case?

21 A.  Yes.

22 Q.  Whom do you know?

23 A.  All of them.

24 Q.  All of them.  Why do you know them?

25 A.  Because we were always together as family.
```

SUHEIL ROSA - (DIRECT BY MR. HERNANDEZ)

1  Q.  As family.  Are you a direct family member of any of them?

2  A.  Yes.

3  Q.  Of whom?

4  A.  I am married to Ramon Maysonet Soler.

5  Q.  You are legally married --

6  A.  Yes.

7  Q.  -- to Mr. Maysonet?

8      I direct your attention to January 2010.

9      Ms. Rosa, I ask you first, were you interested in

10 attending trial in this case?

11 A.  Yes.

12 Q.  You did came to the courthouse?

13 A.  Yes.

14 Q.  On which dates during January, if you remember?

15 A.  All of them.

16 Q.  All of them, starting when?

17 A.  Starting January 19, 2010.

18 Q.  Do you recall at what time you got here on January 19th?

19 A.  It was around 8:00 in the morning, approximately.

20 Q.  With whom you attended the courthouse on January 19th?

21 A.  My mother-in-law, my father-in-law.

22 Q.  Do you recall what happened that day, on January 19th, in

23 relation to the trial in this case?

24 A.  Well, I wasn't aware what was going on in the courtroom

25 because we never attended inside the courtroom.

SUHEIL ROSA - (DIRECT BY MR. HERNANDEZ)

1          **THE COURT:**  We're talking about January 19th?

2          **MR. HERNANDEZ:**  Yeah, we are still on the 19th.

3          **THE COURT:**  Okay.  Thank you.

4  **BY MR. HERNANDEZ:**

5  **Q.**  And during that day, did trial actually commence during

6  that day?

7  **A.**  No.  No.

8  **Q.**  At what time, if any, you departed from the courthouse?

9  **A.**  In the afternoon, around 4, 4:30.

10 **Q.**  Okay.  Were you -- did you came into the courthouse any

11 other day?

12 **A.**  Yes, we came the next day.

13 **Q.**  Which was which number?

14 **A.**  On the 20.

15 **Q.**  On the 20th.  And what happened during the 20th; at what

16 time did you got here?

17 **A.**  When we got here, it was approximately 8, 8:30.

18 **Q.**  Who were you with?

19 **A.**  My mother-in-law, my father-in-law.

20 **Q.**  Can you give us the names of both persons?

21 **A.**  Yes, my father-in-law, Ramon Maysonet Serrano.

22 **Q.**  Okay.

23 **A.**  And my mother-in-law, Carmen Soler Lopez.

24 **Q.**  I ask you, what happened during that day, specific day,

25 January 20th?

SUHEIL ROSA - (DIRECT BY MR. HERNANDEZ)

1  **A.**  Well, when we got here, there were many people in the

2  lobby area.

3  **Q.**  When you say "the lobby area," are you referring to the

4  hallway right  --

5  **A.**  Yes.

6  **Q.**  -- in front of the courtroom?

7  **A.**  Yes, correct.

8  **Q.**  Thank you.

9  **A.**  We just stayed there.  The Defendants came in.  It was in

10  the courtroom number 4.  And we just stayed outside during all

11  day.

12  **Q.**  Did, at any time, did you try to go into the courtroom?

13  **A.**  We were trying to peek through the windows, but every time

14  we peeked, Mr. Sierra came and he told us not to do that, that

15  that wasn't allowed.

16  **Q.**  I'm going to ask you something, before -- I mean, was

17  there a time that you tried to actually go into the courtroom?

18  **A.**  Well, not trying, like going in, no.  I asked my husband's

19  attorney.

20  **Q.**  Which is?  Who is that person?

21  **A.**  Alexander Zeno.

22  **Q.**  Mr. Zeno, you asked Mr. Zeno.  And what happened?

23  **A.**  And he told me that's something that is usual, that the

24  lawyers, prosecutors, judge, defendants and *the posibles*

25  *jurado* --

SUHEIL ROSA - (DIRECT BY MR. HERNANDEZ)

1          **THE INTERPRETER:**  Potential jurors.

2          **MR. HERNANDEZ:**  Prospective jurors.

3          **THE WITNESS:**  -- were only allowed in the courtroom.

4   **BY MR. HERNANDEZ:**

5   **Q.**  So, therefore, you stayed outside trying to peek?

6   **A.**  Yes.

7   **Q.**  And when I say outside -- you correct me if I'm wrong --

8   it's the hallway where the benches are, right in front of the

9   courtroom's door?

10  **A.**  Yes.

11  **Q.**  And then you say you started peeking.

12       Was this during morning hours?  Was it during afternoon

13  hours?  When was that?

14  **A.**  We tried -- I tried at least during -- most of the time we

15  stood here until late at night.

16  **Q.**  And were you able to peek?

17  **A.**  Some of the times, in the morning, yes.

18  **Q.**  And those times, you mentioned to my questions before,

19  that Sierra was the one controlling that peeking --

20  **A.**  Yes.

21  **Q.**  -- is that correct?

22  **A.**  Yes.

23  **Q.**  And why do you say that only during the morning were you

24  peeking?

25  **A.**  Because in the afternoon he put white papers and locked

SUHEIL ROSA - (DIRECT BY MR. HERNANDEZ)

1  the doors, therefore, we couldn't see at all.

2  **Q.**  And why do you say that it was Mr. Sierra?  How do you

3  identify him?

4  **A.**  Because I saw him placing the white papers.

5  **Q.**  And how do you identify Mr. Sierra?  Why do you identify

6  him?

7  **A.**  Because he was always in the room, in the courtroom.

8  **Q.**  So you saw him afterwards?

9  **A.**  Yes.

10  **Q.**  But at any time during the jury selection process during

11  June -- sorry, January 20th, were you able to come into the

12  courtroom?

13  **A.**  No.

14  **Q.**  No time.  At what time did you left the courthouse on that

15  day?

16  **A.**  I would say approximately 9:00 in the night.

17  **Q.**  Nine at night.  And while you were out in the hallway in

18  front of the courtroom, was there anyone coming in or going

19  out of that courtroom?

20  **A.**  The jurors, the ones that were not selected, they were

21  coming out.

22  **Q.**  They were coming out.

23      And do you recall if at any time, point in time, the door

24  was locked in that courtroom?

25  **A.**  Yes.

SUHEIL ROSA - (DIRECT BY MR. HERNANDEZ)

1    **Q.**  Why do you recall that?

2    **A.**  Every time the jurors went out, Mr. Sierra opened and

3    locked.

4    **Q.**  And during the whole January 20th jury selection process,

5    you were outside with the two persons that you mentioned were

6    with you?

7    **A.**  Yes.

8    **Q.**  Was there anyone else outside?

9    **A.**  Yes, other family members of the Defendants.

10   **Q.**  Of which Defendants?

11   **A.**  Of Luis Rodriguez, Jose Negron, Wilfredo Rosario and Josue

12   Perez.

13            **MR. HERNANDEZ:**  Just a second, Your Honor.

14            No more questions.

15            **THE COURT:**  Cross examination.  Mr. Henwood.

16                     <u>CROSS EXAMINATION</u>

17   **BY MR. HENWOOD:**

18   **Q.**  Good morning, Ms. Rosa.

19   **A.**  Good morning.

20   **Q.**  Ma'am, just a few questions.

21       You had a conversation with Alexander Zeno.  He was the

22   attorney for your husband during the trial, correct?

23   **A.**  Yes, that is correct.

24   **Q.**  Do you know if he was a retained attorney or

25   court-appointed attorney?

SUHEIL ROSA - (CROSS BY MR. HENWOOD)

1  A.  I don't understand the question.

2  Q.  Did you all have to pay for him to represent your husband

3  or did the court appoint him as your attorney?

4  A.  No, it was a paying attorney.

5  Q.  When did you have that conversation with him about whether

6  or not you were going to be allowed to go into the courtroom

7  during the jury selection?

8  A.  I don't recall the time exactly, but every time the lawyer

9  came out -- once, I think it was break time or -- well, one of

10  those times I asked him.

11  Q.  And to the best of your recollection, what was that

12  conversation?  Give us the details.

13  A.  I just asked him if we were allowed to go in, and he said

14  that that's a procedure that is always taken like that.

15  Q.  Do you know if other people that were there for other

16  defendants had similar conversations with the attorneys for

17  their particular defendant?

18  A.  I think so, yes.

19  Q.  Were you able to observe any of those conversations?

20  A.  Not observe, not listen to them, but we always commented,

21  like spoke between each other.

22      And like I said, I told them, the other family members, we

23  are not allowed because this is something that is usual.

24  Q.  And do you remember who you had those conversations with?

25  A.  Yes.

SUHEIL ROSA - (CROSS BY MR. HENWOOD)

1    **Q.**   Who?

2    **A.**   Zuheily; my mother-in-law; my father-in-law.

3    **Q.**   Who is Zuheily?

4    **A.**   Zuheily Otero.

5    **Q.**   Do you remember when you had that conversation?

6    **A.**   Right at the moment.

7    **Q.**   And what did you comment amongst each other?

8    **A.**   Nothing, that it's something that we didn't see -- we're

9    not aware of those details.

10   **Q.**   Did you ask the attorney to ask for permission from the

11   Judge to be let in?

12   **A.**   No.

13   **Q.**   Did you see how many -- approximately how many jurors were

14   brought in that morning?

15   **A.**   There were many people here.  I did not count them, sorry.

16   **Q.**   You didn't count them.

17        When you were able to peek in, where were the Defendants

18   seated when you peeked in?

19   **A.**   In the courtroom number 4, right there.

20   **Q.**   Right there.

21   **A.**   Where they are right now.

22   **Q.**   And the marshals, where were the marshals seated?

23        **MR. HERNANDEZ:**   I'm sorry to object, but may we let

24   the record reflect where is "right there."  It's the front

25   bench of the right-hand side of the courtroom, I think that's

SUHEIL ROSA - (CROSS BY MR. HENWOOD)

1  what she said.

2          **MR. HENWOOD:**  That's correct, Judge.

3  **BY MR. HENWOOD:**

4  **Q.**  And where were the marshals seated?

5  **A.**  Behind them.

6  **Q.**  And the jurors were seated in the other available spaces?

7  **A.**  Yes.

8          **MR. HENWOOD:**  Nothing further, Your Honor.

9          **THE COURT:**  Any redirect, Mr. Hernandez?

10                 <u>REDIRECT EXAMINATION</u>

11  **BY MR. HERNANDEZ:**

12  **Q.**  Ms. Rosa, how did you know where people were seated?

13  **A.**  I don't know -- I did not recognize who was sitting where,

14  I just saw a lot of people.

15      I know where the Defendants were.  I know who the lawyers

16  were.  I know who the prosecutors were.  I know where the

17  Judge sits, but I don't know who is who.  I know the marshals.

18  **Q.**  But were you aware of their seating spaces why?  How were

19  you able to see them?

20  **A.**  I just peeked.

21  **Q.**  Because you were peeking?

22  **A.**  Yes.

23  **Q.**  One other question.  You depicted Mr. Sierra.  Was

24  Mr. Sierra dressed as our co-worker here?

25  **A.**  Yes, that is correct.

SUHEIL ROSA - (REDIRECT BY MR. HERNANDEZ)

1          **MR. FERNANDEZ:**  For the record, she means the court

2    security officer.

3    **Q.**  One other question --

4          **MR. HERNANDEZ:**  I withdraw, Your Honor.  No further

5    questions.

6          **THE COURT:**  Thank you very much, Ms. Rosa.  You're

7    excused.

8          **THE WITNESS:**  Okay.  Thank you.

9          **THE COURT:**  Next witness, please.

10         **MR. FERNANDEZ:**  Miriam Ramos, Your Honor.

11         Can we take a five-minute break until we find Miriam?

12         **THE COURT:**  Let's take a break until a quarter of 12.

13         (Recess.)

14         **THE COURT:**  Please take Ms. Ramos' oath.

15         **THE CLERK:**  Raise your right hand, please.

16                    MIRIAM RAMOS GRATEROLES,

17   after having first been duly sworn to state the truth, the

18   whole truth and nothing but the truth, testified as follows:

19         **MR. FERNANDEZ:**  May it please the Court?

20         **THE COURT:**  You may proceed, Mr. Fernandez.

21                    DIRECT EXAMINATION

22   BY MR. FERNANDEZ:

23   **Q.**  Good morning.

24   **A.**  Good morning.

25   **Q.**  It's a pleasure to see you.

MIRIAM RAMOS - (DIRECT BY MR. FERNANDEZ)

1      Could you state your name for the record.

2  **A.**  Miriam Ramos Grateroles.

3  **Q.**  What is your profession?

4  **A.**  Attorney.

5  **Q.**  Are you admitted to this court?

6  **A.**  Yes.

7  **Q.**  When were you admitted?

8  **A.**  1975.

9  **Q.**  About how many -- in those few years that you have been

10 admitted, about how many trials have you tried?

11 **A.**  Honestly, I have lost the account, I cannot tell, but I

12 believe more than 30, more than 40.

13 **Q.**  Between 30 or 40?

14 **A.**  Yes, or 50, more or less.

15 **Q.**  Madam, were you related -- were you an attorney in this

16 case, 08-310?

17 **A.**  Yes, I was.

18 **Q.**  Who was your client?

19 **A.**  Josue Perez Mercado.

20 **Q.**  If I bring your attention to the voir dire of that -- of

21 this case, were you present during voir dire?

22 **A.**  Certainly.

23 **Q.**  Could you tell us pretty much where was everybody sitting,

24 where were Defendants sitting, where were marshals, where were

25 the potential jurors sitting in the courtroom?

MIRIAM RAMOS - (DIRECT BY MR. FERNANDEZ)

1  **A.**  Well, the Defendants were seated where they are now, the

2  marshals behind them.  There were more marshals.  And the jury

3  was in the public, the potential jury members.

4  **Q.**  Did they take up the whole room?

5  **A.**  Yes, yes.

6  **Q.**  Were any family members present during --

7  **A.**  No, they are not allowed.

8  **Q.**  What do you mean they're not allowed?

9  **A.**  Well, it has been a practice, as far as I can remember,

10 that during the jury selection, the public, the family

11 members, are not allowed in court.

12 **Q.**  In those 30 or 40 trials that you have tried, ma'am, did

13 you ever encounter a trial where family members were allowed

14 in?

15 **A.**  None that I recall of, none.

16 **Q.**  Did you have any discussions with any of the marshals or

17 the court officers, to allow, to make any type of provisions

18 to allow the family members to come in during voir dire?

19 **A.**  No, sir.

20 **Q.**  Did you talk -- did you talk to your client or your

21 client's family regarding whether or not they could come into

22 the courtroom regarding -- during voir dire?

23 **A.**  Well, my -- my client's sister, Carla, she brought the

24 clothing the first day and the days after, and the first day

25 she asked me if she could enter into the courtroom, and I say,

MIRIAM RAMOS - (DIRECT BY MR. FERNANDEZ)

1  "No, you are not allowed."

2  **Q.**  And that was your belief at that time?

3  **A.**  Yes.  And as a matter of fact, my client also asked me if

4  his sister could be present, and I told him, "No, she's not

5  allowed."

6  **Q.**  While voir dire was coming up, was taking place, did you

7  notice anything about doors, about the windows?

8  **A.**  Well, they stick a paper in the glass, they stick a paper,

9  and you cannot look from the outside to the inside, nor from

10  the inside to the outside.

11  **Q.**  Do you remember when was that done?

12  **A.**  The paper, I don't recall when it was placed, but I recall

13  that the paper was there.

14  **Q.**  Were you able to see who placed the paper?

15  **A.**  No, no.  No, sir.

16  **Q.**  Would it be fair to say that it wasn't a tactical decision

17  on your part not to allow -- to tell the family members that

18  they couldn't come in?

19  **A.**  A tactical decision?  Not really a tactical decision; the

20  practice in this court is that the public, the family members

21  are not allowed when the jury selection goes on, and it has

22  happened through many years.

23      So it was not tactical, it was just informative.

24  **Q.**  It was just what you thought correct at the time?

25  **A.**  Yes, what I thought was right and what I had seen in many

MIRIAM RAMOS - (DIRECT BY MR. FERNANDEZ)

1  years.

2  **Q.**  Did you object to that?

3  **A.**  No, I did not object.

4  **Q.**  Why not?

5  **A.**  I did not raise the matter because that was the standard

6  proceeding in this court.  I took it for good.

7  **Q.**  For granted, yes.

8  **A.**  Yes.

9           **MR. FERNANDEZ:**  Thank you, ma'am.

10          Nothing further, Your Honor.

11          **THE COURT:**  Cross examination.  Ms. Castellon.

12                        CROSS EXAMINATION

13 **BY MS. CASTELLON:**

14 **Q.**  Mrs. Ramos Grateroles, how long have you been an attorney?

15 **A.**  Since 1975.

16 **Q.**  1975.  And you, as you mentioned, you have tried many,

17 many cases?

18 **A.**  Yes.

19 **Q.**  Are you aware of the Sixth Amendment?

20 **A.**  I believe so.

21 **Q.**  You believe so?

22 **A.**  Yes.

23 **Q.**  Are you aware of the Sixth Amendment?

24 **A.**  Yes.

25 **Q.**  You are aware that your client --

MIRIAM RAMOS - (CROSS BY MS. CASTELLON)

1  A.  I'm sorry, could you approach the microphone so I can hear

2  you.

3  Q.  Can you explain what is the Sixth Amendment right of your

4  client?

5  A.  You want me to explain the Sixth Amendment right?

6  Q.  Yes.

7  A.  Those are the rights that the Constitution provides the

8  defendant, and that he has the right to a public trial, that's

9  one of the ones.  And I believe that's the issue here.

10      He has the right to an attorney, and so forth, there are a

11  lot of Constitutional rights he is entitled to.

12  Q.  And that is the right of your client?

13  A.  Yes, that's correct.

14  Q.  And as part of your duties as an attorney that practices

15  here in federal court, you have the duty to represent your

16  client and assert every right that he has, correct?

17  A.  That's correct.

18  Q.  That's correct.  And it's only him the one who can

19  relinquish his rights, correct?

20  A.  Yes, that's correct.

21  Q.  And you mentioned today that even though you were aware of

22  the Sixth Amendment right and that you had the duty to

23  represent your client -- and I understand your client is Josue

24  Perez Mercado, correct?

25  A.  That's correct.

MIRIAM RAMOS - (CROSS BY MS. CASTELLON)

1  **Q.**  You did not assert his rights?

2          **MR. FERNANDEZ:**  Objection, Your Honor, to the plural,

3  "rights".

4          **MS. CASTELLON:**  Sixth Amendment rights --

5          **THE COURT:**  We're talking here about the right to a

6  public trial; that, everybody knows.

7          **MR. FERNANDEZ:**  Then I withdraw.

8          **THE COURT:**  And the question is whether -- well,

9  let's put it this way, Ms. Ramos:  Did you object to the Court

10 as to the fact that the family members were not allowed in the

11 courtroom during the voir dire?

12         **THE WITNESS:**  No, I did not, Judge.

13 **BY MS. CASTELLON:**

14 **Q.**  You did not make the timely objection, but you discussed

15 that with your client?

16 **A.**  No, I didn't.

17 **Q.**  You mentioned today that you discussed the fact that your

18 client asked you why his sister would not go inside the

19 courtroom, and you said --

20         **THE COURT:**  No, I think the question was that

21 Mr. Perez Mercado asked her whether his sister could be

22 present, and she told him no because of the procedure in this

23 district.

24         I think that was your testimony.  Am I correct,

25 Ms. Ramos?

MIRIAM RAMOS - (CROSS BY MS. CASTELLON)

1          **THE WITNESS:**  Yes, Your Honor.

2   **BY MS. CASTELLON:**

3   **Q.**  But did you explain to your client, Josue Perez Mercado,

4   that he had the right to have a public trial, and that

5   included having his family present here in the courtroom?

6   **A.**  No, I did not.

7   **Q.**  You were not into the details of his rights?

8   **A.**  Not at all.

9   **Q.**  And did you inform him that he had the right to request

10  that from the Court even though it was the practice?

11  **A.**  No, I did not.

12  **Q.**  And you mentioned that that was the practice of this

13  court.  You mentioned this courtroom or the district, all

14  together?

15  **A.**  The district, since we were in Old San Juan.

16  **Q.**  So you mentioned that during all the trials that you have

17  tried through all these years, you've never requested from any

18  judge to have the family members brought inside the courtroom;

19  is that your testimony?

20  **A.**  Yes, that's correct, I have not.

21  **Q.**  And you never have requested from the Court to let members

22  of the public to go inside a courtroom during voir dire; is

23  that your testimony?

24  **A.**  That's my testimony.

25  **Q.**  You are aware of the rulings of the First Circuit in the

MIRIAM RAMOS - (CROSS BY MS. CASTELLON)

1  Owens case, correct?

2  **A.**  Which year was that case?

3         **THE COURT:**  2007.

4  **BY MS. CASTELLON:**

5  **Q.**  The year 2007.

6  **A.**  No, I do not recall.

7  **Q.**  Do you know that as part of your responsibilities as an

8  officer of this court, as an attorney, that you have to be

9  aware of the decisions that are the ones that are ruling in

10  this district and the Supreme Court?

11        **MR. FERNANDEZ:**  Your Honor --

12  **A.**  Yes.

13        **MR. FERNANDEZ:**  Your Honor, I object to this line of

14  questioning.  First of all, it was not brought forth in

15  direct.  And second, I feel that the witness is being

16  badgered.

17        **THE COURT:**  Well, no, wait a minute, wait a minute.

18  There is testimony -- there has been testimony here about the

19  practice of this district.

20        **MR. FERNANDEZ:**  Yes.

21        **THE COURT:**  And I think what Ms. Castellon is getting

22  at is that since 2007, the First Circuit has indicated that --

23  well, I'll read from the Braulio Agosto case.

24        It says, "In Owens, we similarly stressed that closure

25  may be justified only by an overriding interest based on

MIRIAM RAMOS - (CROSS BY MS. CASTELLON)

1  findings that closure is essential to preserve higher values

2  and is narrowly tailored to serve that interest, and held, in

3  Owens, that a Court must consider and reject alternatives to

4  closure before barring public access."

5          So I think what Ms. Castellon is getting at, is that

6  the fact that this case existed -- and, indeed, there is some

7  1984 cases from the Supreme Court that could be, and certainly

8  were, cited with authority in the Presley case -- which, by the

9  way, came down on January 19, 2010.

10         **MR. FERNANDEZ:**  Yes, Your Honor.

11         **THE COURT:**  I think what she's getting at, even

12  though this may have been the practice in the district, there

13  is a Constitutional issue here that the Supreme Court may have

14  decided since 1984 and that the Circuit has certainly decided

15  in 2007.  I think that's what she's getting at.

16         **MR. FERNANDEZ:**  And I certainly don't object to my

17  sister, my sister's question in that respect.

18         What I'm saying is, counsel --

19         **THE COURT:**  Ramos.

20         **MR. FERNANDEZ:**  -- counsel Ramos, I'm sorry, already

21  said that she didn't know Owens, and there is no need to

22  badger her any more.

23         **THE COURT:**  In that sense, yes, I will sustain the

24  objection.

25         **MR. FERNANDEZ:**  Thank you.

MIRIAM RAMOS - (CROSS BY MS. CASTELLON)

1  **BY MS. CASTELLON:**

2  **Q.**  Counselor Ramos, you mentioned -- you understand that it

3  was your duty to object if there was a closing or a closure of

4  a trial or the courtroom in this case, correct?

5  **A.**  You have asked me that, yes.

6  **Q.**  It was your duty?

7  **A.**  Yes.

8  **Q.**  And it was your duty as well to notify the Court the fact

9  that pieces of paper were blocking the view from the

10  courtroom?

11  **A.**  Yes.  And I think it was also your duty to inform the

12  Court --

13       **THE COURT:**  Well, let's not argue.  There is a

14  question pending.  Just answer the question, Ms. Ramos.

15       **THE WITNESS:**  Yes.

16  **BY MS. CASTELLON:**

17  **Q.**  And it's your testimony that it happened and you didn't

18  object?

19  **A.**  That's correct.  You have asked me that several times and

20  I said, "That's correct."

21       **THE COURT:**  Let's not argue, please.

22  **BY MS. CASTELLON:**

23  **Q.**  Counselor, you provided a sworn statement to

24  Counselor Fernandez regarding this incident, correct?

25  **A.**  Yes.

MIRIAM RAMOS - (CROSS BY MS. CASTELLON)

1  **Q.**  And you mentioned, under the penalty of perjury, that on

2  January 20, 2010, the court security officers did not allow

3  family members to the public to be present in the courtroom?

4  **A.**  That's correct.

5  **Q.**  But you were not specific as to which person did not allow

6  the Defendant's family --

7  **A.**  I'm sorry?

8  **Q.**  You did not provide the name of that person?

9  **A.**   No. I was not asked.  I was just asked about what

10  transpired, and I was very brief and I stated in short words

11  what has happened.

12  **Q.**  Who was the person?

13  **A.**  The person, Carla, the sister of my --

14  **Q.**  No, who was the person that you stated that did not allow

15  your client's relatives not to go in?

16  **A.**  The persons were the security officer, but I cannot tell

17  you if it was the one that was appointed here or who it was,

18  but the practice is that the security officer do not allow --

19  **Q.**  I'm not asking you the practice, Counselor.

20         **THE COURT:**  She said she doesn't know.  Somebody,

21  whether it's the security officer or one of the deputy

22  marshals, did it.  She doesn't know who.

23  **BY MS. CASTELLON:**

24  **Q.**  And it's your testimony, since it was standard procedure,

25  that you did not object; that's your testimony?

MIRIAM RAMOS - (CROSS BY MS. CASTELLON)

1  **A.**  Yes.

2  **Q.**  And do you understand that is effective assistance of

3  counsel?

4  **A.**  The Court will determine that.

5         **MR. FERNANDEZ:**  Objection, Your Honor.

6         **THE COURT:**  Sustained.

7         Any redirect, Mr. Fernandez?

8                 REDIRECT EXAMINATION

9  **BY MR. FERNANDEZ:**

10 **Q.**  Madam, were any family members present during voir dire?

11 **A.**  Yes, the sister was present outside, outside, in the hall.

12        **THE COURT:**  Inside the courtroom.

13        **THE WITNESS:**  Inside the courtroom, no, sir.

14        **MR. FERNANDEZ:**  Thank you, ma'am.

15        **THE COURT:**  Thank you very much, Ms. Ramos.  You're

16 excused.

17        **THE WITNESS:**  Good morning.

18        **THE COURT:**  Next witness, please.

19        **MR. HERNANDEZ:**  For the record, this is Attorney

20 Hernandez.  The next witness would be Alexander Zeno.

21        **THE COURT:**  Mr. Zeno.

22        **THE CLERK:**  Raise your right hand, please.

23                 ALEXANDER ZENO,

24 after having first been duly sworn to state the truth, the

25 whole truth and nothing but the truth, testified as follows:

MIRIAM RAMOS - (REDIRECT)

1          **MR. HERNANDEZ:**  May it please the Court?

2          **THE COURT:**  You may proceed, Mr. Hernandez.

3          **MR. HERNANDEZ:**  Thank you, Your Honor.

4                     DIRECT EXAMINATION

5    **BY MR. HERNANDEZ:**

6    **Q.**  Good afternoon, sir.

7    **A.**  Good afternoon.

8    **Q.**  May you state your name for the record.

9    **A.**  Alexander Zeno.

10   **Q.**  Can you state your profession.

11   **A.**  I'm an attorney.

12   **Q.**  You are an attorney.  Since when?

13   **A.**  Nineteen -- January 1997.

14   **Q.**  Have you been admitted to this court?

15   **A.**  Yes, sir.

16   **Q.**  When?

17   **A.**  When?  It was in 1997, I don't remember if it was August

18   or September, around that date.

19   **Q.**  And you practiced in this court since then?

20   **A.**  Yes, sir.

21   **Q.**  Can you tell us, more or less, how many trials have you --

22   **A.**  I've been practicing in this district for about 10

23   years -- well, as a criminal defense attorney in this

24   district, I have been practicing for about 10 years, and in

25   that period I have had two jury trials.

ALEXANDER ZENO - (DIRECT BY MR. HERNANDEZ)

1    **Q.**  And were you part of the Criminal Justice Act panel in

2    this --

3    **A.**  Yes, sir.

4    **Q.**  -- district, or were you not?

5        You were?

6    **A.**  I was until -- I don't remember, I believe it was 2007,

7    2008.

8    **Q.**  Did you participated in this case, 08-310?

9    **A.**  Yes, sir.

10   **Q.**  How did you participated?

11   **A.**  I was the lead attorney for Mr. Ramon Maysonet Soler.

12   **Q.**  I'm going to direct your attention to the jury selection

13   process.

14       Do you recall what happened during the jury selection

15   process?

16   **A.**  Well, most of it.

17   **Q.**  Were the family members of Mr. Maysonet able to come into

18   the courtroom during the jury selection process?

19   **A.**  I don't remember seeing them inside the courtroom.

20           **THE COURT:**  During the jury selection process.

21           **THE WITNESS:**  Correct.

22   **BY MR. HERNANDEZ:**

23   **Q.**  Did you have any conversation with either Mr. Maysonet or

24   his family members concerning their ability to get into the

25   courtroom?

ALEXANDER ZENO - (DIRECT BY MR. HERNANDEZ)

1   **A.**  Not that date.

2   **Q.**  You didn't have one?

3   **A.**  Well, because we did have conversations as to

4   Mr. Maysonet's wife, but not with the jury selection, that's

5   what I'm trying to say.

6       Later on, there were some incidents that provoked that

7   type of discussion.  But as to jury selection, we did not have

8   any type of discussion as to whether or not they had the right

9   or not to come into the courtroom.

10  **Q.**  Did any of them request --

11          **THE COURT:**  Wait a minute.  Wait a minute.  Let me

12  clear something up here, Mr. Zeno.

13          These are conversations with Mr. Maysonet's family?

14          **THE WITNESS:**  With his wife.

15          **THE COURT:**  With his wife.  What about with

16  Mr. Maysonet himself?

17          **THE WITNESS:**  I don't remember ever having a

18  discussion with him as to that.  When I say "his family," I

19  don't mean during jury selection.  After jury selection, there

20  were some instance --

21          **THE COURT:**  We're talking about jury selection.

22          **THE WITNESS:**  All right.

23          **THE COURT:**  You did not -- or you don't recall having

24  any conversation with Mr. Maysonet's wife?

25          **THE WITNESS:**  No.

ALEXANDER ZENO - (DIRECT BY MR. HERNANDEZ)

1        **THE COURT:**  Or with Mr. Maysonet himself?

2        **THE WITNESS:**  I don't remember with anybody having a

3   conversation as to that.

4   **BY MR. HERNANDEZ:**

5   **Q.**  Sir, you got here -- the day jury selection took place,

6   you got here at what time?

7   **A.**  I don't remember, but I guess -- I assume it was around 8

8   in the morning.

9   **Q.**  And what happened after 8 in the morning in order for the

10  process to start, if you recall?

11  **A.**  Well, are you talking --

12  **Q.**  You came down, you went to --

13  **A.**  The 19th or the 20th?  Because the trial was supposed to

14  start on the 19th --

15  **Q.**  Correct.

16  **A.**  -- and it started on the 20th.

17  **Q.**  Okay.  I'm talking about the 20th.

18  **A.**  The 20th.  I don't remember exactly what happened, but I

19  can infer that I got here early and I came into the courtroom

20  to do my job.

21  **Q.**  And before getting into the courtroom to do your job, did

22  you talk to the family members, Mr. Maysonet's family members,

23  either his wife or any of them?

24  **A.**  I don't remember talking to them.  I assume that I did

25  because I used to talk to them all the time.

ALEXANDER ZENO - (DIRECT BY MR. HERNANDEZ)

1  **Q.**  Very good.  You assume that you did?

2  **A.**  I assume that I did.

3  **Q.**  As far as you're concerned, during the jury selection

4  process, was there any family member whatsoever, be it Ramon

5  Maysonet's family or any other Defendant's family, inside the

6  courtroom during jury selection?

7  **A.**  I'm sorry, the first part of the question?

8  **Q.**  As far as you being present during jury selection, was

9  there any member of any of the families of the codefendants

10  inside the courtroom during jury selection?

11  **A.**  I don't remember seeing any of them.

12  **Q.**  And at that point in time, was it the usual practice

13  within this court to have family members during that process

14  inside?

15  **A.**  At that time, it was my understanding that nobody from the

16  public could come into the courtroom.

17  **Q.**  Why was that your understanding, sir?

18  **A.**  Well, I can tell you that when I was trying to get into

19  the CJA panel, they have this thing, I don't remember what

20  they call it, the Mentoring Program, or whatever, I remember

21  trying to see the jury selection process with Judge Fuste,

22  because he was about to start a trial and they were doing jury

23  selection.  And I actually did go with Ms. -- Attorney

24  Sandoval, which she was mentoring me, and she asked

25  Judge Fuste if I could watch the proceedings, the jury

ALEXANDER ZENO - (DIRECT BY MR. HERNANDEZ)

1  selection.  And she told me that he said no, that I could not

2  stay inside the courtroom.

3      So that made me believe that the public is not welcome

4  during the jury selection process.

5  **Q.**  Very well, sir.  During the jury selection process in this

6  case, January 20th, do you recall if there was anything placed

7  on the doors of the courtroom?

8  **A.**  That, I don't remember.

9  **Q.**  You don't remember.

10      Do you recall if every one from the public was coming in

11  or out in the jury selection process?

12  **A.**  I don't remember anybody coming in or out.

13  **Q.**  Do you recall -- can you tell us what happened when each

14  of the prospective jurors or the proposed jurors were

15  dismissed, what happened then?

16  **A.**  I don't remember exactly, but I think as they were being

17  dismissed, they were allowed to leave.

18  **Q.**  Allowed to leave?

19  **A.**  You're talking about those jurors that were not selected?

20  **Q.**  Yes.

21  **A.**  Yes, I think they were allowed to leave.

22  **Q.**  So they were going out?

23  **A.**  Going out, correct.

24  **Q.**  Did you saw if, at the time that they were going out,

25  somebody was coming in?

ALEXANDER ZENO - (DIRECT BY MR. HERNANDEZ)

1    **A.**   I don't remember that.

2    **Q.**   Very well.

3         As to Mr. Maysonet, you just said that you had no

4    conversation with him concerning access by the public during

5    jury selection, to the courtroom; is that right?

6    **A.**   That's right.

7    **Q.**   And I'm going to ask you, did you object or brought to the

8    Court's attention the fact that they were not letting family

9    members in the courtroom?

10   **A.**   Not during the jury selection.

11   **Q.**   Not during the jury selection?

12   **A.**   No.

13   **Q.**   So at that point in time you did not raise it as an issue?

14   **A.**   No, I never did.

15   **Q.**   Why not?

16   **A.**   Because it was my understanding that the public was not

17   allowed during jury selection, and I always assumed that the

18   reason for that was that the court was full of jurors, so

19   there was no space for them.  So that was my understanding.

20        Plus, I had so many other things in my mind at that time,

21   I was so busy thinking about other things that, you know ...

22   **Q.**   So then it would be fair to say that it was no tactical

23   decision whatsoever?

24   **A.**   No tactical, strategic decision as to that.

25        **MR. HERNANDEZ:**  Very well.  No further questions.

ALEXANDER ZENO - (DIRECT BY MR. HERNANDEZ)

1       **THE COURT:**  Cross examination.

2                    CROSS EXAMINATION

3  **BY MS. CASTELLON:**

4  **Q.**  Was the courtroom locked?

5       **THE COURT:**  During jury selection?

6  **BY MS. CASTELLON:**

7  **Q.**  During jury selection?

8  **A.**  I don't know that for sure, but I can tell you when I

9  tried to enter the courtroom, it was not locked, because I

10 could get in, I managed to get in.

11 **Q.**  You got in, and it wasn't locked?

12 **A.**  I assume that it wasn't.

13 **Q.**  And you mentioned that -- you recall if there was a court

14 security officer in this courtroom?

15 **A.**  Not that day, I don't remember.  I know during the trial

16 there was, but I don't remember that day if there was.

17 **Q.**  And it's your testimony today that you did not discuss

18 with your client and his wife regarding that they wanted to be

19 present here in the courtroom?

20 **A.**  During jury selection?

21 **Q.**  That day, January 20, 2010.

22 **A.**  I don't remember discussing anything with them as to that.

23 **Q.**  Do you recall that she addressed your attention and she

24 asked you why she was not let in?

25 **A.**  I don't remember she ever asking me that that day.

ALEXANDER ZENO - (CROSS BY MS. CASTELLON)

1  Q.  When you say "that day," do you recall when she asked you

2  about it?

3  A.  I don't know if it was the next day, a few days after

4  that, there was an incident in the courtroom where --

5  Q.  That was not related to the jury selection?

6  A.  No, that was not related to jury selection.

7  Q.  So you did not object, it's your testimony, regarding the

8  fact that people were not let in?

9  A.  No, I never objected.

10 Q.  Sir, are you aware of the decision in Owens versus

11 United States, First Circuit case from this district?

12 A.  I'm not aware of that decision.

13     **THE COURT:**  Not from this district.

14 **BY MS. CASTELLON:**

15 Q.  From the First Circuit, I'm sorry.

16 A.  What's the name of the decision?

17 Q.  Owens versus United States.

18 A.  If I'm aware today or that day?

19     **THE COURT:**  Actually, that day.

20     **THE WITNESS:**  That day, no, I wasn't aware of that.

21     **MS. CASTELLON:**  I have no further questions.

22     **THE COURT:**  Any redirect?

23     **MR. HERNANDEZ:**  Just one question.

24

25

ALEXANDER ZENO - (REDIRECT)

1                        REDIRECT EXAMINATION

2  **BY MR. HERNANDEZ:**

3  **Q.**  Sister counsel asked you that -- whether you had

4  discussions with Mr. Maysonet or his wife concerning the

5  ability of the family members to come in, but I want to just

6  be clear.  Do you recall or don't you recall whether they even

7  asked you, "we want to go in"; not a discussion, but whether

8  she asked you, "I want to go in"?

9  **A.**  You're talking about the day the jury was selected?

10 **Q.**  I'm saying prior to jury selection, the day the jury was

11 selected, the question is whether she approached even to go in

12 and asked you whether she could go in or not, that's the

13 question.

14 **A.**  Before the jury selection and during jury selection, she

15 never asked me whether or not -- well, I don't remember her

16 asking me whether or not she could come in.

17            **MR. HERNANDEZ:**  Okay, thank you.

18            **THE COURT:**  Thank you very much.

19            **THE WITNESS:**  Thank you, Your Honor.

20            **THE COURT:**  You're excused.

21            Next witness, please.

22            **MR. FERNANDEZ:**  Ramon Garay, Your Honor.

23            **THE CLERK:**  Raise your right hand, please.

24                        RAMON GARAY MEDINA,

25 after having first been duly sworn to state the truth, the

1  whole truth and nothing but the truth, testified as follows.

2                          DIRECT EXAMINATION

3  **BY MR. FERNANDEZ:**

4  **Q.**  Good morning, sir.

5  **A.**  Good morning.

6  **Q.**  Pleasure to see you again.

7          **THE COURT:**  Mr. Garay, would you please talk into the

8  microphone.

9          **THE WITNESS:**  Yes, Your Honor.

10         **THE COURT:**  Thank you.

11  **BY MR. FERNANDEZ:**

12  **Q.**  State your name for the record, please.

13  **A.**  Ramon Luis Garay Medina.

14  **Q.**  What is your profession, sir?

15  **A.**  Attorney at law.

16  **Q.**  Since when have you been an attorney?

17  **A.**  1980.

18  **Q.**  Are you admitted in this district?

19  **A.**  That's correct.

20  **Q.**  Since when have you been admitted to this district?

21  **A.**  I believe close to 1989, something like that.

22  **Q.**  Since that time, could you tell me a rough estimate of how

23  many jury trials have you tried up until today?

24  **A.**  An exact number, I cannot give you, maybe close to 10 to

25  15.

RAMON GARAY - (DIRECT BY MR. FERNANDEZ)

1  **Q.**  Between 10 and 15?

2  **A.**  Yes.

3  **Q.**  Were you involved in this case, 08-310?

4  **A.**  That's correct.

5  **Q.**  In what capacity?

6  **A.**  Attorney for Jose Negron Sostre.

7  **Q.**  Sir, if I might direct your attention to January 20th of

8  2010, that was the day of voir dire.

9      Could you tell us what happened during voir dire, just

10 give us a general overview?

11 **A.**  After discussions of several matters, the process of jury

12 selection started.

13 **Q.**  Do you remember who was sitting in the courtroom, where

14 were the Defendants sitting?

15 **A.**  Potential jury members --

16 **Q.**  Let's start, where were the Defendants sitting?

17 **A.**  The Defendants were in the row behind the attorneys.

18 **Q.**  Where they are sitting now?

19 **A.**  More or less, I believe so, that day.

20 **Q.**  Anybody sitting behind them?

21 **A.**  The marshals, U.S. Marshals.

22 **Q.**  And how about the potential jurors, where were they?

23 **A.**  Potential jurors, I believe, were on the other side of the

24 courtroom.

25 **Q.**  Do you recall, sir, if family members were inside the

RAMON GARAY - (DIRECT BY MR. FERNANDEZ)

1  court, inside the courtroom during voir dire?

2  **A.**  No, they were not.

3  **Q.**  Why not?

4  **A.**  Well, it was informed by security officers that the

5  members of the family were not allowed in the courtroom during

6  jury selection.

7  **Q.**  Did that person inform you?

8  **A.**  It was a matter of general information.  Yes, it was

9  informed to me also, as part of the attorneys of record.

10 **Q.**  Do you remember who it was?

11 **A.**  I believe it was Mr. Sierra, who is the court security

12 officer.

13 **Q.**  Did you raise the matter with your client?

14 **A.**  I did not discuss that particular matter with my client

15 because this is a practice in this courtroom for many years

16 and it has been done like that.

17 **Q.**  In your 10 or 15 trials that you have tried, do you recall

18 if, in any of them, family members were allowed into the

19 courtroom during voir dire?

20 **A.**  Most likely, my memory tells me they were not.

21 **Q.**  Did you raise the matter with any marshal, court security

22 officer, to make arrangements to allow the family in?

23 **A.**  I may have on one particular occasion, very particular

24 matter.

25 **Q.**  No, I mean in this case.

RAMON GARAY - (DIRECT BY MR. FERNANDEZ)

1   **A.**  No, in this case, no.

2   **Q.**  Sir, how long did the voir dire take?

3          **THE COURT:**  Wait a minute.

4          **MR. FERNANDEZ:**  I'm sorry, Your Honor.

5          **THE COURT:**  Excuse me.

6          **MR. FERNANDEZ:**  Yes, I'm sorry.

7          **THE COURT:**  Did you raise the issue with the Court?

8          **THE WITNESS:**  No.

9   **BY MR. FERNANDEZ:**

10  **Q.**  No objection was made?

11  **A.**  No objection was made to the Court.

12  **Q.**  How long did voir dire take?

13  **A.**  I believe it took the whole 20th.

14  **Q.**  Do you remember anything about the doors, anything special

15  about the doors during that day?

16  **A.**  I remember they were closed; not more than that.

17         **THE COURT:**  When you mean "closed," you mean locked?

18         **THE WITNESS:**  I believe they were locked.

19  **BY MR. FERNANDEZ:**

20  **Q.**  And who was letting -- what would happen when a potential

21  juror was dismissed; what is your recollection?

22  **A.**  The marshal -- one of the marshals would escort that

23  person outside of the courtroom.

24  **Q.**  And he would open and close?

25  **A.**  I believe so.  I believe there was one particular marshal

RAMON GARAY - (DIRECT BY MR. FERNANDEZ)

1  close to the doors.

2  **Q.**  Do you remember who it was?

3  **A.**  No, I can't tell you that.

4         **MR. FERNANDEZ:**  Nothing further, Your Honor.

5         **THE COURT:**  Cross examination.  Mr. Henwood.

6         **MR. RIVERA:**  Your Honor, can we have a second?

7         **THE COURT:**  Yes, of course.

8         **MR. FERNANDEZ:**  Go ahead, please.

9                    CROSS EXAMINATION

10 **BY MR. HENWOOD:**

11 **Q.**  Sir, you're aware of your client's right to a public

12 trial, correct?

13 **A.**  That's correct, sir.

14 **Q.**  And you knew, based on your experience as an attorney

15 litigating in this jurisdiction for -- I believe you said

16 since 1980, that the Sixth Amendment guarantees your client's

17 right to a public trial; correct?

18 **A.**  That's correct.

19 **Q.**  And there had been case law from 1984, 2007, First Circuit

20 case law, specifically a case called Owens, in 2007, which

21 stood for the proposition that the jury selection was part of

22 the trial and there was a public right for participation and

23 entry by members of the public during jury selection, correct?

24 **A.**  Yes.

25 **Q.**  But yet, you chose --

RAMON GARAY - (CROSS BY MR. HENWOOD)

1           **THE COURT:**  Excuse me.  Are you saying that you were

2   aware of this Owens case?

3           **THE WITNESS:**  I was aware of some of the

4   jurisprudence.

5   **BY MR. HENWOOD:**

6   **Q.**  But you chose, as a tactical matter or based -- you

7   choose, as a tactical matter, not to raise that with the Court

8   on that particular case, on that particular date?

9   **A.**  No, that's not correct.

10  **Q.**  Why didn't you raise it if the case law stated --

11  **A.**  The problem is your question is if it was a tactical

12  matter.

13          **THE COURT:**  That, you answered "no".

14          The next question is:  Why did you not raise it?

15          **THE WITNESS:**  I did not raise the issue because it

16  was the practice in this district not to allow the family

17  members during jury selection.

18  **BY MR. HENWOOD:**

19  **Q.**  And do you know why it was a practice in this district,

20  based on your experience here, not to allow the family members

21  inside during jury selection?

22  **A.**  Basically, the information provided during jury selection

23  by the court security officer is the problem with the

24  courtroom, lack of space, some of the reasons.

25  **Q.**  A lack of space, in that it is also customary in this

RAMON GARAY - (CROSS BY MR. HENWOOD)

1  jurisdiction for all the venire members to be allowed into the

2  courtroom at one time so we can more efficiently question them

3  and select the jury; correct?

4  **A.**   Yes.

5  **Q.**   So the courtroom was then full with defendants, marshals,

6  and the potential jurors, correct?

7  **A.**   Yes.

8  **Q.**   Now, you mentioned that you believe the doors were locked;

9  is that correct?

10  **A.**   Yes.

11  **Q.**   Now, were they locked throughout the entire process,

12  according to your recollection?

13  **A.**   That, I cannot tell you exactly.  I know they were open

14  for the second day of trial, but I cannot exactly tell you if

15  they were open during the jury selection to allow persons

16  going out.

17  **Q.**   Are you aware as to whether or not the fact that the doors

18  were closed was mentioned during the jury selection at all by

19  anyone?

20  **A.**   No, I don't remember that.

21  **Q.**   You don't remember?

22          **MR. HENWOOD:**   Judge, can I have --

23          **THE COURT:**   Did you mention it?

24          **THE WITNESS:**   No, I did not.

25          **MR. HENWOOD:**   Judge, can I have the overhead

RAMON GARAY - (CROSS BY MR. HENWOOD)

 1  projector turned on?

 2  **BY MR. HENWOOD:**

 3  **Q.**   This is the transcript from the jury selection which took

 4  place on January 20, 2010.   And I'm going to be referring to

 5  just one page of it.   This isn't the page, but I want to show

 6  you that at Page 62, up here, we have the Judge off the bench

 7  at one; a lunch break is taken from 1 until 2:48, at which

 8  time the proceedings continue as follows.

 9      And then Judge Besosa comes out and says, "Good afternoon.

10  Please be seated."

11      You were here during those proceedings, Mr. Garay?

12  **A.**   Yes.

13  **Q.**   And you recall participating, representing your client

14  during those proceedings, correct?

15  **A.**   Yes.

16  **Q.**   And you've been testifying about that today under oath,

17  correct?

18  **A.**   Yes.

19  **Q.**   Now, I'm going to turn to Page 80.   And we have the Judge,

20  there's a discussion and you're in the middle of questioning a

21  potential juror, and the Court says, "Well, there will be

22  testimony in here about the use of weapons, do you think that

23  there will be" --

24      And the juror says:   "It might."

25      Mario Torres Marin says, "May I?   If the Judge asks you to

RAMON GARAY - (CROSS BY MR. HENWOOD)

1   base your decision just based on the evidence presented to

2   you, can you be -- can you make your decision based on the

3   evidence alone?

4              "THE JUROR:  I don't know to -- if I

5           should answer that question without

6           present certain.

7              "THE COURT:  Well, you're excused,

8           Mr. Serra."

9           I think that's Mr. Sierra.

10          **THE COURT:**  That's the juror's name.

11          **MR. HENWOOD:**  Oh, Serra is the name.  That's the

12  juror's name, correct.

13  **BY MR. HENWOOD:**

14  **Q.**  Then we have you, Mr. Garay, "Your Honor, we have noticed

15  that during your questioning, sometimes we see jurors entering

16  and going out, and we don't know if they had heard your

17  questions or not."

18      The Judge says, "I'll ask a general question."

19      "MS. CASTELLON:  Or maybe not to leave the courtroom."

20      And then you say:  "Or seal the room."

21      You see that?

22  **A.**  Yes, I see it.

23  **Q.**  So this is in the afternoon during this jury selection.

24  You're pointing out, for the record, that people are going in

25  and out, and you make a suggestion to the Judge that the room

RAMON GARAY - (CROSS BY MR. HENWOOD)

1  be sealed; isn't that correct?

2  **A.**  Yes, the issue was that some of the potential jurors stood

3  up and would go out of the courtroom one minute or two

4  minutes.  If someone opened the door for them or they were

5  able to come out as they pleased, I don't remember that.

6  **Q.**  But it's clear that any mention of sealing, or the mention

7  of sealing that we pointed to there, was raised by you,

8  correct?

9  **A.**  Yes, due to the fact that they were going in and out.  If

10  the doors were closed or not at that particular point, that

11  was the issue raised to the Court.

12  **Q.**  And that was in the middle of the jury selection in the

13  afternoon, correct?

14  **A.**  That's during the jury selection.

15      **MR. HENWOOD:**  Nothing further, Your Honor.

16      **THE COURT:**  Any redirect?

17      **MR. FERNANDEZ:**  No, Your Honor.

18      **THE COURT:**  Thank you, Mr. Garay.  You're excused.

19      Next witness.  Mr. Rivera.

20      **MR. RIVERA:**  Mariangela Tirado.

21      **THE COURT:**  Before Ms. Tirado comes in, how many

22  witnesses do you have left?

23      **MR. RIVERA:**  I think that would be the end for us in

24  terms of witnesses.

25      **THE COURT:**  Are you going to call any of the

1    deputies?

2            **MR. RIVERA:**  I don't think so.

3            **MR. FERNANDEZ:**  No, Your Honor.

4            **THE COURT:**  Why don't we do this, after Ms. Tirado's

5    testimony, we will take a lunch break.

6            **THE CLERK:**  Raise your right hand, please.

7                    MARIANGELA TIRADO VALES,

8    after having first been duly sworn to state the truth, the

9    whole truth and nothing but the truth, testified as follows:

10                   DIRECT EXAMINATION

11   **BY MR. RIVERA:**

12   **Q.**  Good afternoon, Ms. Tirado.

13   **A.**  Good afternoon.

14   **Q.**  Could you please give us your complete name, please.

15   **A.**  Mariangela Tirado Vales.

16   **Q.**  And what do you do for a living?

17   **A.**  I am an attorney.

18   **Q.**  What kind of attorney?

19   **A.**  I have a general practice, but I have -- part of my -- big

20   part of my practice is as a CJA attorney in this court.

21   **Q.**  And that's criminal?

22   **A.**  Yes.

23   **Q.**  How long have you been practicing in this district?

24   **A.**  My first case, assigned case, was in August 1989.

25   **Q.**  How many criminal trials have you seen?

MARIANGELA TIRADO - (DIRECT BY MR. RIVERA)

1   **A.**  Criminal trials in full, around -- could be 8 to 10.

2   **Q.**  Now, taking your attention to January 20th of 2010, were

3   you at trial that day?

4   **A.**  Yes, I was at trial with Judge Besosa in Criminal 80-310,

5   and I was representing Luis Rodriguez Sostre, I was his

6   appointed attorney.

7   **Q.**  Now, that day, we had -- I'm sorry.  There was the jury

8   selection that day; wasn't it?

9   **A.**  Yes, yes.

10  **Q.**  Do you remember how that process took place?

11  **A.**  Well, my recollection of that process is, it has been, as

12  the usual process in this court, all the jurors were inside

13  the court, the Defendants were inside the court, and family

14  members were kept outside, they were not permitted into the

15  court.

16  **Q.**  Now, the sitting arrangement that day with the Defendants,

17  would it be basically what we have today, the Defendants and

18  then the marshals behind?

19  **A.**  Yes, yes.

20  **Q.**  And prospective jurors would have been on that side of the

21  room?

22  **A.**  I don't recall if they were behind the prosecutor's desk

23  or if they were also behind the prosecutors and there were

24  some behind the defense and some in the jury box, I don't --

25  but it was a full room.

MARIANGELA TIRADO - (DIRECT BY MR. RIVERA)

1  **Q.** But do you remember -- do you have any idea about how many

2  jurors were there that day?

3  **A.** I don't remember that.

4  **Q.** More than 50?

5  **A.** There were more than 50, yes.

6  **Q.** Less than a hundred?

7  **A.** Yes.

8  **Q.** Now, you mentioned before that you had seen between 8 to 9

9  trials.  Okay.

10  **A.** Yes, more or less.

11  **Q.** The jury selection process of those trials, was any

12  different from the jury selection that took place on

13  January 10 -- on 08-310?

14  **A.** No, in the sense that in all the jury selections in

15  criminal cases that I have had so far in this court, family

16  members and public is not permitted into the court while the

17  jury selection is going on.

18  **Q.** Now, going back to January 20, were you aware that family

19  members of the Defendants were not allowed in the jury room

20  that day?

21  **A.** Yes, I know that they were outside.  They were not inside

22  the jury selection.

23  **Q.** But did anybody tell you, "Ms. Tirado, I'm out here, I

24  want to be inside"?  For example, Mr. Omar's family, Rodriguez

25  Sostre?

MARIANGELA TIRADO - (DIRECT BY MR. RIVERA)

1        **THE COURT:**  Mr. Rodriguez Sostre.

2        **THE WITNESS:**  I don't recall having that specific

3   communication.  I do know that at some point family members

4   tried to come in and they were not allowed, but I don't recall

5   that his family, specifically, we had that conversation.

6   **BY MR. RIVERA:**

7   **Q.**  That day at any time did you have any discussions with

8   Mr. Rodriguez Sostre about his right of having the family

9   inside the courtroom?

10  **A.**  No, I did not, because that was the standard operating

11  procedure.  And for me, it was a non-issue.  For me, I didn't

12  really, you know, it was the procedure of the Court and I did

13  not understood that I had to speak about that with him or to

14  explain to him anything.  So I did not talk about that matter.

15  **Q.**  Had he asked you the question, what explanation would you

16  have given him?

17  **A.**  Well, that that was the procedure in this court and that

18  no one was allowed, and that was, you know, that was the

19  standard operating procedure, family members would have to

20  stay outside while the jury selection is going on.

21        **MR. RIVERA:**  No further questions, Your Honor.

22        **THE COURT:**  Cross examination.

23                    <u>CROSS EXAMINATION</u>

24  **BY MS. CASTELLON:**

25  **Q.**  Counselor, you stated that you have been a member of this

MARIANGELA TIRADO - (CROSS BY MS. CASTELLON)

1  district from 1989?

2  **A.**  That's correct.

3  **Q.**  Do you consider -- you're a part of the CJA panel, as you

4  stated?

5  **A.**  Yes.

6  **Q.**  Do you consider yourself a competent attorney?

7  **A.**  I understand I am.

8  **Q.**  You are?

9  **A.**  I understand so.

10  **Q.**  You are aware of the Sixth Amendment right?

11  **A.**  Of course, but I didn't explain that to my client that

12  day; or the other trials, I haven't explained.  And I'm an

13  officer of the court and that has not been an issue.

14  **Q.**  I'm asking you, are you aware of the Sixth Amendment right

15  of your client?

16       **THE COURT:**  Well, wait a minute, the right to a

17  public trial.

18       **MS. CASTELLON:**  The right to a public trial.

19       **THE WITNESS:**  I am aware of that right, but I have

20  not explained that to this defendant or to any other of my

21  clients, because, as the procedure of this court is, and as an

22  officer of the court -- and you are an officer of the court --

23  we all know that the procedure was keeping people outside.

24  **BY MS. CASTELLON:**

25  **Q.**  I'm not asking about myself.

MARIANGELA TIRADO - (CROSS BY MS. CASTELLON)

1    I'm asking you, again, did you at any point explain to

2 your client, Rodriguez Sostre, that he had the Constitutional

3 right to have a public trial?

4 **A.**  No, I did not.

5 **Q.**  You did not.

6    And you were not told by any of the relatives on that day

7 that they were not allowed to go inside the courtroom on that

8 day; that's your testimony today?

9 **A.**  I do not recall that any of his family members directly

10 told me so.  I do know that there was some argument about

11 family members not being permitted to come into the court.

12    The court -- the court doors had some papers, there were

13 marshals or court officers in the door and they would not

14 permit any family members.

15    But, that I explained -- if you're asking me whether I

16 explained to my client his right to a public trial and whether

17 he waived it, my answer is no.

18 **Q.**  And let me ask you this, since you're a member of this

19 district since 1989, can you tell this Court who were those

20 security officers posted in the door entrance?

21 **A.**  No, I cannot, but I believe there is a roster.  And you

22 were here.  So I don't know.  I don't know --

23 **Q.**  But I'm asking you.

24 **A.**  No, I don't know.

25       **THE COURT:**  Let's not argue.

MARIANGELA TIRADO - (CROSS BY MS. CASTELLON)

1          The question is whether you know, and she doesn't.

2   That's it.

3          **THE WITNESS:**  I know Mr. Sierra was here, I do know

4   that.  And I -- there are -- I don't know the names, even

5   though I have been here for quite a while, I don't know all

6   the names, but I have seen familiar faces which were in the

7   trial.  But what day, if they were on the 20th, that day, I

8   cannot say.

9          I do know that no one -- no family members were

10  allowed.

11  **BY MS. CASTELLON:**

12  **Q.**  So it is your testimony today that you were aware, you

13  were made aware of the fact that some family members of other

14  Defendants were not allowed to go in; is that your testimony?

15  **A.**  At a point in time, I heard that, yes.

16  **Q.**  On that day?

17  **A.**  Counselor, I'm under oath, and if I tell you if it's on

18  that date or it was after --

19          **THE COURT:**  If you don't remember, you don't

20  remember.

21          **THE WITNESS:**  I don't remember.  I don't remember.

22  But I did not discuss it with my client either.

23  **BY MS. CASTELLON:**

24  **Q.**  You submitted a sworn statement that is part of the record

25  on document 3676-1, correct?

MARIANGELA TIRADO - (CROSS BY MS. CASTELLON)

1  **A.**  I know I submitted a sworn statement.  I don't know the

2  docket number.

3  **Q.**  You were the one who drafted it, wrote it, and gave it to

4  the attorney?

5  **A.**  I know I submitted a document.  I don't have it in front

6  of me, but I know I submitted a sworn statement where I say

7  that, basically, the standard operating procedure of this

8  district is what I just testified about, no family members

9  were allowed while jury selection was going on.

10  **Q.**  And you mentioned that on that specific day, January 20th,

11  2010, the court security officers did not allow the

12  Defendants' family to go inside the courtroom?

13  **A.**  That's correct.

14  **Q.**  One last question.  Were you aware at the time of the

15  trial that you were representing Mr. Rodriguez Sostre, of the

16  First Circuit decision in United States versus Owens case?

17  **A.**  No, I was not.

18  **Q.**  Are you aware, do you keep the practice of reading the

19  jurisprudence that abides this district?

20  **A.**  I try to keep myself abreast, and I, afterwards, or at a

21  point in time I learned of the decision, but not at the time

22  of the jury selection.

23     And, you know, I may have, you know, not protected my

24  client's right as I should have.

25  **Q.**  And you recall during the same voir dire making objections

1  on behalf of other Defendants, other than your client, during

2  jury selection?

3  **A.**  At what time?

4  **Q.**  During jury selection.  You objected to and claimed rights

5  of other Defendants because you stated that you five attorneys

6  were representing the five Defendants in this case?

7  **A.**  You know, I would have to read or review the transcript.

8  I know that probably we raised a lot of issues during the

9  trial, perhaps during the jury selection, but as to the right

10 of my client of a public trial, I did not make any objection

11 as to that.  That was my bad.

12         **MS. CASTELLON:**  No further questions.

13         **THE COURT:**  Any redirect?

14                   <u>REDIRECT EXAMINATION</u>

15 **BY MR. RIVERA:**

16 **Q.**  Counsel Tirado, the fact that you did not address the

17 issue about the family not being -- being excluded from the

18 courtroom on the 20th, did that at any time fall within a

19 strategic decision on your part?

20 **A.**  No.  Basically, it was -- how would I say -- I just didn't

21 thought about it because that was the standard operating

22 procedure in this court -- not in this particular court, in

23 this district, so I just didn't thought that I need to raise

24 it or to discuss it with my client or to do anything about it.

25    It was not even a strategy or nothing.  It was something

 1  that was done.

 2  **Q.**  So there is no objection on your part, on the record?

 3  **A.**  No, there is none.

 4           **MR. RIVERA:**  No more questions, Your Honor.

 5           **THE COURT:**  Thank you very much.

 6           Ms. Tirado, you're excused.

 7           **MR. FERNANDEZ:**  Your Honor, could we approach one

 8  second?

 9           **THE COURT:**  Yes, of course.

10           (Whereupon the following proceedings took place at

11  sidebar:)

12           **MR. FERNANDEZ:**  Your Honor, you mentioned if we had

13  another witness, I totally forgot about Paco Dolz.

14           **THE COURT:**  Is he out there?

15           **MR. FERNANDEZ:**  Yes, he's out there.  But I think

16  he's going to be repetitive.

17           **MS. CASTELLON:**  I have a question for him.

18           **THE COURT:**  Well, you can sit him, or do you want

19  them to sit him?

20           **MR. HENWOOD:**  I don't think we can make them sit him.

21           **THE COURT:**  You can call him.

22           **MR. RIVERA:**  Why don't we get the opportunity to

23  discuss that issue again and then make a decision.

24           **THE COURT:**  All right, fine.

25           Now, let me ask you this, as long as I have everybody

MARIANGELA TIRADO - (REDIRECT)

1  here present.  Once the evidence is in, everybody, is that it?

2  I mean, you requested the Circuit to remand --

3          **MR. FERNANDEZ:**  I did.

4          **THE COURT:**  -- for me to be able to determine one way

5  or the other.  They haven't done so.

6          **MR. FERNANDEZ:**  That's correct.

7          **THE COURT:**  As a matter of fact, they called,

8  somebody from the Circuit called the Clerk's office because of

9  that --

10         **MR. FERNANDEZ:**  Motion.

11         **THE COURT:**  -- motion.  And they were told that my

12 Order said that the date that we were going to have this,

13 today, was to allow the marshals to bring everybody in,

14 because they were -- because not all of them were in the same

15 place.

16         I just wanted to tell you that, because as of right

17 now, all I think that I can do is get this other transcript and

18 send it up to the Circuit.

19         **MR. FERNANDEZ:**  You can certainly do that,

20 Your Honor, but Your Honor could also make findings of fact.

21 I think Your Honor has authority to do both.

22         **MS. MIZNER:**  I think Rule 10(e) might require

23 findings of facts by the district court to settle the issues.

24         **THE COURT:**  Appellate Rule 10.

25         **MS. CASTELLON:**  And I understand our office submitted

 1  also a response.

 2           **MR. FERNANDEZ:**  The United States joined in part my

 3  motion.  And I say "joined in part" because they wanted --

 4  they asked the First Circuit to remand the case, so they

 5  joined that.

 6           But I went further in my motion.  I asked the First

 7  Circuit not only to remand the case but to give Your Honor

 8  jurisdiction to provide the remedy, which Your Honor --

 9           **THE COURT:**  Findings of fact is different than

10  providing a remedy.

11           **MS. CASTELLON:**  And we opposed to that in our motion.

12  You did it in the petition?

13           **MR. FERNANDEZ:**  He said for the First Circuit to

14  retain jurisdiction.

15           **MS. CASTELLON:**  Yes.

16           **MR. FERNANDEZ:**  That's what I meant, yeah.

17           **MS. CASTELLON:**  So I understand.

18           **THE COURT:**  Well, let's take our lunch break.  Let's

19  be back at 2, and then we'll have the Government present

20  their --

21           **MS. CASTELLON:**  And Paco Dolz.

22           **THE COURT:**  You decide whether you are going to

23  present Mr. Dolz.

24           **MR. RIVERA:**  Thank you.

25           **THE COURT:**  Let's take a lunch break.  Please be back

MARIANGELA TIRADO - (REDIRECT)

1  at 2:00.

2          (Whereupon the Court took a lunch recess.)

3

4                   A F T E R N O O N   S E S S I O N

5                        2:10 P.M.

6          **THE COURT:**  Good afternoon.  Please be seated.

7          Ms. Mizner.

8          **MS. MIZNER:**  We will be calling Francisco Dolz as our

9  next witness.

10         **THE COURT:**  Will you be doing the examination?

11         **MS. MIZNER:**  I will, Your Honor.

12         **THE CLERK:**  Mr. Dolz, raise your right hand, please.

13                   FRANCISCO DOLZ SANCHEZ,

14  after having first been duly sworn to state the truth, the

15  whole truth and nothing but the truth, testified as follows:

16         **MS. MIZNER:**  Your Honor, we are missing one of the

17  attorneys, he will be back in a moment.

18         **THE COURT:**  Well, why don't you start.

19                   DIRECT EXAMINATION

20  **BY MS. MIZNER:**

21  **Q.**  Would you please state your name for the record.

22  **A.**  Francisco M. Dolz, D-O-L-Z, Sanchez.

23  **Q.**  And what is your profession, Mr. Dolz?

24  **A.**  I'm a lawyer.

25  **Q.**  Are you admitted to practice before this court?

FRANCISCO DOLZ - (DIRECT BY MS. MIZNER)

1   **A.**   Yes, ma'am.

2   **Q.**   How long have you been admitted to practice here?

3   **A.**   Since 1975, early '75.

4   **Q.**   Have you conducted jury trials in this court?

5   **A.**   Many.

6   **Q.**   Approximately how many?

7   **A.**   I don't have the slightest idea.

8           **THE COURT:**  I'm sorry?

9           **THE WITNESS:**  I don't have the slightest idea of how

10  many trials I have.

11          **THE COURT:**  Oh, "I don't have the slightest idea."

12          **THE WITNESS:**  That's correct.

13  **BY MS. MIZNER:**

14  **Q.**   You have conducted many trials in this courthouse?

15  **A.**   That's correct.

16  **Q.**   Did you represent a defendant in this case, 08-310, at

17  trial?

18  **A.**   That is correct.

19  **Q.**   Who did you represent?

20  **A.**   Wilfredo Rosario Camacho.

21  **Q.**   You were present on January 20th for jury selection?

22  **A.**   That is correct.

23  **Q.**   And did you have a conversation with Mr. Rosario's sister

24  that day?

25  **A.**   I do recall having some kind of conversation.  She was

FRANCISCO DOLZ - (DIRECT BY MS. MIZNER)

1  present throughout the case and she was very inquisitive about

2  what was transpiring.  So I did have many conversations with

3  her.

4  Q.  When you say she was present during the case, was she in

5  the -- in the courtroom during the jury selection process?

6  A.  Of course not.  No, she was not.

7  Q.  Were any members of Mr. Rosario's family in the court --

8  or friends -- in the courtroom during the jury selection

9  process?

10  A.  No, ma'am.

11  Q.  And what is your -- what was your understanding of the

12  process for jury selection at that time in this courthouse?

13  A.  Well, since I recall back in 1975, the public was never

14  allowed during jury selection, that included even the

15  attorneys not related to the case.

16  Q.  Did you object to the exclusion of members of the public?

17  A.  Not really.  I don't think there was any use of that.

18  Everybody was used to the public being excluded during jury

19  selection, for my whole life.

20  Q.  So this was not a strategic or tactical decision not to

21  object?

22  A.  No, it was not.

23  Q.  Do you recall seeing anything about the doors of the

24  courtroom during that day?

25  A.  At one point in time white sheets of paper were put on the

FRANCISCO DOLZ - (DIRECT BY MS. MIZNER)

1  small glasses so that nobody could see inside of the

2  courtroom.

3  **Q.**  Did you see who put those pieces of paper in the door?

4  **A.**  No, I didn't see that.

5  **Q.**  Were they in the windows for the entire day or for part of

6  the day?

7  **A.**  Part of the day, or maybe the entire day until the

8  selection was over.

9  **Q.**  Were they --

10      **THE COURT:**  Well, Mr. Dolz, you said that it was at

11  one point in time.  Was that during the day that the jury

12  selection was conducted?

13      **THE WITNESS:**  I'm sorry, Your Honor?

14      **THE COURT:**  You said that the paper was placed on the

15  door windows --

16      **THE WITNESS:**  That is correct.

17      **THE COURT:**  -- during a point in time.  My question

18  is whether it was during the day of jury selection?

19      **THE WITNESS:**  That was during jury selection,

20  Your Honor.

21      **MS. MIZNER:**  May I have a moment, Your Honor?

22      **THE COURT:**  Yes, of course.

23      **MS. MIZNER:**  No more questions, Your Honor.

24      **THE COURT:**  Cross examination.

25                      CROSS EXAMINATION

FRANCISCO DOLZ - (CROSS BY MS. CASTELLON)

1  **BY MS. CASTELLON:**

2  **Q.**  Counselor, you stated that you represented Wilfredo

3  Rosario.

4  **A.**  That is correct.

5  **Q.**  And you did not submit any affidavit when you were

6  approached by counselors that are representing Mr. Rosario?

7          **MS. MIZNER:**  Objection.

8          **THE COURT:**  Well, first of all, whether he was

9  approached.

10          **MS. CASTELLON:**  Let me rephrase.

11  **BY MS. CASTELLON:**

12  **Q.**  Were you approached by Counselor Ignacio Fernandez

13  regarding asking you questions, if people and members of the

14  family were allowed into this courtroom while jury selection?

15  **A.**  I believe I talked with him about the affidavit, providing

16  an affidavit; not the contents.

17  **Q.**  I'm sorry?

18  **A.**  We didn't discuss contents.

19  **Q.**  You were asked to provide an affidavit regarding the

20  specific incident of family members not being allowed into

21  this courtroom?

22  **A.**  In the jury selection.  During the jury selection.

23  **Q.**  You were asked?

24  **A.**  I was asked.

25  **Q.**  Did you provide one?

FRANCISCO DOLZ - (CROSS BY MS. CASTELLON)

1   **A.**  No, I did not.

2   **Q.**  Why not?

3   **A.**  I didn't see it necessary.

4   **Q.**  Is it true that you discussed and I approached you

5   regarding this specific matter?

6           **MS. MIZNER:**  Objection, Your Honor.

7           **THE COURT:**  Overruled.

8           **THE WITNESS:**  I believe you asked me the reason why I

9   had not provided an affidavit, and I don't recall what I told

10  you.

11  **BY MS. CASTELLON:**

12  **Q.**  Did you -- was your answer that you did not provide one

13  because you didn't remember that incident happening?

14          **MS. MIZNER:**  Objection, Your Honor, to a conversation

15  between the attorney and the witness.

16          **MR. HERNANDEZ:**  If she wants to be a witness, she's

17  welcomed to sit down and testify.  She can't testify through

18  the testimony of another witness.

19          **MR. FERNANDEZ:**  The problem is, I would say,

20  Your Honor, it's improper impeachment.

21          **MS. CASTELLON:**  It's refreshing the recollection of

22  the witness, Your Honor.

23          **THE COURT:**  Well, that's not what the question was.

24  **BY MS. CASTELLON:**

25  **Q.**  Do you recall, does it refresh your recollection that you

FRANCISCO DOLZ - (CROSS BY MS. CASTELLON)

1  stated to this attorney that you did not provide one because

2  you did not remember that incident happening?

3  **A.**  I don't recall telling you that.  I don't recall telling

4  you that, because it would have been incorrect.  I'm fully

5  aware that the family members and the public was not allowed

6  during jury selection.

7  **Q.**  You were approached on that very same day?

8  **A.**  By who?

9  **Q.**  By the family members, that they were not being allowed to

10  go inside the courtroom?

11  **A.**  There could have been a conversation.

12  **Q.**  No, I'm asking you, were you or were you not?

13  **A.**  I don't have a clear recollection whether they approached

14  me on that subject.

15  **Q.**  Were you approached the day after?

16  **A.**  I don't recall.  I really don't recall.

17  **Q.**  You don't recall.

18      You don't recall being approached by any other relatives

19  of the Defendants regarding their being forbidden into the

20  courtroom?

21  **A.**  I don't have a clear recollection.  If they had, I would

22  have told them they were not allowed into the courtroom while

23  jury selection was going on.  That's what I would have told

24  them.

25  **Q.**  You were not going to object or do anything regarding that

FRANCISCO DOLZ - (CROSS BY MS. CASTELLON)

1  matter?

2  **A.**  No, no, no.

3  **Q.**  And it's your testimony, then, that since the year 1975

4  you have not been claiming your client's right to a jury trial

5  to be held in public?

6  **A.**  Custom and usage, nobody did that, nobody objected to

7  that.

8  **Q.**  So as an attorney, you are telling this Court that even

9  though you know that that is a Constitutional right, you have

10  not addressed that in any of the cases that you have tried?

11  **A.**  I don't think so.

12  **Q.**  Before this courtroom?

13  **A.**  I don't think so.  It's never been brought up.  I know

14  what the procedure was, standard operational procedure:

15  Public is excluded, family members are excluded, even

16  attorneys are excluded.

17      That's been going on since I started back in 1975.

18  **Q.**  Are you aware, and as an attorney, have you inquired and

19  requested where is that standard procedure for the district

20  written, if in any place?

21  **A.**  No.  No, I have not.  I never did.

22  **Q.**  And you're a member of the CJA panel?

23  **A.**  I'm a member of the CJA panel.  I was in the Federal

24  Public Defender's Office for many years, and that was the

25  standard operational procedure, the public was excluded.

FRANCISCO DOLZ - (CROSS BY MS. CASTELLON)

1  **Q.**  And this is the first time that you testify regarding a

2  similar situation, even though you've tried all those cases

3  since 1975?

4  **A.**  This is about the second time in my life I have to testify

5  in a case that was mine.

6  **Q.**  So are you aware of the First Circuit decision in Owens

7  versus United States?

8  **A.**  Of course.  Of course.

9  **Q.**  You are aware?

10  **A.**  I'm aware of it.

11  **Q.**  And you were aware that it's a decision that it's your

12  duty to make that request on the behalf of your client?

13  **A.**  If it was my duty, maybe I just let it go.

14  **Q.**  Sorry?

15  **A.**  If it was my duty, then I just let it pass.

16  **Q.**  You failed to assert your client's right?

17  **A.**  Well, it was, as I told you, standard operational

18  procedure, people were excluded, public was excluded, even

19  attorneys not related to the case were excluded, for 35 years

20  that I have been in practice.

21          **MS. CASTELLON:**  I have no further questions.

22          **THE COURT:**  Any redirect?

23          **MS. MIZNER:**  No, Your Honor.

24          **THE COURT:**  Thank you very much, Mr. Dolz.  You are

25  excused.

1          **THE WITNESS:**  Thank you.

2          **THE COURT:**  Any further evidence from the Defense?

3          **MR. FERNANDEZ:**  None, Your Honor.

4          **THE COURT:**  Ms. Castellon, Mr. Henwood, any evidence?

5          **MR. HENWOOD:**  We are going to re-call Mr. Carlos

6    Sierra.

7          **THE COURT:**  Mr. Sierra, please.

8          You have a seat, Mr. Sierra.  You remain under the

9    oath you took this morning.

10          Go ahead, Mr. Henwood.

11          **MR. HENWOOD:**  Thank you.

12                         DIRECT EXAMINATION

13   **BY MR. HENWOOD:**

14   **Q.**  Mr. Sierra, I'm just going to ask you a couple more

15   questions.

16          During that jury selection that took place on

17   January 20th, 2010, do you recall locking the door so that

18   people could not come in and out during the proceeding of jury

19   selection?

20   **A.**  No, sir.

21   **Q.**  And do you recall putting pieces of paper on the windows

22   during the jury selection so that people couldn't peer or look

23   through the windows?

24   **A.**  That's not the CSO's work.

25          **THE COURT:**  The question is whether you did it or

1   not.

2            **THE WITNESS:**  No.

3            **MR. HENWOOD:**  Nothing further, Judge.

4            **THE COURT:**  Any cross examination?

5            **MR. FERNANDEZ:**  No, Your Honor.

6            **THE COURT:**  Thank you very much, Mr. Sierra.  You are

7   excused.

8            Your first witness, Government -- or your second

9   witness.

10           **MS. CASTELLON:**  The United States will call deputy

11  United States Marshal Miguel Portalatin.

12           **THE COURT:**  Mr. Portalatin.

13           **MS. CASTELLON:**  Good afternoon, sir.

14           **THE WITNESS:**  Good afternoon.

15           **THE COURT:**  Let's swear him in, please.

16           Mr. Portalatin, will you please rise.

17           **THE CLERK:**  Raise your right hand, please.

18                          MIGUEL PORTALATIN,

19  after having first been duly sworn to state the truth, the

20  whole truth and nothing but the truth, testified as follows:

21                         DIRECT EXAMINATION

22  BY MS. CASTELLON:

23  **Q.**  Would you please state your name for the record.

24  **A.**  My name is Miguel Portalatin.

25  **Q.**  Sir, what is your occupation?

MIGUEL PORTALATIN - (DIRECT BY MS. CASTELLON)

1   **A.**   I'm a deputy U.S. Marshal in the District of Puerto Rico.

2   **Q.**   For how long have you been a deputy United States Marshal?

3   **A.**   Close to ten years.

4   **Q.**   In the year 2010 --

5          **THE COURT:**  Mr. Portalatin -- excuse me -- have you

6   been in Puerto Rico for all those 10 years?

7          **THE WITNESS:**  No, sir.  I spent two years in

8   Los Angeles, from 2004 to 2006.

9          **THE COURT:**  And then?

10         **THE WITNESS:**  And then I came back.  I started here,

11  went to Los Angeles, and came back.

12         **THE COURT:**  Thank you.  So except for those two

13  years, you have been a deputy here in Puerto Rico?

14         **THE WITNESS:**  Yes, sir.

15  **BY MS. CASTELLON:**

16  **Q.**   For those 10 years that you have been a deputy United

17  States Marshal, what are your duties?

18  **A.**   Some of my duties are to ensure the safety and security of

19  the courthouse, arrest fugitives, judicial sales,

20  extraditions.

21  **Q.**   I bring your attention to January 20, 2010.

22         Were you working as a deputy United States Marshal for the

23  District of Puerto Rico?

24  **A.**   Yes, ma'am.

25  **Q.**   Do you recall the duties that were assigned to you during

MIGUEL PORTALATIN - (DIRECT BY MS. CASTELLON)

1  that day?

2  **A.**   Yes, I was in charge of the trial here with Judge Besosa.

3  **Q.**   Do you recall the trial that was held before Judge Besosa

4  on that date?

5  **A.**   No, I don't.

6  **Q.**   Do you remember, do you recall what was the case about?

7  **A.**   Besosa's case?

8  **Q.**   Yes.

9  **A.**   It was a drug case.

10  **Q.**   Drug case.   Do you recognize the Defendants that were on

11  trial before Judge Besosa, here in this courtroom today?

12  **A.**   Yes, I do.

13  **Q.**   So you were in charge of that trial against these

14  Defendants, correct?

15  **A.**   Yes.

16  **Q.**   Do you recognize the Defendants that are here in the court

17  as all the Defendants who were on trial?

18  **A.**   Yes.

19  **Q.**   So we have five of them, correct?

20  **A.**   Yes.

21  **Q.**   Can you explain and can you be specific as to what were

22  your responsibilities as being in charge regarding that trial

23  on that date?

24  **A.**   Yes.   Basically, my responsibility is to assign the

25  personnel in the courthouse, ensure the safety and security of

1   the prisoners and everyone else in the courtroom, and follow

2   the guidelines from Judge Besosa.

3   **Q.**   When you say following the guidelines from Judge Besosa,

4   would that be then that you would follow the instructions

5   regarding the management of the case in this courtroom?

6   **A.**   Yes.

7   **Q.**   And who would be the person in charge of what's going on

8   inside this courtroom?

9   **A.**   Well, Judge Besosa would be in charge, and I will follow

10  his instructions.

11  **Q.**   You will follow his instructions.

12      Do you recall at any point during that day, January 20,

13  2010 -- and that was jury selection.  Do you recall being here

14  during jury selection, sir?

15  **A.**   Yes.

16  **Q.**   Do you recall receiving any instructions from Judge Besosa

17  regarding closing this courtroom?

18  **A.**   Not specifically from Judge Besosa.  The courtroom was

19  completely packed with the jurors, and usually if we don't

20  have space -- first of all, we didn't close the doors.  We

21  just have enough space for jurors in the courtroom.

22      I didn't get any specific instructions from Judge Besosa

23  as far as closing the door or leaving the door open.

24  **Q.**   And do you recall that you posted a marshal, not allowing

25  people to go in?

MIGUEL PORTALATIN - (DIRECT BY MS. CASTELLON)

1  **A.**  We always have marshals in the entrance of the courtroom.

2  As a matter of fact, I was one of them and then Maldonado,

3  Deputy Maldonado was the other one.

4  **Q.**  And people would go in and out of this courtroom?

5  **A.**  Yes.

6  **Q.**  Do you recall members of the jury venire leaving the

7  courtroom as they were being excused?

8  **A.**  Yes.

9  **Q.**  They would go freely?

10  **A.**  Yes.

11  **Q.**  They have -- the door had to be opened for them in order

12  to get to leave this courtroom?

13  **A.**  Yes.

14  **Q.**  Did they have to open it, it means it was locked, and

15  unlock the door?

16  **A.**  No, the door was never locked.

17  **Q.**  Was there any, at any point in time during that day, that

18  the courtroom--that the windows from this courtroom were

19  blocked --

20  **A.**  No.

21  **Q.**  -- with any type of paper?

22  **A.**  No.

23  **Q.**  That you recall?

24  **A.**  I do recall.  I do recall, because we remember -- I

25  remembered having to tell some of the people that were

1   standing outside, standing on those two little windows, which

2   disrupted the courtroom proceedings, and I know that

3   Judge Besosa doesn't like people standing by the door, so I

4   remember going outside to tell people, you know, you have to

5   move.

6   **Q.**  And do you recall that the members of the group were being

7   allowed to go in once the members of the jury were leaving,

8   people were filling the seats; do you recall that?

9   **A.**  No, I do not.

10  **Q.**  You do not recall that?

11          **THE COURT:**  Mr. Portalatin, you mentioned that

12  Deputy Maldonado was the person at the door?

13          **THE WITNESS:**  Not all the time.

14          **THE COURT:**  Okay.  Did you give any of the deputies

15  under your charge that day instructions not to let people in?

16          **THE WITNESS:**  No, I did not.

17  **BY MS. CASTELLON:**

18  **Q.**  Who will give the instructions to the court security

19  officer in this courtroom?

20  **A.**  I would or Maldonado would also.

21  **Q.**  As the deputy?

22  **A.**  Right.

23  **Q.**  Did you give any orders to the court security officer,

24  Carlos Sierra, on that date not to allow people to go in this

25  courtroom?

MIGUEL PORTALATIN - (DIRECT BY MS. CASTELLON)

1  **A.**  I never gave anyone orders to not allow anyone to come in,

2  because, like I mentioned before, we didn't have space, so I

3  didn't have to tell anybody, "Don't let anybody in," because

4  we didn't have space.

5  **Q.**  Did you give him any orders to block the glass window of

6  the door --

7  **A.**  No.

8  **Q.**  -- of this courtroom?

9  **A.**  No.

10  **Q.**  Is any court security officer posted on that back door

11  during jury selection, or it has to be a deputy marshal?

12  **A.**  The personnel in the back area of the courthouse were all

13  marshals and the DSOs.

14      The CSO would always be posted right here, close to the

15  Judge's door and the entrance and exit for the jury.

16  **Q.**  So he wouldn't be posted at the door?

17  **A.**  No.

18  **Q.**  And he wouldn't be controlling the entrance by locking or

19  unlocking, if that would be the case?

20  **A.**  No.

21  **Q.**  Would you allow it?

22  **A.**  No.

23          **MS. CASTELLON:**  I have no further questions.

24          **THE COURT:**  Cross examination.  Mr. Fernandez.

25                          CROSS EXAMINATION

MIGUEL PORTALATIN - (CROSS BY MR. FERNANDEZ)

1  **BY MR. FERNANDEZ:**

2  **Q.**  Good afternoon, sir.

3  **A.**  Good afternoon.

4  **Q.**  Sir, could you please tell me, getting back to jury

5  selection on that day, January 20, 2010, how packed was the

6  courtroom?

7  **A.**  Packed.

8  **Q.**  What do you mean "packed"?  All these seats were taken?

9  **A.**  All those seats taken.

10  **Q.**  All these seats were taken?

11  **A.**  Yes.

12  **Q.**  How about these seats?

13  **A.**  All taken.

14  **Q.**  By whom?

15  **A.**  By jury.

16  **Q.**  Do you recall seeing any family members inside the

17  courtroom during jury selection?

18  **A.**  No.

19          **MR. FERNANDEZ:**  Thank you.

20          **THE COURT:**  Any redirect, Ms. Castellon?

21          **MS. MIZNER:**  Your Honor, may I ask?

22          **THE COURT:**  Of course, yes.

23                     CROSS EXAMINATION

24  **BY MS. MIZNER:**

25  **Q.**  Good afternoon.

MIGUEL PORTALATIN - (CROSS BY MS. MIZNER)

1   **A.**   Good afternoon.

2   **Q.**   I believe you testified on direct that you at one point

3   had to tell some people to move away from the door?

4   **A.**   From the outside, yes.

5   **Q.**   And those were people who were not jurors?

6   **A.**   Yes.

7   **Q.**   And were those people who were attempting to enter the

8   courtroom?

9   **A.**   They would stand by the door to look inside.

10  **Q.**   And they were not allowed to come in --

11  **A.**   No.

12  **Q.**   -- at that time?

13          **MS. MIZNER:**   Thank you.

14          **THE COURT:**   Any further cross examination?

15          Any redirect, Ms. Castellon?

16          **MS. CASTELLON:**   No, Your Honor.

17          **THE COURT:**   Thank you very much, Mr. Portalatin.

18          **THE WITNESS:**   Thank you.

19          **THE COURT:**   You're excused.

20          Next witness, please.

21          **MS. CASTELLON:**   No further witness, Your Honor.

22          **THE COURT:**   From what we spoke during the sidebar, I

23  believe that the next order of business would be for me to

24  enter some findings of fact and remit those findings of fact

25  along with the transcript to the First Circuit Court of

1   Appeals.  Am I correct?

2           **MR. FERNANDEZ:**  Yes, Your Honor.

3           **THE COURT:**  Is there anything else that we have to do

4   today?  Ms. Mizner.

5           **MS. MIZNER:**  No, Your Honor.  I have one question,

6   though.  Would the Court like proposed findings of facts from

7   the parties?

8           **THE COURT:**  That would be nice, yes.  I would

9   appreciate that.

10          **MS. MIZNER:**  After we get the transcript.

11          **THE COURT:**  Of course.  I would appreciate that.

12          Ms. Castellon, Mr. Henwood, proposed findings of fact,

13  let's say 15 days once you receive the transcript?  Okay?

14          All right.  Thank you very much.

15          **MS. CASTELLON:**  Your Honor, if we receive the

16  transcript during the last week of July, can we request AN

17  additional time, because we are going to be --

18          **THE COURT:**  You are going to be on trial?

19          **MS. CASTELLON:**  No, we are going to be taking some

20  time off, that's going to be the first, and we are going to be

21  away from the office for the last two weeks of July.

22          **THE COURT:**  I'll tell you what, let's have those

23  findings of fact by August 15.  Okay?

24          Mr. Fernandez.

25          **MR. FERNANDEZ:**  Yes, another thing, Your Honor.

1   Would it be all right if the Defendants remain here in

2   San Juan until all the matters are disposed of, until all the

3   findings of fact are filed and Your Honor is able to send a

4   complete record up to the Court of Appeals?

5         **MS. CASTELLON:**  I have to object, Your Honor.  I

6   understand they are under the custody of the Bureau of

7   Prisons.

8         **THE COURT:**  They are under the custody of the Bureau

9   of Prisons.  Let me find out about that.  I'll get back to you

10   on that, please.

11         They didn't participate in the proceedings.

12         **MS. CASTELLON:**  There would be no additional

13   testimony regarding this matter.  It's submitted to the Court,

14   to the determination of the Court.  I don't see any need for

15   them to be here.

16         **THE COURT:**  This is something new for me.  So let me

17   discuss this with the marshals and the Bureau of Prisons, and

18   I'll let you know by the beginning of next week.

19         **MR. FERNANDEZ:**  My point is -- I understand my

20   sister's point and it's certainly well taken, but certainly,

21   since they are here, they can certainly help, at least my

22   client can help me with the appeal also.

23         I mean, since they are here already, you know --

24         **THE COURT:**  I understand your point.

25         **MR. FERNANDEZ:**  Why don't just leave them 30 days or

```
 1  45 days.

 2          THE COURT:  I understand your point, but that's not

 3  the proper -- you know, that's not -- now that you're talking

 4  about the procedure of the District.  But I will get back to

 5  you on that.

 6          MR. FERNANDEZ:  Thank you, Your Honor.

 7          MS. MIZNER:  Your Honor, is the Court going to order

 8  the transcript?

 9          THE COURT:  Yes.  Yes.

10          What I would suggest is that one attorney order it for

11  CJA purposes, and then you can make the appropriate copies for

12  the rest of them, the rest of you.  Okay?

13          MS. MIZNER:  Thank you, Your Honor.

14          THE COURT:  That's what we did during the trial, in

15  any event.

16          Thank you very much.

17          (Whereupon this hearing was concluded.)

18

19

20

21

22

23

24

25
```

1                          REPORTER'S CERTIFICATE

2

3           I, ZULMA M. RUIZ, Official Court Reporter for the

4   United States District Court for the District of Puerto Rico,

5   appointed pursuant to the provisions of Title 28, United States

6   Code, Section 753, do hereby certify that the foregoing is a

7   true and correct computer-aided transcript of proceedings had

8   in the within-entitled and numbered cause on the date herein

9   set forth; and I do further certify that the foregoing

10  transcript has been prepared by me or under my direction.

11

12

13

14

15

16
                                  S/Zulma M. Ruiz
17                        _____

18                          Official Court Reporter

19

20

21

22

23

24

25